**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>INTEGRATED HEALTH SERVICES, INC., <u>et al.</u>,<br><br><br>               Debtors. | Chapter 11<br><br>Case No. 00-389 (MFW)<br><br>(Jointly Administered) |
| INDEMNITY INSURANCE COMPANY OF NORTH AMERICA,<br>             Plaintiff,<br>       v.<br>INTEGRATED HEALTH SERVICES, INC. and ABE BRIARWOOD CORP.,<br>             Defendants. | C.A. No. 04-1262 (GMS) |

**MOTION OF IHS LIQUIDATING LLC TO INTERVENE AND RESPONSE**
**TO THE MOTION OF INDEMNITY INSURANCE COMPANY**
**OF NORTH AMERICA TO AMEND THE COMPLAINT**

       IHS Liquidating LLC ("Liquidating LLC"), by its attorneys, hereby (i) moves this Court (the "Motion") for an order pursuant to Federal Rule of Civil Procedure 24, permitting it to intervene in this action for certain limited purposes, and (ii) submits this response to the *Motion to Amend the Complaint* filed by plaintiff Indemnity Insurance Company of North America ("IICNA") on April 18, 2005 [Docket No. 15] (the "Motion to Amend"). In support of the Motion, and in response to the Motion to Amend, the Liquidating LLC represents as follows:

**PRELIMINARY STATEMENT**

       1.     The Liquidating LLC seeks to intervene for the limited purposes of (i) opposing the Motion to Amend, and (ii) in the event that the Motion to Amend is granted, requesting that this Court refer IICNA's new cause of action contained in the Proposed 1999 Count (as herein

defined) to the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), where the same issue has been raised in a separate pending adversary proceeding commenced by the Liquidating LLC (the "1999 Policy Proceeding"). As explained below, not only is the Proposed 1999 Count completely unrelated to the matters currently at issue in this action, but the Proposed 1999 Count seeks relief in which the current defendants have no interest. The real party in interest, the Liquidating LLC, has been omitted as a defendant for the obvious reason that IICNA hopes to avoid the automatic reference of the Proposed 1999 Count to the Bankruptcy Court. For these reasons, the Motion to Amend should be denied.

2.      If the Motion to Amend is granted, the Liquidating LLC requests that it be permitted to intervene in order to request that the Proposed 1999 Count be severed from the instant action and referred back to the Bankruptcy Court, to be heard together with the 1999 Policy Proceeding. As IICNA is aware, the Proposed 1999 Count implicates issues that are critical to the implementation of the Plan (as herein defined) and the administration of the Debtors' bankruptcy cases. For these reasons, the Liquidating LLC would likely prevail in seeking referral of the Proposed 1999 Count to the Bankruptcy Court. In the interest of judicial economy, the Court should deny the Motion to Amend and allow the parties to litigate the merits of the Proposed 1999 Count in the adversary proceeding that is already pending before the Bankruptcy Court.

## RELEVANT BACKGROUND

### A.    The Debtors' Chapter 11 Cases

3.      On February 2, 2000 (the "Filing Date"), Integrated Health Services, Inc. ("IHS") and a number of its direct and indirect subsidiaries (collectively with IHS, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2

4.      The Debtors operated through three principal business segments, one of which was the operation of skilled nursing and subacute care facilities. As of the Filing Date, the Debtors operated 377 facilities, with a total of approximately 42,000 licensed beds. In such facilities, the Debtors provided a wide range of basic medical and subacute care services for the patients in their care.

5.      Because of the nature of the long term care industry and the sheer magnitude of the Debtors' operations, the Debtors maintained certain programs and practices to manage their exposure to liability claims asserted against the Debtors in the operation of their businesses. The Debtors' practices included, *inter alia*, the procurement of insurance policies for liabilities including, *inter alia*, professional and general liability claims ("PL/GL Claims").

**B.      The Plan, the SPA, the Liquidating LLC and the Treatment of PL/GL Claims**

6.      By order dated May 12, 2003 (the "Confirmation Order"),[1] the Bankruptcy Court confirmed the *Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and its Subsidiaries under Chapter 11 of the Bankruptcy Code*, dated March 13, 2003 (as amended, modified or supplemented, including by the Confirmation Order, the "Plan").[2] The Plan became effective on September 9, 2003 (the "Effective Date").

7.      The cornerstone of the Plan was the consummation of a stock purchase agreement (the "SPA") between IHS and Abe Briarwood Corp. ("Briarwood"). Both the SPA and the Plan contemplated the formation by IHS of two new wholly-owned subsidiaries named IHS Long Term Care, Inc. (the "LTC Subsidiary") and IHS Therapy Care, Inc. (the "Therapy Subsidiary" and, together with the LTC Subsidiary, the "Purchased Subsidiaries"). *See* Plan at §5.9(b); SPA at p.1.

---

[1]     A copy of the Confirmation Order (without exhibits) is annexed hereto as Exhibit "A".

[2]     A copy of the Plan is annexed hereto as Exhibit "B".

3

Section 5.9(b) of the Plan provided for the implementation of the SPA, including the provision that IHS will "contribute and assign" to either the LTC Subsidiary or the Therapy Subsidiary, as the case may be, all of IHS' assets and liabilities other than the Excluded Assets and the Excluded Liabilities. *Id.*

        8.    The Bankruptcy Court specifically authorized IHS to assign these assets and liabilities pursuant to the Confirmation Order, which states, in relevant part:

> Simultaneously with the Closing, IHS shall be authorized to (i) **contribute and assign** to the LTC Subsidiary all of its assets and liabilities not described in clause (ii) below, including without limitation the capital stock of all of the Subsidiaries (as defined in the Sale Agreement) that conduct IHS's long-term care business **and any and all past, current and future PLGL Claims arising after the Commencement Date**, but excluding the Excluded Assets and the Excluded Liabilities, and (ii) contribute and assign to the Therapy Subsidiary all of its assets and liabilities that relate to IHS's contract rehabilitation therapy business and mobile x-ray services business, including without limitation the capital stock of all of the Subsidiaries that conduct IHS's contract rehabilitation therapy business, but in each case excluding the Excluded Assets and the Excluded Liabilities.

*See* Confirmation Order at ¶37 (emphasis added).

        9.    Effective as of August 31, 2002, in accordance with the SPA, the Plan and the Confirmation Order, IHS contributed and assigned to the LTC Subsidiary all of its assets and liabilities that related to IHS' long-term care business, other than "Excluded Assets" and "Excluded Liabilities" (each as defined under the SPA) and contributed and assigned to the Therapy Subsidiary all of its assets and liabilities that related to IHS' contract rehabilitation therapy business, again other than Excluded Assets and Excluded Liabilities.

        10.    At the closing under the SPA, Briarwood purchased from IHS all of the outstanding shares of the Purchased Subsidiaries for a cash purchase price of approximately $110

million, subject to certain adjustments and the establishment of certain escrows. As a result, the LTC Subsidiary, owned by Briarwood post-closing, is liable for all liabilities of IHS in respect of PL/GL Claims arising from and after the Filing Date, and the Reorganized Debtors, indirectly owned by Briarwood through the LTC Subsidiary, remain liable for PL/GL Claims against them arising from and after the Filing Date.

11.     In addition to the implementation of the SPA, the Plan contemplated the formation of the proposed intervenor, Liquidating LLC, a Delaware limited liability company, for the purpose of implementing certain aspects of the Plan after the Effective Date. In accordance with section 5.9 of the Plan, upon the closing under the SPA, the then-remaining assets and liabilities of IHS, consisting of the net proceeds of the SPA, the Excluded Assets and the Excluded Liabilities, were transferred to the Liquidating LLC. As a result of the consummation of the transactions contemplated by the Plan, IHS was left with no assets or liabilities.

12.     Among other things, the Liquidating LLC is charged with responsibility for the administration of disputed prepetition claims against the Debtors, including, without limitation, PL/GL Claims arising *prior* to the Filing Date.

13.     Under the Plan, a special and distinct class was established for PL/GL Claims arising during the calendar year 1999 ("1999 Insured Tort Claims"), because the Debtors' professional/general liability ("PL/GL") insurance coverage for claim arising in 1999 presented a number of unique and complex issues requiring an equitable resolution under the Plan, as discussed in greater detail below.

## C.     The Reliance Liquidation and Treatment of 1999 Insured Tort Claims Under the Plan

14.     The Debtors' primary PL/GL insurance carrier for 1999 was Reliance Insurance Company ("Reliance"). The policy issued by Reliance (the "Reliance Policy") is a

matching deductible insurance policy. In the view of IHS (and, since the Effective Date, the Liquidating LLC), the Reliance Policy provides coverage of $2,000,000 per incident for professional liability claims and $1,000,000 per incident for general liability claims, with an aggregate coverage limit of $9,000,000. Under the Reliance Policy, IHS is subject to deductibles in the same amounts as the coverage limits.

15.     On October 3, 2001, the Commonwealth Court of Pennsylvania declared Reliance insolvent and entered an Order of liquidation (the "Liquidation Order"). M. Diane Koken, Insurance Commissioner of the Commonwealth of Pennsylvania, was named as the Reliance Liquidator.

16.     On or about September 20, 2002, IHS filed a litigation against Reliance (the "Reliance Action") to resolve certain disputes between the Reliance Liquidator and the Debtors with respect to the Reliance Policy. In the Reliance Action, IHS seeks, among other things, a declaration that the Reliance Policy provides total coverage of $9,000,000. The Reliance Liquidator maintains that the aggregate policy limit is only $4,500,000. The Liquidating LLC (as successor to IHS in the litigation) and the Reliance Liquidator agree that the aggregate limits of the Reliance Policy have been exhausted, whether those limits are $4.5 million or $9 million, by judgments entered against the Debtors and settlements made by the Debtors totaling substantially in excess of $9 million.

17.     Since the Liquidation Order was entered, the Reliance Liquidator has not paid any claims or defense costs covered by the Reliance Policy. Once the litigation between IHS and Reliance is resolved, the Liquidating LLC will have a claim against the Reliance liquidation estate for any part of the coverage that was not exhausted prior to the Reliance liquidation. The value of the claim cannot be determined until both the allowed amount of the claim and the likely percentage recovery of creditors is determined.

6

18.     As a result of Reliance's liquidation proceeding, it became obvious that in the absence of a resolution among the holders of 1999 Insured Tort Claims, there was a risk that certain holders of 1999 Insured Tort Claims whose claims were liquidated within the Reliance coverage limits would be partially or completely deprived of access to insurance proceeds, while other holders would have access to the full benefit of coverage under the excess policies. In order to address this problem, the Debtors established a special class under the Plan for holders of 1999 Insured Tort Claims.

19.     The Plan provides that each holder of an allowed 1999 Insured Tort Claim shall be entitled to receive its *pro rata* share of the aggregate sum of (i) the proceeds recovered at any given time under the Debtors' insurance policies, including excess insurance policies, in respect of allowed 1999 Insured Tort Claims, after payment of defense costs payable under the policies ("Available 1999 Insurance Proceeds"); and (ii) 3% of the difference between the Available 1999 Insurance Proceeds and the total amount of allowed 1999 Insured Tort Claims.

20.     In order for the Liquidating LLC to implement distributions to the holders of allowed 1999 Insured Tort Claims, the Plan further provides for the formation of an escrow account (the "1999 Insured Tort Claims Escrow"), to be established on the Effective Date and administered by the Liquidating LLC. Pursuant to the Plan, as each 1999 Insured Tort Claim is resolved, the insurance proceeds that would otherwise be paid directly to the claimant must be paid to the Liquidating LLC for deposit into the 1999 Insured Tort Claims Escrow, so that the Liquidating LLC may make pro rata interim and final distributions as provided in the Plan.

**D.     The Debtors' Coverage Dispute With National Union for 1999 Insured Tort Claims**

21.     National Union Fire Insurance Company of Pittsburgh ("National Union") issued an excess insurance policy providing both professional liability and general liability coverage

for IHS for the policy period January 1, 1999 through January 1, 2000 (the "National Union Policy"). The National Union Policy provides the first layer of $25 million per occurrence/aggregate in excess in the Reliance Policy.

22.    Shortly before the Plan was confirmed, National Union took the position that the Debtors could not look to National Union for any professional liability insurance coverage until the $9 million primary layer of coverage was exhausted by the actual cash payment of $9 million in claims and expenses.  Because both IHS and Reliance were in insolvency proceedings, it was unlikely that IHS would ever actually pay the $9 million obligation in full.  The position taken by National Union therefore amounted to a complete denial of coverage.

23.    On March 26, 2003, IHS filed an adversary proceeding in the Bankruptcy Court styled *Integrated Health Services, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA*, adv. proc. no. 03-52081, in an effort to enforce coverage under the National Union Policy (the "National Union Adversary Proceeding").  By order dated October 23, 2003 (the "Summary Judgment Order"), the Bankruptcy Court entered partial summary judgment in favor of IHS. The Summary Judgment Order held, *inter alia*, that coverage under the National Union Policy was triggered upon IHS becoming liable for 1999 Insured Tort Claims and related defense costs in excess of $9 million, whether by settlement or judgment, regardless of whether IHS or Reliance paid such claims and expenses in cash.

24.    The 1999 Insured Tort Claims that have to date been liquidated in amount by judgments or settlement agreements constituting binding legal obligations aggregate to an amount in excess of the limits of the Reliance Policy and the National Union Policy.  In accordance with the Plan, National Union has made payments to the Liquidating LLC for 1999 Insured Tort Claims within National Union's layer of coverage.

E.    **The 1999 GenStar Policy**

25.    General Star Indemnity Company ("GenStar") issued an excess insurance policy providing both professional liability and general liability coverage for IHS for the policy period January 1, 1999 through January 1, 2000 (the "GenStar Policy"). The GenStar Policy provides the second layer of $25 million per occurrence/aggregate in excess of the Reliance Policy and National Union Policy.

26.    Once the National Union coverage limits were reached, GenStar, without any objection, acted in conformance with the Bankruptcy Court's directive in the National Union Adversary Proceeding and assumed the administration and defense of the remaining 1999 Insured Tort Claims. GenStar has reportedly entered into settlements on behalf of IHS and/or obligated itself to satisfy judgments against IHS that will soon exhaust the $25 million limit of the GenStar Policy. In accordance with the Plan, and consistent with the Bankruptcy Court's ruling in the National Union litigation, GenStar has made payments to the Liquidating LLC for 1999 Insured Tort Claims within GenStar's layer of coverage.

F.    **The IICNA 1999 Policy**

27.    The third layer of insurance coverage in excess of the Reliance Policy, the National Union Policy and the GenStar Policy consists of insurance issued by IICNA, pursuant to that certain Excess Liability Catastrophe Policy, No. XLX G19545507 (the "1999 IICNA Policy"), a copy of which is annexed hereto as Exhibit "C".[3]    The 1999 IICNA Policy provides excess

---

[3]    The Motion to Amend and the proposed amended complaint attached thereto refer to a different policy number. However, counsel for IICNA has since informed the Liquidating LLC's counsel that the policy number was changed in 1999, for reasons not yet determined.

coverage for 1999 Insured Tort Claims of $50 million per occurrence and $50 million in the aggregate in excess of underlying insurance limits.

28.    Upon information and belief, the aggregate amount of Allowed 1999 Insured Tort Claims will exceed the limits under the GenStar policy, and as a result, some portion of the excess coverage provided by the 1999 IICNA Policy will be payable. As confirmed by the express language of Sections IV.C and IV.I(2) of the 1999 IICNA Policy, the insolvency and bankruptcy of IHS do not relieve IICNA of its obligations under the 1999 IICNA Policy.

29.    Section I of the 1999 IICNA Policy defines the coverage obligation of IICNA as follows:

A.    COVERAGE

WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.

30.    The 1999 IICNA Policy defines "Ultimate Net Loss" as "the amount paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages." The 1999 IICNA Policy further provides that "[d]efense expense payments shall be included within the ULTIMATE NET LOSS, provided that such expenses are included within the terms, conditions, and limits of insurance of any UNDERLYING INSURANCE."

31.    Similar to the National Union policy, the 1999 IICNA Policy expressly provides that the bankruptcy or insolvency of IHS, or of IHS's underlying insurance carrier, will not relieve IICNA of any obligation to pay a covered claim. Section IV.C states, in relevant part, that "[b]ankruptcy and insolvency of YOU, or YOUR estate will not relieve US of OUR obligations under this policy." Additionally, Section IV.I(2) provides, in relevant part, that if any limits of liability of underlying insurance are "unavailable due to bankruptcy or insolvency of an underlying insurer . . . then the insurance afforded by this policy shall apply in the same manner as if such underlying insurance and limits of liability had been in effect, available, so maintained and unchanged."

## G.    The 2000 IICNA Policy, the IICNA Complaint and the Motion to Amend

32.    Separate and apart from the 1999 IICNA Policy, IICNA also provided the Debtors with insurance coverage for claims arising during the year 2000. That insurance is provided pursuant to that certain Excess Liability Catastrophe Policy, No. XLXG20108034. (the "2000 IICNA Policy"). After confirmation but prior to the consummation of the SPA, Briarwood filed a motion in the Bankruptcy Court seeking certain relief against IHS, and requesting a declaration from the Bankruptcy Court that the IICNA 2000 Policy, which primarily covered PL/GL Claims arising after the Filing Date, would be in full force and effect upon consummation of the SPA. Upon information and belief, in the interest of administrative convenience, Briarwood and IICNA subsequently agreed to litigate that issue in a separate adversary proceeding.

33.    Accordingly, on August 15, 2003, IICNA commenced the instant action as an adversary proceeding in the Bankruptcy Court, naming Briarwood and IHS as defendants. The complaint (the "IICNA Complaint") seeks a declaratory judgment that (i) Briarwood and the Purchased Subsidiaries are not insureds under the 2000 IICNA Policy, (ii) in the alternative, that

11

Briarwood and the Purchased Subsidiaries are subject to the same obligations as the named insureds under the 2000 IICNA Policy, and (iii) that IICNA is entitled to defend and settle the PL/GL Claims covered by the 2000 IICNA Policy under a complete reservation of rights.

34.    At the time the IICNA Complaint was filed, the Plan had not become effective, the SPA had not been consummated, and the Liquidating LLC had not yet come into existence. Less than one month later, as a result of the consummation of the Plan, IHS was divested of all of its assets and liabilities, and Briarwood assumed defense of this action.

35.    On September 3, 2004, IICNA filed a motion pursuant to 28 U.S.C. §157(d) to withdraw the automatic reference of this proceeding to the Bankruptcy Court. The motion was unopposed, and by Order dated December 2, 2004, this Court withdrew the reference.

36.    On April 18, 2005, IICNA filed the Motion to Amend, seeking, among other things, to add a claim for declaratory relief relating to the 1999 IICNA Policy (the "Proposed 1999 Count"). Specifically, the Proposed 1999 Count seeks a declaration that unless and until the underlying limits of the Reliance Policy, the National Union Policy and the GenStar Policy have been exhausted by the actual *payment* of claims against IHS during the policy period, IICNA owes no duty under the 1999 IICNA Policy to indemnify and defend the Debtors' estates against 1999 Insured Tort Claims or any other claims occurring within the policy period. In other words, notwithstanding the Plan's contemplation that the proceeds of the insurance policies covering 1999 Insured Tort Claims are to be paid to the Liquidating LLC for pro rata distribution to creditors, *and* notwithstanding the Bankruptcy Court's coverage determination in the National Union Adversary Proceeding, IICNA belatedly seeks a ruling -- not from the Bankruptcy Court, which is already familiar with the underlying issues, but from this Court -- that as a result of the bankruptcy of the Debtors and the liquidation of Reliance, IICNA will *never* have any obligation to defend the Debtors'

12

estates against 1999 Insured Tort Claims and/or contribute funds to the 1999 Insured Tort Claims Escrow.

37.    On May 6, 2005, the Liquidating LLC commenced an adversary proceeding in the Bankruptcy Court styled *Integrated Health Services, Inc. v. Ace Insurance Company, f/k/a Indemnity Insurance Co. of North America, Inc.*, Adv. Proc. No. 05-51318, by which it seeks declaratory relief to enforce coverage under the 1999 IICNA Policy (the "1999 Policy Proceeding").

## RELIEF REQUESTED

38.    By this Motion, the Liquidating LLC seeks to intervene in this action for the limited purposes of (i) opposing the Motion to Amend, insofar as it seeks to add the Proposed 1999 Count, and (ii) in the event the Motion to Amend is granted, filing a subsequent motion requesting that the Proposed 1999 Count be severed from this action and referred to the Bankruptcy Court. As explained below, the Liquidating LLC is the real party in interest with respect to the Proposed 1999 Count and should be permitted to defend the interests of Debtors' estates and the holders of 1999 Insured Tort Claims in avoiding the unnecessary and inappropriate addition of Proposed 1999 Count to this totally unrelated proceeding.

39.    It is obvious that the Motion to Amend is an attempt at an end run around the Standing Order of this Court, which would have automatically referred the Proposed 1999 Count to the Bankruptcy Court had it been filed as a separate action. The Proposed 1999 Count (i) has nothing whatsoever to do with the pending dispute between IICNA and Briarwood involving the 2000 IICNA Policy, (ii) seeks relief in which neither Briarwood nor IHS is a real party in interest, (iii) involves the very same issues as the 1999 Policy Proceeding pending before the Bankruptcy Court, (iv) involves facts and legal issues substantially similar to issues that the Bankruptcy Court

13

already ruled upon in the National Union Adversary Proceeding, and (v) arises out of and is related to the Debtors' chapter 11 cases. Accordingly, the Court should deny the Motion to Amend.

## I.    The Court Should Permit the Liquidating LLC to Intervene in This Action

40.    As a threshold matter, the Federal Rules of Civil Procedure require the Court to permit the Liquidating LLC to intervene in this action as a matter of right. Rule 24(a) provides, in relevant part, that "anyone shall be permitted to intervene in an action... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless that applicant's interest is adequately represented by existing parties." Fed. R. Civ. P. 24(a).

41.    The Third Circuit has held that intervention is proper as of right where there exists (1) a timely application for leave to intervene; (2) a sufficient interest in the litigation; (3) a threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action; and (4) inadequate representation of the prospective intervener's interest by existing parties to the litigation. *Kleissler v. Ridgway Area Schl. Dist.*, 157 F.3d 964, 969 (3d Cir. 1998).

42.    The Liquidating LLC's request to intervene is timely. Until the Motion to Amend was filed, the action did not assert relief that would require the Liquidating LLC to intervene. Moreover, IICNA should not be surprised by the instant Motion. Before the Motion to Amend was filed, the Liquidating LLC informed IICNA's counsel that it was the real party in interest and that the Proposed 1999 Count, having nothing to do with the instant action and in fact raising issues critical to the implementation of the Plan, should be initiated in a separate adversary proceeding before the

14

Bankruptcy Court.[4]  After the Motion to Amend was filed, counsel for IICNA agreed to extend the

response deadline to today's date.  Hence, there should be no dispute that the Motion is timely.

43.    Moreover, there can be no doubt that the Liquidating LLC has a sufficient

interest in the Motion to Amend, which if granted will force the Liquidating LLC to appear in this

action and defend against a claim that is already the subject of a separate adversary proceeding before

the Bankruptcy Court.  The Plan specifically contemplates the payment of insurance proceeds from

the 1999 IICNA Policy to the Liquidating LLC and the distribution of those and other funds to the

holders of Allowed 1999 Insured Tort Claims.  The purpose of this distribution scheme was to enable

all claimants to share ratably in available insurance proceeds from the National Union Policy, the

GenStar Policy and the 1999 IICNA Policy, based upon the common understanding that as a result

of the Reliance liquidation, it would never pay in full the claims exhausted within the Reliance

coverage limits.  By operation of the Plan, the Liquidating LLC is the party responsible for defending

the rights of the holders of 1999 Insured Tort Claims to receive their fair share of the 1999 IICNA

Policy proceeds.  The Bankruptcy Court is the appropriate forum for the adjudication of the

substantive issues relevant to the Proposed 1999 Count.

44.    Unless intervention is granted, there is no party in this action that will represent

the interests of the Liquidating LLC in opposing the Motion to Amend.  Defendant IHS is a mere shell

company with no assets, and its responsibilities to the holders of 1999 Insured Tort Claims were

transferred to the Liquidating LLC by operation of the Plan.   Defendant Briarwood has no

responsibility for 1999 Insured Tort Claims and is solely interested in the outcome of the existing

---

[4]     Annexed hereto as Exhibit "D" is a copy of the email exchange between counsel for the
Liquidating LLC (Ana Alfonso) and IICNA (Marc Casarino), wherein the Liquidating
LLC's counsel advised IICNA's counsel of the reasons why it would oppose the Motion
to Amend and seek to have the matter referred to the Bankruptcy Court.

claim relating to the 2000 IICNA Policy. Neither of the defendants have any interest in the merits of the Proposed 1999 Count, let alone the addition of that claim into this action. Thus, the Liquidating LLC submits that the Court should permit intervention as a matter of right.

45.     Moreover, even if the Court is not required to permit the Liquidating LLC to intervene pursuant to Rule 24(a), the Court can and should exercise its discretionary authority to permit intervention in this instance. Federal Rule of Civil Procedure 24(b) states in pertinent part that "anyone may be permitted to intervene in an action. . . .when an applicant's claim or defense and the main action have a question of law or fact in common."

46.     This Court has held that its central consideration for the exercise of such discretion is whether allowing intervention will cause delay or prejudice. *Bell Atlantic-Delaware, Inc. v. Global Naps South, Inc.*, 77 F.Supp.2d 492, 502 (D.Del. 1999) (permitting intervention by long-distance telecommunications carrier in dispute over agreement between local exchange carriers where its interests would be affected by the legal issues resolved in the case, it filed its motion and briefing in a timely fashion, and its intervention would not cause prejudice to the parties). As noted above, the Liquidating LLC's request is timely and will in no way prejudice the parties. Rather, the interests at stake belong exclusively to parties not named in this action, who will be prejudiced if the Court declines to permit the Liquidating LLC to intervene and defend their interests.

47.     Courts in the Third Circuit routinely permit interventions on Rule 24(b) grounds, particularly where, as here, the intervening party's involvement in the action would be limited. *See e.g., In re Cendant Corp. Securities Litig.*, 109 F.Supp.2d 273, 276, 279 (D.N.J. 2000) (permitting intervention by derivative action plaintiff in securities fraud suit for purpose of objecting to settlement agreement); *Borkowski v. Fraternal Order of Police, Phil. Lodge No. 5*, 155 F.R.D. 105, 111 (E.D.Pa. 1994) (permitting 50 percent shareholder in corporation to intervene in suit initiated by

other 50 percent shareholder for limited purpose of seeking dismissal of the action); *Nat'l Labor Relations Bd. v. Frazier*, 144 F.R.D. 650, 656 (D.N.J. 1992) (permitting union to intervene in subpoena enforcement action to determine who would have to pay for witness transportation costs where questions arose from a common set of facts and law). The Liquidating LLC hopes that it will prevail in opposing the Motion to Amend, in which case it would no longer need to participate in this action.

48.     In light of all relevant considerations, the interests of justice weigh in favor of permitting the Liquidating LLC to intervene and oppose the Motion to Amend.

## II.     The Motion to Amend Should be Denied

49.     IICNA does not have the unfettered right to amend its complaint at this stage of the action. After an answer has been filed, a plaintiff may amend its complaint only with leave of court or the written consent of the opposing party. *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir.1993); Fed. R. Civ. P. 15(a). The court may deny a motion for leave to amend a complaint based on bad faith, dilatory motive, undue delay, or futility. *Id.* at 1414-15 (affirming lower court's denial of motion to amend where two-year delay by holder of convertible debentures was unreasonable and additional facts would not "breathe life into her RICO claim.").

50.     IICNA is well aware of the fact that the Proposed 1999 Count requests relief that is completely different from and unrelated to the subject matter currently before the Court, that neither Briarwood nor IHS has a real interest in the outcome of the Proposed 1999 Count, and that the Liquidating LLC is the entity responsible for defending the interests of the Debtors' estates against such a claim. Indeed, the Liquidating LLC's counsel pointed out these facts to IICNA's counsel before IICNA filed the Motion to Amend. *See* Exhibit D (email from Ana Alfonso dated April 15, 2005).

17

51.    IICNA obviously knew that naming the Liquidating LLC as a defendant would require the commencement of a new adversary proceeding in the Bankruptcy Court, which entered summary judgment in the National Union Adversary Proceeding in a manner unfavorable to IICNA's position with respect the Proposed 1999 Count.[5]    In order to gain a strategic advantage against a referral of the Proposed 1999 Count to the Bankruptcy Court, IICNA chose not to file suit directly against the Liquidating LLC, but instead chose to file a knowingly deficient motion seeking to introduce  the Proposed 1999 Count into the current action -- which was  withdrawn from the Bankruptcy Court without protest from Briarwood and before the Liquidating LLC had an opportunity to be heard. IICNA's deliberate attempt to initiate this proceeding without naming the Liquidating LLC as a necessary party was improper and should act as a bar to its Motion to Amend.

52.    Moreover, the Motion to Amend should be denied for the further reason that granting IICNA leave to amend would be futile. The issues to be decided in the Proposed 1999 Count are  the very same issues pending before the Bankruptcy Court in the 1999 Policy Proceeding. Thus, if the Proposed 1999 Count were filed, it would likely be referred to the Bankruptcy Court because of the Proposed 1999 Count's fundamental relationship to the Debtors' bankruptcy cases.  Under these circumstances, permitting IICNA to also assert the Proposed 1999 Count in the instant action would serve no legitimate purpose.

53.    ˙ As the Court is aware, section 157 of the United States Judicial Code authorizes federal district courts to refer to the Bankruptcy Court "any or all proceedings arising under

---

[5]    IICNA attempts in its amended complaint to characterize the Proposed 1999 Count as substantively dissimilar to the matter decided by the Bankruptcy Court in the National Union Adversary Proceeding.  However, the proposed amended complaint conveniently omits critical provisions in the 1999 IICNA Policy that are analogous to terms in the National Union Policy upon which the Bankruptcy Court based its summary judgment decision.

title 11, or arising in or related to a case under title 11." This Court's Standing Order of Reference, dated July 23, 1984, as reinstated effective October 6, 2001, provides for the automatic referral to the Bankruptcy Court of proceedings arising under title 11, or arising in or related to a case under title 11. *See, e.g., In re: Big V. Holding Corp. v. C&S Wholesale Grocers, Inc.*, 2002 U.S. Dist. LEXIS 12609, at *1 (D. Del. 2002) (a copy of which is attached hereto as Exhibit E); *Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1234 (3d Cir. 1994).

54.    Because the availability of proceeds from the 1999 IICNA Policy is a critical element of the Plan's unique distribution scheme for the holders of Allowed 1999 Insured Tort Claims, which could only be implemented in the context of a bankruptcy case, the adjudication of that issue is a "core" proceeding over which can and should be heard and determined by the Bankruptcy Court. 28 U.S.C. § 157(b)(2) (core matters include "matters concerning the administration of the estate").

55.    The Proposed 1999 Count plainly concerns the administration of the Debtors' estates, for which the Liquidating LLC is the representative. The Liquidating LLC was formed as an integral part of the Plan and charged with responsibility for procuring, maintaining and distributing insurance proceeds to the holders of Allowed 1999 Insured Tort Claims on a pro rata basis. The Plan specifically provides that the Liquidating Manager of the Liquidating LLC is responsible for "carrying out the implementation of the Plan," which contemplates the Liquidating LLC's receipt and distribution of proceeds from the 1999 IICNA Policy. The Proposed 1999 Count, which challenges its obligation to make payments under the 1999 Policy, directly threatens the administration of the Plan. Thus, the Liquidating LLC believes that the Proposed 1999 Count is a core matter that should be referred to the Bankruptcy Court.

56.    At a minimum, the Bankruptcy Court has "related to" jurisdiction over the Proposed 1999 Count, within the meaning of section 157(c)(1) of the Judicial Code. 28 U.S.C. §157(c)(1) (authorizing bankruptcy courts to "hear a proceeding that is not a core proceeding but is otherwise related to" a bankruptcy case). A proceeding is related to a bankruptcy case if it "could conceivably have any effect on the estate being administered in bankruptcy such that it is possible that [the] proceeding may impact on the debtor's rights liabilities, options, or freedom from action or the handling and administration of the bankrupt estate." *Copelin v. Spirco, Inc.*, 182 F.3d 174, 179 (3d Cir. 1999) (internal quotes and citations omitted); *Halper v. Halper*, 164 F.3d 830, 837 (3d Cir. 1999).

57.    Considerations of judicial economy weigh squarely in favor of referral of the Proposed 1999 Count to the Bankruptcy Court. Judge Walrath, who has presided over the Debtors' bankruptcy cases for more than five years, is intimately familiar with the case and the complex transactions and distribution procedures contemplated by the Plan. *Kaiser Aluminum & Chemical Corp. v. Monument Select Insurance Corp.*, 2004 U.S. Dist. LEXIS 19868 (D. Del. September 30, 2004) (a copy of which is attached hereto as Exhibit F) (granting motion for referral to the bankruptcy court because it had presided over a similar related aspect of the case and the outcome would affect the amount of money available in the debtor's estate). *See also In re: Big V. Holdings*, 2002 U.S. Dist. LEXIS 12609, *5, *13 ("The Bankruptcy Court is intimately familiar with the numerous complex issues surrounding the [the action]," and had ruled on a separate but interrelated adversary proceeding in the action).

58.    In sum, the Proposed 1999 Count does not belong in this action, is duplicative of the 1999 Policy Proceeding, and if added to this action, will most likely be referred to the

Bankruptcy Court, which is the proper forum for its adjudication. Accordingly, the Court should deny the Motion to Amend insofar as it seeks to incorporate the Proposed 1999 Count.

WHEREFORE, for all of the foregoing reasons, the Liquidating LLC respectfully requests that the Court grant the motion to intervene and deny the Motion to Amend, or in the alternative, order the proceeding be referred to the Bankruptcy Court for proper adjudication before the Bankruptcy Court, and such other and further relief which may be just and proper.

Dated: Wilmington, Delaware
  May 13, 2005

      YOUNG CONWAY STARGATT & TAYLOR, LLP

      James L. Patton (No. 2202)
      Robert S. Brady (No. 2847)
      Edmon L. Morton (No. 3856)
      Kenneth J. Enos (No. 4544)
      The Brandywine Building
      1000 West Street, 17th Floor
      P.O. Box 391
      Wilmington, DE 19899-0391
      (302) 571-6600
          - and -

      KAYE SCHOLER LLP
      Arthur Steinberg
      Marc D. Rosenberg
      Hilary Lane
      Ana M. Alfonso
      425 Park Avenue
      New York, NY 10022-3598
      (212) 836-8000

      Attorneys for IHS Liquidating LLC