Motion to Compel). On April 23, 2003, the Court entered an Order (the "April 23 Order") on the

Motion to Compel which provided, *inter alia*, that pursuant to the March 2002 Stipulation, a

master lease agreement was deemed to exist between the parties effective May 1, 2003 (the

"Master Lease"). The Debtors and the Official Committee of Unsecured Creditors thereafter

filed a motion for reconsideration of the April 23 Order (the "Reconsideration Motion") and a

motion to stay pending reconsideration ("Stay Motion"). The Stay Motion was denied by the

Court on May 2, 2003 and the Reconsideration Motion is scheduled to be heard by the Court on

May 21, 2003. The Rejection Motion was continued to a date to be determined. By virtue of the

foregoing orders (and not by this Order), the Master Lease shall be treated as an assumed lease

pursuant to section 365 of the Bankruptcy Code, and the applicable Debtor(s) party to such

Master Lease shall perform the Master Lease until the Effective Date of the Plan, after which the

Master Lease shall be performed by the applicable Reorganized Debtor(s) unless and until an

order is entered by this Court or another court of competent jurisdiction permitting rejection of

the THCI Leases within the meaning of section 365(g)(1) of the Bankruptcy Code and/or

nullifying or invalidating the Master Lease, in which case, nothing contained in this Order shall

be deemed to have effected an assumption of the Master Lease or the THCI Leases. Nothing in

the Plan shall be deemed to provide for the rejection of the Master Lease or the THCI Leases.

The Effective Date shall not, in any way, divest this Court or any other court of competent

jurisdiction from jurisdiction to hear, consider and decide the Rejection Motion. In accordance

with paragraph 37 of this Order and the provisions of the Sale Agreement, simultaneously with

the Closing (as defined in the Sale Agreement), IHS will contribute and assign to the LTC

Subsidiary all of its assets (other than those constituting Excluded Assets) and postpetition

liabilities (other than those constituting Excluded Liabilities) not described in paragraph 37(c)(ii)

of this Order. Notwithstanding anything herein, the Debtors and THCI reserve all rights to make any and all arguments on appeal which they would otherwise be entitled to make.

(c)     This Order shall not constitute an assumption, assignment or rejection of the Software End User License and Services Agreement dated September 15, 1995, as amended (the "License Agreement"), between IHS and PeopleSoft USA, Inc. ("PeopleSoft"), or affect in any way the respective rights of PeopleSoft or IHS with respect to the License Agreement. PeopleSoft's objection to confirmation of the Plan shall be treated as an objection to the Debtors' request to assume, or to assume and assign, the License Agreement, which request shall be addressed at the hearing scheduled for May 21, 2003.

(d)     This Order shall not constitute an assumption, assignment or rejection of the Debtors' vehicle lease and related executory contracts (collectively, the "PHH Contracts") with PHH Vehicle Management Services, LLC and the D.H. Peterson Trust (collectively, the "PHH Entities"), or affect the respective rights of the PHH Entities or the Debtors with respect to the Debtors' request to assume or establish the full and final cure amount with respect to the PHH Contracts. The PHH Entities' objection to confirmation of the Plan shall be treated as an objection to the Debtors' proposed cure amount in connection with their request to assume the PHH Contracts, which request shall be addressed at the hearing scheduled for May 21, 2003.

(e)     Nothing in this Order shall prejudice the Colorado Department of Health Care Policy and Financing's ("CDHCPF") right to pursue its objection to the cure amount (the "Colorado Objection") and be afforded any relief ordered by the Court with respect to the Colorado Medicaid provider agreement that is the subject of the Colorado Objection (the "Colorado Provider Agreement"), it being understood that the Order shall not be deemed to

constitute or authorize an assumption or rejection of the Colorado Provider Agreement, nor shall this Order be deemed to constitute a ruling with respect to the appropriate cure amount under the Colorado Provider Agreement. If the Debtors and the CDHCPF are unable to resolve the issues raised in the Colorado Objection, such issues will be addressed at the hearing scheduled for May 21, 2003.

(f)      Nothing in this Order shall prejudice the rights of Nationwide Health Properties ("NHP") with respect to its facility leases with the Debtors, including but not limited to, its assertion that a master lease must be executed or that such leases may not be subleased without NHP's prior consent. The Court shall retain jurisdiction notwithstanding entry of the Order to determine NHP's rights under the *Order Approving Motion to Approve Amendments to Six Leases, Assume Five of Them As Amended, and To Approve a Stipulation Regarding Disposition of Another, Covering Properties in California, Ohio and Nevada (National* [sic] *Health Properties, Landlord)*, entered on May 13, 2002.

50.    <u>Bar Date for Rejection Damage Claims</u>. Pursuant to Section 8.3 of the Plan, if the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to Section 8.2 of the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors, the Liquidating LLC or the Debtors' estates, assets, properties or interests in properties or against the Reorganized Debtors or their estates, assets, properties or interests in properties, unless a proof of claim is filed with the Bankruptcy Court and served upon the Debtors on or before thirty (30) days after (a) in the case of an executory contract or unexpired lease that was terminated or expired by its terms prior to the Confirmation Date, the Confirmation Date, (b) in the case of an executory contract or

unexpired lease rejected by any Debtor, the entry of the order of the Bankruptcy Court authorizing such rejection (unless such order provides for an earlier deadline), or (c) in the case of an executory contract or unexpired lease that is deemed rejected pursuant to Section 8.2 of the Plan and this Confirmation Order, the Confirmation Date.

51.    General Authorizations. Each of the Debtors, the Reorganized Debtors and the Liquidating LLC is authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Plan Documents. The Debtors, the Reorganized Debtors and the Liquidating LLC and their respective directors, officers, members, agents, and attorneys, are authorized and empowered to issue, execute, deliver, file, or record any agreement, document, or security, including, without limitation, the documents contained in the Plan Supplement and any other Plan Documents, as modified, amended, and supplemented, in substantially the form included therein, and to take any action necessary or appropriate to implement, effectuate, and consummate the Plan in accordance with its terms, or take any or all corporate actions authorized to be taken pursuant to the Plan, including the Sale Transactions, whether or not specifically referred to in the Plan or the Plan Supplement, without further order of the Court.

52.    Issuance of New Securities. The issuance of the Membership Interests by the Liquidating LLC is hereby authorized without further act or action under applicable law, regulation, order, or rule.

53.    Securities Laws Exemption. The offering, issuance, and distribution by the Liquidating LLC of the Membership Interests are exempt from the provisions of section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration for the

offer, issuance, distribution, or sale of a security by reason of section 1145(a) of the Bankruptcy Code. No person that receives the Membership Interests in accordance with the Plan shall be permitted to (a) hold ten percent (10%) or more of the Membership Interest or (b) transfer its Membership Interests.

54.    Substantive Consolidation. The Substantive Consolidation Motion is granted and approved in all respects. Subject to the occurrence of the Effective Date: (i) for purposes of distributions only (and not for any other purposes) on account of all Allowed Claims in Classes 4 through 6 and Classes 8 through 10, all of the Debtors other than the Premiere Debtors will be deemed to be substantively consolidated, and (ii) with regard to Class 7, the Premiere Debtors will be deemed to be separately consolidated with each other solely for purposes of effecting distributions to the holders of Allowed Premiere Unsecured Claims (but not for any purpose other than effecting such distributions). In connection therewith: (a) no distributions shall be made under the Plan on account of intercompany claims among the Debtors; (b) all guarantees by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors; and (c) each and every Claim filed or to be filed in the IHS Reorganization Cases shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors. The foregoing consolidation of the Debtors and the Premiere Debtors, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this paragraph) affect: (a) the legal and organizational structure of the Reorganized Debtors; (b) pre-and post-Commencement Date liens and security interests that

are required to be maintained (i) in connection with executory contracts or unexpired leases that were entered into during the IHS Reorganization Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code or (ii) pursuant to the Plan; and (c) distributions out of any insurance policies or proceeds of such policies. As of the Effective Date, each of the Reorganized Debtors shall be deemed to be properly capitalized, legally separate and distinct entities.

55.    Governmental Approvals Not Required. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, the Plan Supplement, and any documents, instruments, or agreements, and any amendments or modifications thereto.

56.    Exemption from Certain Taxes. Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, sales, use, mortgage recording or other similar tax.

57.    DIP Credit Facility. On the Effective Date, all DIP Credit Facility Claims under or evidenced by amounts outstanding under the DIP Credit Facility (other than DIP Credit Facility Letters of Credit) shall be paid in full in Cash by the Liquidating LLC in accordance with the Plan. On the Effective Date, the Purchaser shall either replace or secure each DIP Credit

Facility Letter of Credit in accordance with the provisions of the DIP Credit Facility.  Upon the payment or satisfaction in full of all DIP Credit Facility Claims (a) all liens and security interests granted to secure such obligations shall be deemed terminated and shall be of no further force and (b) the lenders under the DIP Credit Facility shall, at the Debtors' expense, take all reasonable action necessary to confirm the removal of any claims and liens on the properties of the Debtors securing the DIP Credit Facility.

58.     Distribution on Account of Other Priority Claims, Other Secured Claims, Senior Lender Claims, United States Claims, General Unsecured Claims, Premiere Unsecured Claims, 1999 Insured Tort Claims.  In accordance with Sections 4, 6 and 7 of the Plan, on the Effective Date, the Disbursing Agent shall distribute, as applicable, to the holders of Allowed Claims in Classes 1, 2, 3, 4, 5, 6, 7 and 8, the Cash, Membership Interests, or other form of distribution which such holders are entitled to receive under the Plan.

59.     Distribution on Account of Settled Subordinated Debt Claims.  In accordance with Sections 4, 6 and 7 of the Plan, on the Effective Date, the holders of Allowed Settled Senior Subordinated Debt Claims shall receive no property from the Debtors' estates but shall receive from the IHS Noteholder Escrow Agent the IHS Noteholder Payment (including all actual interest and earnings thereon, and less the fees of the Majority Noteholder Counsel and the Class 9 Indenture Trustees as set forth in the Plan and this Order).

60.     Class 9 Related Fees and Expenses; Certifications.

(a)     Majority Noteholder Counsel.  On the Effective Date, the IHS Noteholder Escrow Agent shall pay the Majority Noteholder Counsel's fees and expenses from the IHS Noteholder Escrow, in an amount not to exceed $200,000, and such payment shall not require further approval by the Bankruptcy Court.

(b)    Class 9 Indenture Trustees.  On the Effective Date, the IHS Noteholder Escrow Agent shall reimburse the Class 9 Indenture Trustees for their reasonable fees and expenses, including, without limitation, reasonable attorneys' fees and expenses and indemnification, from the IHS Noteholder Escrow Account to the extent permitted by the respective Class 9 Indentures, and such payment shall not require further approval by the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, The Bank of New York, as a Class 9 Indenture Trustee shall have all of the rights and protections given pursuant to the Plan to U.S. Bank National Association, as a Class 9 Indenture Trustee and Disbursing Agent.

(c)    Certifications.  Subject to the occurrence of the Effective Date, IHS, Rotech, Citibank, N.A., the Majority Noteholders and the Class 9 Indenture Trustees shall execute and deliver to the IHS Noteholder Escrow Agent the written certifications and all other documents and information reasonably requested by the IHS Noteholder Escrow Agent to facilitate the distributions contemplated from the IHS Noteholder Escrow Account.

61.    Payment of the Fees and Expenses of the Class 10 Indenture Trustee. Subject to the occurrence of the Effective Date, the Class 10 Indenture Trustee shall be paid its outstanding fees and expenses accrued through the Effective Date (which shall in no event exceed $150,000) from the Class 4 Cash Fund prior to its distribution to the Disbursing Agent for Class 4, and any liens that the Class 10 Indenture Trustee had or asserted shall be deemed released upon such payment.

62.    Dissolution of Creditors' Committees. The Creditors' Committee and the Premiere Group Creditors' Committee shall dissolve on the Effective Date, and the members of such committees shall be released and discharged from all duties and obligations arising from or related to the IHS Reorganization Cases.

63.    <u>Final Fee Applications</u>.  Pursuant to Section 2.2 of the Plan, all entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date; and (b) shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to the allowance of any such Administrative Expense Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense Claim and the Liquidating LLC.  The Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.  After the Effective Date, the Liquidating LLC is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date (including, without limitation, compensation for services rendered and reimbursement of the expenses incurred by professionals retained by the Liquidating LLC, the Post-Confirmation Committee, and the Liquidating Manager), in the ordinary course and without the need for Bankruptcy Court approval.

64.    <u>Discharge of Claims and Termination of Equity Interests</u>.  Pursuant to Section 10.2 of the Plan, except as otherwise provided in the Plan or the DIP Credit Facility, the rights afforded in the Plan and the payments and distributions to be made thereunder shall completely satisfy and discharge all existing debts and Claims, and terminate all Equity Interests (other than Subsidiary Equity Interests), of any kind, nature, or description whatsoever against or

in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141

of the Bankruptcy Code.  Except as provided in the Plan or the DIP Credit Facility, upon the

Effective Date, all existing Claims against and Equity Interests in the Debtors, shall be, and shall

be deemed to be, discharged, satisfied, released and terminated in full, and all holders of Claims

and Equity Interests shall be precluded and enjoined from asserting against the Liquidating LLC

or the Reorganized Debtors, their successors and assigns, or any of their respective assets or

properties, any other or further Claim or Equity Interest based upon any act or omission,

transaction, or other activity of any kind or nature that occurred prior to the Effective Date,

whether or not such holder has filed a proof of claim or proof of equity interest and whether or

not the facts or legal bases therefor were known or existed prior to the Effective Date.

Notwithstanding the foregoing, the Claims and Causes of Action against IHS in the

Compensation Action are preserved.

    65. <u>Discharge of Debtors</u>.  Pursuant to Section 10.3 of the Plan, upon the

Effective Date and in consideration of the distributions to be made under the Plan, except as

otherwise expressly provided in the Plan or the DIP Credit Facility, each holder (as well as any

trustee or agent on behalf of such holder) of a Claim or Equity Interest and any affiliate of such

holder shall be deemed to have forever waived, released, and discharged the Debtors, to the

fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims,

Equity Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective

Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the

Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or Equity

Interest in the Debtors.

66. <u>Survival of Corporate Indemnities</u>. Pursuant to Section 8.4 of the Plan (as modified herein), any obligations of the Debtors pursuant to their corporate charters and bylaws or agreements, entered into at any time prior to the Effective Date or pursuant to the Elkins Settlement Agreement, to the extent permitted by applicable law, to indemnify current directors, officers, agents, and/or employees, or the Elkins Released Parties with respect to all present and future claims, actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan of Reorganization, *provided, however,* that this provision shall not affect the priority of any claim for indemnification under the applicable provisions of the Bankruptcy Code and applicable law, as to which all rights are reserved. Notwithstanding the foregoing, the current directors, officers, agents and/or employees of the Debtors who are defendants in the Compensation Action shall be entitled to the advancement and/or reimbursement of the reasonable fees and expenses of their respective legal counsel incurred in connection with the Compensation Action; <u>provided</u> that such fees and expenses shall not exceed the sum of (a) $270,000, which has accrued, and (b) $1,000,000, which shall be payable only if (i) the Sale Transactions close and (ii) any portion of the Class 4 Cash Fund that may be used by the Debtors is repaid in full.

67. <u>Releases, Exculpations, and Injunctions</u>. The release, exculpation, and injunction provisions contained in Sections 10.4, 10.5, 10.6 and 10.7 of the Plan as modified herein are fair and equitable, are given for valuable consideration, and are in the best interests of the Debtors and their chapter 11 estates, and the following provisions shall be effective and binding upon all persons and entities:

(a)    Term of Injunctions or Stays. Except as otherwise provided in the

Plan, all injunctions or stays arising under or entered during the IHS Reorganization Cases under

section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation

Date, shall remain in full force and effect until the later of the Effective Date and the date

indicated in the order providing for such injunction or stay. Notwithstanding the foregoing, on

the earlier of the Confirmation Date and April 29, 2003: (i) the adversary proceeding pending in

the IHS Reorganization Cases captioned *Integrated Health Services, Inc. and Premiere*

*Associates, Inc. v. Don G. Angell, D. Gray Angell, Jr., and Don R. House, individually and in*

*their capacities as Co-Trustees of the Don Angell Irrevocable Trust Under Instrument dated July*

*24, 1992; Angell Care Incorporated; Angell Family Limited Partnership; and Bermuda Village*

*Retirement Center Limited Partnership*, Adv. Pro. No. 01-1030 (the "Angell Injunction Action")

shall be deemed to be dismissed with prejudice; (ii) the Stipulation and Order, dated June 12,

2001, effective as of April 19, 2001 [Docket No. 20] entered in the Angell Injunction Action

shall be deemed to be vacated, and (iii) to the extent any stay pursuant to Section 362 or 105 is

applicable to the civil action, pending in the United States District Court for the Middle District

of North Carolina, captioned *Don G. Angell; D. Gray Angell, Jr., and Don R. House, in their*

*capacities as Co-Trustees of the Don Angell Irrevocable Trust Under Instrument Dated July 24,*

*1992; and Angell Care Incorporated, v. Elizabeth B. Kelly, C. Taylor Pickett, Daniel J. Booth*

*and Ronald L. Lord* [Case No. 01-CV-435] (the "Angell Action"), such stay shall be deemed

modified to allow the Angell Action to be prosecuted; *provided, however*, that nothing herein

shall be construed as waiving or limiting the right of any defendant in the Angell Action to raise

any defenses or counterclaims it may have, including without limitation, that the claims asserted

in the Angell Action are property of the Debtors' estates and that the plaintiffs do not have

standing to assert such claims; and *further provided*, that any Premiere Unsecured Creditors or their professionals, including without limitation, the plaintiffs in the Angell Action and any of their affiliates, shall waive any claim they may have in the IHS Reorganization Cases for substantial contribution pursuant to section 503(b) of the Bankruptcy Code. The Debtors and the plaintiffs in the Angell Action have agreed to bear their own fees and expenses, including attorneys' fees, incurred in connection with the Angell Injunction Action. Nothing contained in the Disclosure Statement, the Plan or this Order shall be construed as discharging or releasing the third party claims held by the plaintiffs in the Angell Action against any non-Debtor party including the defendants in the Angell Action.

(b)    Injunction Against Interference With Plan. Upon the entry of this Order and except as otherwise provided in the DIP Credit Facility, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employers, agents, officers, directors, or principals, shall be permanently and forever barred, restrained and enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

(c)    Injunction Against Suits Against IHS Under the Sale Transactions. Upon consummation of the Sale Transactions and effective as of the Effective Date, and except as otherwise provided in the Plan or the DIP Credit Facility, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employers, agents, officers, directors, or principals, shall be permanently and forever barred, restrained and enjoined from taking any action, directly or indirectly, against IHS, to collect, recover or receive payment of, on, or with respect to any Claim or Equity Interest arising on or before the date of the Confirmation Order, including claims (within the meaning of section 101(5) of the

Bankruptcy Code) against IHS relating to any asset or liability being purchased or assumed by the Purchaser under the Sale Agreement.

(d)    Exculpation.  Neither the Debtors, Alvarez & Marsal, Inc., any Disbursing Agent, the Liquidating LLC, the Liquidating Manager, the Creditors' Committee, the Premiere Group Creditors' Committee, the Post-Confirmation Committee, the Unofficial Senior Lenders' Working Group, nor any of their respective members, officers, directors, employees, agents, counsel or other professionals that served at any time after the Commencement Date shall have or incur any liability to any holder of any Claim or Equity Interest or any other entity for any act or omission in connection with, or arising out of, the IHS Reorganization Cases, the formulation, dissemination, implementation or confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, or any other act or omission in connection with the Plan of Reorganization, the Disclosure Statement, or any contract, instrument, release or other document or agreement related thereto, *provided, however*, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted gross negligence or willful misconduct; *provided, further*, the foregoing shall not be deemed to encompass acts or omissions solely related to the ordinary course conduct of the Debtors' businesses during the pendency of the IHS Reorganization Cases.  Any of the foregoing parties in all respects shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities in connection with the Plan of Reorganization, and all other matters referred to in Section 10.7 of the Plan.

68.    <u>Retention of Causes of Action/Reservation of Rights</u>.

(a)    Nothing contained in the Plan (except for the dismissal of actions referred to in Sections 10.4 and 10.9 of the Plan) or this Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors, the Debtors' estates, the Liquidating LLC, or the Post-Confirmation Committee may have or which the Liquidating LLC may choose to assert under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against any of the Debtors, the Liquidating LLC, or their respective officers, directors, or representatives, and (ii) the turnover of any property of any of the Debtors' estates.

(b)    Nothing contained in the Plan (except for the dismissal of certain actions described in Sections 10.4 and 10.9 of the Plan) or this Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which any of the Debtors or the Debtors' estates had immediately prior to the Commencement Date or thereafter, against or with respect to any Claim left unimpaired by the Plan. The Liquidating LLC shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date or thereafter fully as if the IHS Reorganization Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan of Reorganization may be asserted after the Confirmation Date to the same extent as if the IHS Reorganization Cases had not been commenced.

69.    <u>Dismissal of Premiere Committee Matters</u>  As of the Effective Date, the motion pending in the IHS Reorganization Cases entitled *Motion of the Official Committee of Unsecured Creditors of Premiere Associates, Inc. and its Subsidiaries for Leave to File an Adversary Proceeding Complaint on Behalf of Premiere Associates, Inc. and its Subsidiaries* filed on January 9, 2002 [Docket No. 6126] (the "Premiere Motion") and the adversary complaint filed in the IHS Reorganization cases captioned *Official Committee of Unsecured Creditors of Premiere Associates, Inc. and its Subsidiaries, on behalf of Premiere Associates, Inc., et al., v. Daniel J. Booth, Ronald L. Lord, C. Taylor Pickett, Marshall Elkins and Marc Levin,* filed on February 1, 2002 [Docket No. 6376] shall each be deemed to be dismissed with prejudice, and the Premiere Committee and the Debtors' estates shall be deemed to have permanently waived and relinquished any and all claims and causes of action referred to in or contemplated by the Premiere Motion.

70.    <u>Cancellation of Existing Securities and Agreements</u>  Pursuant to Section 5.7 of the Plan, except for purposes of evidencing a right to distributions under the Plan or as otherwise provided hereunder, on the Effective Date all agreements and other documents evidencing Claims or rights of any holder of a Claim against any of the Debtors, including all indentures and notes evidencing such Claims, shall be canceled and deemed null and void and of no force and effect as against the Debtors; *provided, however* that (a) the Class 9 Indentures shall continue in effect for the purposes of (i) allowing the Class 9 Indenture Trustees to make any distributions on account of the respective Settled Senior Subordinated Debt Claims pursuant to the Plan and to perform such other necessary administrative functions with respect thereto, and (ii) permitting the Class 9 Indenture Trustees to maintain and assert any rights or liens for reasonable fees, costs and expenses under the Class 9 Indentures, and (b) the Class 10 Indenture

shall continue in effect for the purpose of allowing the Class 10 Indenture Trustee to retain its

charging lien until payment of its fees pursuant to Section 4.10(c) of the Plan. Upon termination

of the indentures, the indenture trustees shall be released from any further obligation or duty

under their respective indentures, except as necessary to effectuate distributions under the Plan.

       71.    Nonoccurrence of Effective Date. In the event the Effective Date does not

occur, and upon written notification submitted by the Debtors, the Creditors Committee or the

Unofficial Senior Lenders' Working Group to the Bankruptcy Court, (a) the Confirmation Order

shall be vacated; (b) no distributions under the Plan shall be made; (c) the Debtors and all holders

of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately

preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all the

Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and

nothing contained in the Plan, Disclosure Statement or other Plan Documents shall be deemed to

constitute a waiver or release of any claims by or against the Debtors or any other entity or to

prejudice in any manner the rights of the Debtors, the Creditors' Committee, the Premiere Group

Creditors' Committee, the Unofficial Senior Lenders' Working Group or any other entity in any

further proceedings involving the Debtors.

       72.    Notice of Entry of Confirmation Order. On or before the tenth (10th)

Business Day following the date of entry of this Confirmation Order, the Debtors shall serve

notice of entry of this Confirmation Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and

3020(c) on all creditors and interest holders, the United States Trustee, and other parties in

interest, by causing notice of entry of the Confirmation Order (the "Notice of Confirmation"), to

be delivered to such parties by first-class mail, postage prepaid. The notice described herein is

adequate under the particular circumstances and no other or further notice is necessary. The

Debtors also shall cause the Notice of Confirmation to be published as promptly as practicable after the entry of this Confirmation Order once in *The Wall Street Journal* or *The New York Times* (National Edition).

73.    Notice of Effective Date. Within five (5) Business Days following the occurrence of the Effective Date, the Reorganized Debtors shall file notice of the occurrence of the Effective Date and shall serve a copy of same on those entities which have filed a notice of appearance and request for service of pleadings in the IHS Reorganization Cases.

74.    Enforceability. Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code and the provisions of this Confirmation Order, the Plan, the Plan Documents and the Plan Supplement shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

75.    Modification/Reversal. If any provision of this Order is hereafter modified, vacated or reversed by subsequent order of this Bankruptcy Court or any other court, such reversal, modification or vacation shall not affect the validity of the obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of any such order; nor shall such reversal, modification or vacation hereof affect the validity or enforceability of such obligations. Notwithstanding any reversal, modification or vacation hereof, any such obligation incurred or undertaken pursuant to and in reliance on this Order prior to the effective date of such reversal, modification or vacation shall be governed in all respects by the provisions hereof and of the Plan, and all documents, instruments and agreements related thereto, or any amendments or modifications thereto.

76.    Reservation of Rights. Anything to the contrary notwithstanding, nothing in this Order, the Plan or the Plan Supplement approved thereby shall be deemed to modify the

rights of the Purchaser extant as of the Confirmation Date, any inconsistent terms in the Order, the Plan or the Plan Supplement notwithstanding. Anything to the contrary notwithstanding, nothing in this Order, the Plan or the Plan Supplement approved thereby shall be deemed to modify the rights of the Debtors as they relate to the Purchaser extant as of the Confirmation Date, any inconsistent terms in the Order, the Plan or the Plan Supplement notwithstanding.

77.    Conflicts Between Confirmation Order and Plan. To the extent of any inconsistency between the provisions of the Plan and this Order, the terms and conditions contained in this Order shall govern. The provisions of this Order are integrated with each other and are nonseverable and mutually dependent unless expressly stated by further order of this Bankruptcy Court. The failure to reference or discuss all or part of any particular provision of the Plan herein shall have no effect on the validity, binding effect and enforceability of such provision, and such provision shall have the same validity, binding effect and enforceability as every other provision of the Plan.

Dated: Wilmington, Delaware
       May 12, 2003


_____
HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

Doc #Confirmation Order.wpd

58

# **Exhibit B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTEGRATED HEALTH SERVICES, INC., *et al.*, | ) | Case No. 00-389 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

## AMENDED JOINT PLAN OF REORGANIZATION OF
## INTEGRATED HEALTH SERVICES, INC. AND ITS SUBSIDIARIES
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
Co-Attorneys for the Debtors
  and Debtors in Possession

JENKENS & GILCHRIST -
PARKER CHAPIN LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Co-Attorneys for the Debtors
  and Debtors in Possession

YOUNG, CONAWAY,
STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Co-Attorneys for the Debtors
  and Debtors in Possession

Docket No. _____

Date Filed ___4|4|03___

[THIS PAGE INTENTIONALLY LEFT BLANK]

TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS AND INTERPRETATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A.   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B.   Interpretation; Application of Definitions and Rules of Construction . . . . . . . . . . . . 21

SECTION 2.  ADMINISTRATIVE EXPENSE CLAIMS, DIP CREDIT FACILITY
            CLAIMS AND PRIORITY TAX CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . 21
   2.1   Administrative Expense Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   2.2   Compensation and Reimbursement Claims . . . . . . . . . . . . . . . . . . . . . . . . 22
   2.3   DIP Credit Facility Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
   2.4   Priority Tax Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

SECTION 3.  CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS . . . . . . . . . . . . . 24

SECTION 4.  TREATMENT OF CLAIMS AND EQUITY INTERESTS . . . . . . . . . . . . . . . . . 26
   4.1   Other Priority Claims (Class 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   4.2   Secured Synthetic Lease Claims (Class 2) . . . . . . . . . . . . . . . . . . . . . . . . 26
   4.3   Other Secured Claims (Class 3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
   4.4   Senior Lender Claims (Class 4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
   4.5   United States Claims (Class 5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   4.6   General Unsecured Claims (Class 6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   4.7   Premiere Unsecured Claims (Class 7) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   4.8   1999 Insured Tort Claims (Class 8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   4.9   Settled Senior Subordinated Debt Claims (Class 9) . . . . . . . . . . . . . . . . . . 37
   4.10  Convertible Senior Subordinated Debenture Claims (Class 10) . . . . . . . . . . 38
   4.11  Punitive Damage Claims (Class 11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   4.12  Subsidiary Equity Interests (Class 12) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   4.13  IHS Equity Interests (Class 13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

SECTION 5.  MEANS FOR IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   5.1   Substantive Consolidation of Debtors for Plan Purposes Only . . . . . . . . . . . 39
   5.2   Termination of Subordination Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   5.3   United States Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   5.4   Release of Non-Debtor Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   5.5   Release of Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   5.6   Limitation on Releases, Indemnification and Exculpation of
         Directors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   5.7   Cancellation of Existing Securities and Agreements . . . . . . . . . . . . . . . . . . 41
   5.8   Merger and Liquidation of Subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   5.9   The Sale Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

i

Page

5.10    The Stand-Alone Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
5.11    Termination of Security Interests Granted Under DIP Credit
         Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

SECTION 6.  DISTRIBUTION PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
6.1    General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
6.2    Distribution Procedures in the Event the Sale Transactions are
        Implemented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
6.3    Distribution Procedures for Classes 4 and 6 under the Stand-Alone
        Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

SECTION 7.  PROCEDURES FOR DISPUTED CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . 62
7.1    Objections to Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
7.2    Payments and Distributions with Respect to Disputed Claims . . . . . . . . . . . 62
7.3    Distributions After Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
7.4    Estimations and Reserves for Contingent, Unliquidated and Disputed
        Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

SECTION 8.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES . . . . . . . . . . . . . . . 64
8.1    Assumption of Executory Contracts and Unexpired Leases . . . . . . . . . . . . 64
8.2    Rejection of Executory Contracts and Unexpired Leases . . . . . . . . . . . . . 65
8.3    Rejection Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
8.4    Survival of the Debtors' Corporate Indemnities . . . . . . . . . . . . . . . . . . 66

SECTION 9.  CONDITIONS PRECEDENT TO CONFIRMATION AND THE
         EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
9.1    Conditions Precedent to Confirmation . . . . . . . . . . . . . . . . . . . . . . . . 66
9.2    Conditions Precedent to the Effective Date . . . . . . . . . . . . . . . . . . . . . 66
9.3    Effect of Failure of Conditions to Effective Date . . . . . . . . . . . . . . . . . 68
9.4    Waiver of Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

SECTION 10. EFFECT OF CONFIRMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
10.1    Vesting of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
10.2    Discharge of Claims and Termination of Equity Interests . . . . . . . . . . . . . 69
10.3    Discharge of Debtors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
10.4    Term of Injunctions or Stays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
10.5    Injunction Against Interference With Plan . . . . . . . . . . . . . . . . . . . . . 70
10.6    Injunction Against Suits Against IHS Under the Sale Transactions . . . . . . . 71
10.7    Exculpation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
10.8    Retention of Causes of Action/Reservation of Rights . . . . . . . . . . . . . . . 71
10.9    Dismissal of Premiere Committee Matters . . . . . . . . . . . . . . . . . . . . . 72

Page

SECTION 11. RETENTION OF JURISDICTION .................................... 72
    11.1    Exclusive Jurisdiction ........................................ 72
    11.2    Jurisdiction Over Compensation Action ......................... 74

SECTION 12. MISCELLANEOUS PROVISIONS ............................... 74
    12.1    Payment of Statutory Fees ................................... 74
    12.2    Retiree Benefits ........................................... 74
    12.3    Dissolution of Statutory Committees of Unsecured Creditors ........... 74
    12.4    Post-Confirmation Committee ................................. 75
    12.5    Substantial Consummation ................................... 75
    12.6    Amendments ............................................. 76
    12.7    Revocation or Withdrawal of the Plan ........................... 76
    12.8    Severability .............................................. 76
    12.9    Governing Law ........................................... 76
    12.10   Time .................................................. 77
    12.11   Section Headings ......................................... 77
    12.12   Exemption from Transfer Taxes .............................. 77
    12.13   Effectuating Documents and Further Transactions .................. 77
    12.14   Injunction Regarding Worthless Stock Deductions .................. 77
    12.15   Exhibits ................................................ 78
    12.16   Notices ................................................. 78

[THIS PAGE INTENTIONALLY LEFT BLANK]

# ORIGINAL

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTEGRATED HEALTH SERVICES, INC., *et al.*, | ) | Case No. 00-389 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**AMENDED JOINT PLAN OF REORGANIZATION OF
INTEGRATED HEALTH SERVICES, INC. AND ITS SUBSIDIARIES
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

4|3|03
9270

Integrated Health Services, Inc. and the other Debtors (as defined below), as debtors and debtors in possession herein, propose the following joint Chapter 11 plan of reorganization for the Debtors, pursuant to section 1121(a) of title 11 of the United States Code:

SECTION 1.  **DEFINITIONS AND INTERPRETATION**

A.  *Definitions.*

The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

1.1  *5¾% Convertible Senior Subordinated Debentures* means the $143,750,000 original principal amount of IHS' 5¾% Convertible Senior Subordinated Debentures due 2004 issued pursuant to the Class 10 Indenture.

1.2  *9¼% Notes* means the $500,000,000 original principal amount of IHS' 9¼% Senior Subordinated Notes due 2008 issued pursuant to the 9¼% Indenture.

1.3  *9¼% Indenture* means the Indenture, dated as of September 11, 1997, as amended, between IHS, as issuer, and U.S. Bank National Association, as successor trustee for First Union National Bank of Virginia, with respect to the 9¼% Notes.

1.4  *9½% Notes* means the $450,000,000 original principal amount of IHS' 9½% Senior Subordinated Notes due 2007 issued pursuant to the 9½% Indenture.

1.5  *9½% Indenture* means the Indenture, dated as of May 30, 1997, as amended, between IHS, as issuer, and U.S. Bank National Association, as successor trustee for First Union National Bank of Virginia, with respect to the 9½% Notes.

1.6  *9⅝% Notes* means the $115,000,000 original principal amount of IHS' 9⅝% Senior Subordinated Notes due 2002, Series A, issued pursuant to the 9⅝% Indenture.

1.7  *9⅝% Indenture* means the Second Amended and Restated Supplemental Indenture, dated as of May 15, 1997, as amended, between IHS, as issuer, and The Bank of New York, as successor trustee, with respect to the 9⅝% Notes.

1.8  *10¼% Notes* means the $150,000,000 original principal amount of IHS' 10¼% Senior Subordinated Notes due 2006 issued pursuant to the 10¼% Indenture.

1.9  *10¼% Indenture* means the Indenture, dated as of May 15, 1996, as amended, between IHS, as issuer, and The Bank of New York, as successor trustee, with respect to the 10¼% Notes.

2

1.10    *10¾% Notes* means the $100,000,000 original principal amount of IHS' 10¾% Senior Subordinated Notes due 2004 issued pursuant to the 10¾% Indenture.

1.11    *10¾% Indenture* means the Amended and Restated Supplemental Indenture, dated as of May 15, 1997, as amended, between IHS, as issuer, and The Bank of New York, as successor trustee, with respect to the 10¾% Notes.

1.12    *1999 Insured Tort Claim* means a Tort Claim covered by the Debtors' insurance policies for PLGL Claims arising in 1999.

1.13    *1999 Insured Tort Claims Escrow* means the escrow account to be established on the Effective Date to provide for the payment of Allowed 1999 Insured Tort Claims in accordance with the Plan.

1.14    *1999 Unpaid Deductible Amount* means the approximately $7.6 million outstanding amount for which the Debtors have a matching-deductible insurance policy with Reliance Insurance Company for PLGL Claims arising in 1999, but only to the extent that such amount is unpaid.

1.15    *Administrative Expense Claim* means any right to payment constituting a cost or expense of administration of any of the IHS Reorganization Cases allowed under sections 503(b), 507(a)(1), and 1114(e) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the IHS Reorganization Cases, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, Tort Claims arising after the Commencement Date, to the extent not an Insured Claim, any Allowed Claims that are entitled to be treated as Administrative Expense Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code, any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

1.16    *Allowed* means, with reference to any Claim, (a) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (b) any timely filed Claim as to which no objection to allowance has been interposed in accordance with Section 7.1 hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order or hereunder.

3

1.17    *Amended Bylaws* means the Bylaws of Reorganized IHS, as amended and restated, and which shall be substantially in the form set forth in the Plan Supplement.

1.18    *Amended Certificate of Incorporation* means the Certificate of Incorporation of Reorganized IHS, as amended and restated, and which shall be substantially in the form set forth in the Plan Supplement.

1.19    *Available 1999 Insurance Proceeds* means the amount of proceeds recovered at any given time under the Debtors' insurance policies, including excess insurance policies, in respect of Allowed 1999 Insured Tort Claims, after payment of defense costs payable under the policies.

1.20    *Avoidance Claims* means the Debtors' Causes of Action, including those actions, if any, commenced by the Creditors' Committee, arising under sections 502, 506, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced to prosecute such Causes of Action as of the Effective Date.

1.21    *Ballot* means a ballot distributed with the Disclosure Statement and approved in form by the Bankruptcy Court for voting on the Plan, and includes any such ballot for any Class entitled to vote on the Plan.

1.22    *Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the IHS Reorganization Cases.

1.23    *Bankruptcy Court* means the unit of the United States District Court for the District of Delaware having jurisdiction over the IHS Reorganization Cases under section 151 of title 28 of the United States Code.

1.24    *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the IHS Reorganization Cases, and any Local Rules of the Bankruptcy Court.

1.25    *Bar Date* means the August 29, 2000 deadline for filing of all proofs of claims against the Debtors established by the Bankruptcy Court, except (i) Claims of governmental units for which proofs of claim were filed in accordance with section 502(b)(9) of the Bankruptcy Code, or (ii) such other date as has been granted by order of the Bankruptcy Court with respect to one or more other holders of Claims.

1.26    *Business Day* means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

4

1.27    *Cash* means legal tender of the United States of America.

1.28    *Catch-Up Distribution* means a distribution of Cash, a Class 4 Membership Interest, Class 6 Membership Interest, New Common Stock or New Subordinated Notes, as the case may be, to a holder of an Allowed Senior Lender Claim, Allowed General Unsecured Claim or Allowed 1999 Insured Tort Claim which was a Disputed Claim as of the date of the last initial or interim distribution made to holders of Allowed Claims in such Class, and on account of which the holder is entitled to a distribution as provided under the Plan.

1.29    *Cause of Action* means any and all actions, causes of actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to indemnification, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

1.30    *Claim* has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.31    *Class* means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

1.32    *Class 2 A-Notes* means the Series A Trust Notes issued pursuant to the Participation Agreement.

1.33    *Class 2 B-Notes* means the Series B Trust Notes issued pursuant to the Participation Agreement.

1.34    *Class 2 Certificates* means the Series C Trust Certificates issued pursuant to the Participation Agreement.

1.35    *Class 4 Cash Fund* means the approximately $42.5 million in Cash being held in escrow for the benefit of the holders of Senior Lender Claims, plus all income earned thereon through the Effective Date.

1.36    *Class 4 Pro Rata Share* means, with respect to distributions contemplated under the Plan, the sum of (A) the ratio (expressed as a percentage) of the amount of an Allowed Senior Lender Claim in Class 4 to the aggregate amount of the sum of (i) Allowed General Unsecured Claims in Class 6 (less the aggregate amount of General Unsecured Claims in respect of which Class 6 Cash-Out Elections have been made, if made effective pursuant to Section 4.6(c) of the Plan), (ii) all Allowed Senior Lender Claims in Class 4 (less the amount of the Class 4 Cash Fund), and (iii) the aggregate amount of all Subordinated Debt Claims, and (B) the result obtained by multiplying the

5

amount of Subordinated Debt Percentage by an Allowed Senior Lender Claim's Pro Rata Share of Allowed Senior Lender Claims.

1.37    *Class 4 Membership Interest* means an uncertificated interest in the Liquidating LLC, to be established in the event that the Sale Transactions are implemented, representing the right of the holder of an Allowed Senior Lender Claim to receive the Class 4 Pro Rata Share distributions contemplated by Sections 6.2(m), 6.2(n) and 6.2(p).

1.38    *Class 4 Stand-Alone Membership Interest* means an uncertificated interest in the Stand-Alone LLC, to be established in the event that the Stand-Alone Transactions are implemented, representing the right of the holder of an Allowed Senior Lender Claim to receive the distributions contemplated by Section 4.4(c)(4)(C) of the Plan.

1.39    *Class 6 Cash-Out Election* means the election, described in Section 4.6(c) of the Plan, which may be made by holders of General Unsecured Claims in Class 6.

1.40    *Class 6 Membership Interest* means an uncertificated interest in the Liquidating LLC, to be established in the event that the Sale Transactions are implemented, representing the right of the holder of an Allowed General Unsecured Claim in Class 6 (other than a holder of a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made) to receive the Class 6 Pro Rata distributions contemplated by Section 6.2(m), 6.2(n) and 6.2(p).

1.41    *Class 6 Pro Rata Share* means, with respect to distributions contemplated under the Plan, the ratio (expressed as a percentage) of the amount of an Allowed General Unsecured Claim in Class 6 (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c) of the Plan) to the aggregate amount of the sum of (i) Allowed General Unsecured Claims in Class 6 (less the aggregate amount of General Unsecured Claims in respect of which Class 6 Cash-Out Elections have been made, if made effective pursuant to Section 4.6(c) of the Plan), (ii) all Allowed Senior Lender Claims in Class 4 (less the amount of the Class 4 Cash Fund) and (iii) the aggregate amount of all Subordinated Debt Claims.

1.42    *Class 6 Stand-Alone Membership Interest* means an uncertificated interest in the Stand-Alone LLC, to be established in the event that the Stand-Alone Transactions are implemented, representing the right of the holder of an Allowed General Unsecured Claim (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c) of the Plan) to receive the distributions contemplated by Section 4.6(b)(3) of the Plan.

1.43    *Class 9 Indenture Trustees* means U.S. Bank National Association (and its successors and assigns) and The Bank of New York (and its successors and assigns), in their respective capacities as indenture trustees for the holders of Settled Senior Subordinated Debt Claims.

1.44    ***Class 9 Indentures*** means, collectively, the (i) 9½% Indenture, (ii) 9¼% Indenture, (iii) 10¼% Indenture, (iv) 9⅝% Indenture and (v) 10¾% Indenture.

1.45    ***Class 10 Indenture*** means the Indenture, dated as of September 15, 1994, as amended, between IHS, as issuer, and HSBC Bank USA, as successor trustee, with respect to the 5¾% Convertible Senior Subordinated Debentures.

1.46    ***Collateral*** means any property or interest in property of the estate of any Debtor subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

1.47    ***Commencement Date*** means February 2, 2000.

1.48    ***Compensation Action*** means that certain civil action currently pending in the Bankruptcy Court (Adv. Pro. No. 02-01830), or such other court as hereafter may be the court where the action is heard, that the Creditors' Committee, by Bankruptcy Court Order dated January 24, 2002, was authorized to commence on behalf of the Debtors' estates, against certain current and former members of the Board of Directors of IHS. The Compensation Action shall include any claims or Causes of Action that are or may be asserted in the Compensation Action, subject to, and in accordance with, the January 24, 2002 Order.

1.49    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

1.50    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.51    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code.

1.52    ***Convertible Senior Subordinated Debenture Claims*** means all Claims arising under, in connection with, or related to, the Class 10 Indenture or the 5¾% Convertible Senior Subordinated Debentures.

1.53    ***Credit Agreement*** means that certain Revolving Credit and Term Loan Agreement, dated as of September 15, 1997, as amended, by and among IHS, as borrower, Citibank N.A., as administrative agent, The Toronto-Dominion Bank, as documentation agent, Citicorp Securities, Inc., as arranger, and the lenders party thereto, and any and all of the documents and instruments relating thereto.

7

1.54    *Creditors' Committee* means the Official Committee of Unsecured Creditors appointed in the IHS Reorganization Cases by the Office of the United States Trustee on February 15, 2000, as constituted from time to time.

1.55    *Debtors* means Integrated Health Services, Inc., and its direct and indirect subsidiaries, which are debtors and debtors in possession. Unless otherwise indicated, the term "Debtors" does not include the Rotech Debtors.

1.56    *Debtors' Claims* means all Causes of Action and Avoidance Claims that a Debtor or a Debtor's estate may have that arose prior to the Effective Date and that, as of the Effective Date, have not been waived, settled, released or denied by Final Order of the court having jurisdiction over a proceeding in which such Cause of Action or Avoidance Claim was asserted.

1.57    *Deficiency Claims* means the amount by which the total Claim of a holder of a Secured Claim exceeds the amount of such Secured Claim (as determined in accordance with the definition of such term herein).

1.58    *DIP Credit Facility* means the Secured Super-Priority Debtor-In-Possession Revolving Credit Agreement, dated as of March 21, 2002, as amended, among IHS, as borrower, The CIT Group/Business Credit, Inc., as Administrative Agent and Lender, CapitalSource Finance LLC, as Collateral Agent and Lender, and the lenders party thereto, together with any of the documents and instruments relating thereto, as approved by the orders of the Bankruptcy Court authorizing and governing such facility.

1.59    *DIP Credit Facility Claims* means all Claims arising under the DIP Credit Facility.

1.60    *DIP Credit Facility Letter of Credit* means any letter of credit issued under the DIP Credit Facility.

1.61    *Disbursing Agent* means any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a disbursing agent under Section 6.1 hereof.

1.62    *Disclosure Statement* means the *Disclosure Statement for Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy Code*, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.63    *Disputed* or *Disputed Claim* means any Claim which has not been Allowed pursuant to the Plan or a Final Order, and:  (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (ii)

8

(a)    if no proof of claim has been filed by the applicable deadline, a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but as to which any of the Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; *or*

(b)    if a proof of claim or request for payment of an Administrative Expense Claim has been filed by the applicable deadline: (1) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules; (2) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of claim varies from the nature and amount of such Claim as listed on the Schedules; (3) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent or unliquidated; (4) a Claim for which a timely objection or request for estimation is interposed by any of the Debtors which has not been withdrawn or determined by a Final Order; or (5) any Tort Claim which has not previously been Allowed.

1.64    ***Disputed General Unsecured Claims Reserve*** means the reserve to be established by the Liquidating LLC if the Sale Transactions are implemented, or by the Reorganized Debtors or the Stand-Alone LLC, as applicable, if the Stand-Alone Transactions are implemented, to provide for the payment of (i) Disputed General Unsecured Claims in Class 6 that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date and (ii) any Disputed Claims referred to in Section 4.2(c) which become Allowed Senior Lender Claims.

1.65    ***Disputed Other Priority Claims Account*** means the account to be established on the books of the Liquidating LLC on the Effective Date if the Sale Transactions are implemented to provide for the payment of Disputed Other Priority Claims that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date.

1.66    ***Disputed Other Secured Claims Account*** means the account to be established on the books of the Liquidating LLC on the Effective Date if the Sale Transactions are implemented, to provide for the payment of Disputed Other Secured Claims that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date.

1.67    ***Disputed Premiere Unsecured Claims Account*** means the account to be established on the books of the Liquidating LLC on the Effective Date if the Sale Transactions are implemented, to provide for the payment of Disputed Premiere Unsecured Claims that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date.

1.68    ***Disputed Priority Tax Claims Account*** means the account to be established on the books of the Liquidating LLC on the Effective Date if the Sale Transactions are implemented, to provide for the payment of Disputed Priority Tax Claims that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date.

1.69    ***Distribution Record Date*** means the Confirmation Date.

1.70    **Distribution Reserve Account** means the account to be established by the Liquidating LLC as of the Effective Date, if the Sale Transactions are implemented, to hold Cash reserved for the purpose of making distributions in respect of Membership Interests (after funding of the Reserves) as provided in the Plan.

1.71    **Effective Date** means the first Business Day on or after the Confirmation Date specified by the Debtors on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan of Reorganization specified in Section 9.2 hereof have been satisfied or waived.

1.72    **Elkins Released Parties** means Dr. Robert N. Elkins and the other parties identified in the Elkins Settlement Agreement as constituting Elkins Released Parties (as defined in the Elkins Settlement Agreement).

1.73    **Elkins Settlement Agreement** means the Agreement dated as of July 26, 2000, as amended and/or modified thereafter, between IHS and Dr. Robert N. Elkins, as approved by Order of the Bankruptcy Court dated January 5, 2001.

1.74    **Equity Interest** means any equity interest in any of the Debtors of any kind or nature, including, without limitation, any interest represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.75    **Excluded Administrative Expense Claims** means the Administrative Expense Claims which constitute Excluded Liabilities.

1.76    **Excluded Administrative Expense Claims Reserve** means the reserve to be established on the Effective Date by the Liquidating LLC if the Sale Transactions are implemented, for payment of Disputed Excluded Administrative Expense Claims that may become Allowed Excluded Administrative Expense Claims after the Effective Date.

1.77    **Excluded Assets** means the assets identified in the Schedule of Excluded Assets attached to the Disclosure Statement as Exhibit F.

1.78    **Excluded Liabilities** means the liabilities identified in the Schedule of Excluded Liabilities attached to the Disclosure Statement as Exhibit G.

1.79    **Exit Financing Facility** means a senior secured credit facility to be established for the Reorganized Debtors in the event that the Stand-Alone Transactions are implemented. The material terms of the Exit Financing Facility are described in the Disclosure Statement.

10

1.80    ***Expense Reserve Account*** means the account to be established by the Liquidating LLC as of the Effective Date if the Sale Transactions are implemented, to hold Cash reserved for the payment of costs and expenses of the Liquidating LLC.

1.81    ***Expense Reserve Account Residual*** means all assets remaining in the Expense Reserve Account, as of the Final Liquidating LLC Distribution Date, after provision has been made for payment of all accrued expenses of the Liquidating LLC and the establishment of the Wind-Up Reserve.

1.82    ***Final Class 8 Distribution Date*** means the date that is twenty (20) Business Days after the date that all Disputed Claims in Class 8 have been resolved by Final Order and all Available 1999 Insurance Proceeds have been paid into the 1999 Insured Tort Claims Escrow Account.

1.83    ***Final Liquidating LLC Distribution Date*** means the date, to be determined pursuant to Section 6.2(o), on which the Liquidating Manager shall, among other things, make the final distributions on account of Class 4 Membership Interests and Class 6 Membership Interests.

1.84    ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the IHS Reorganization Cases, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order or judgment shall not cause such order to not be a Final Order.

1.85    ***Final Stand-Alone Distribution Date*** means twenty (20) Business Days after the first date on which all Senior Lender Claims, all General Unsecured Claims (other than General Unsecured Claims in respect of which a Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c)(2) of the Plan) which were Disputed Claims and all deemed Disputed Claims referred to in Section 4.2(c) have been resolved by a Final Order, or as soon thereafter as is reasonably practicable.

1.86    ***General Unsecured Claim*** means any Claim against any of the Debtors that is not a DIP Credit Facility Claim, Administrative Expense Claim, Priority Tax Claim, Other Priority

11

Claim, Secured Synthetic Lease Claim, Other Secured Claim, Senior Lender Claim, United States Claim, Premiere Unsecured Claim, 1999 Insured Tort Claim, Settled Senior Subordinated Debt Claim, Convertible Subordinated Debenture Claim or Punitive Damage Claim.

1.87    ***Headquarters Property*** means the property described in Schedule A to the Deed of Trust, Fixture Filing, Assignment of Rents and Security Agreement, dated July 31, 1997, which secures certain of the Class 2 B-Notes and certain of the Class 2 Certificates.

1.88    ***IHS*** means Integrated Health Services, Inc., a Delaware corporation and debtor or debtor in possession (as the context requires) herein, and the ultimate parent company of the other Debtors, each of which is a direct or indirect subsidiary of IHS.

1.89    ***IHS Equity Interest*** means any Equity Interest in IHS.

1.90    ***IHS Noteholder Escrow Account*** means the escrow account established pursuant to the Escrow Agreement, dated as of March 26, 2002, among IHS, Rotech Medical Corporation and the IHS Noteholder Escrow Agent, for the benefit of the holders of Settled Subordinated Debt Claims, in accordance with the IHS Noteholder Settlement.

1.91    ***IHS Noteholder Escrow Agent*** means U.S. Bank National Association.

1.92    ***IHS Noteholder Payment*** means $27,700,000.

1.93    ***IHS Noteholder Settlement*** means the settlement between the holders of Senior Lender Claims and the Majority Noteholders, for the benefit of the holders of Settled Senior Subordinated Debt Claims, which is described in the Disclosure Statement, to be effectuated through the Plan.

1.94    ***IHS Reorganization Cases*** means the jointly administered cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors on February 2, 2000, in the United States District Court for the District of Delaware, and jointly administered under the caption *In re Integrated Health Services, Inc., et al.*, 00-389 (MFW), other than the cases of the Rotech Debtors administered under Chapter 11 of the Bankruptcy Code.

1.95    ***Impaired*** means any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.96    ***Initial Class 8 Distribution*** means the initial distribution of Cash to the holders of Allowed 1999 Insured Tort Claims pursuant to Section 4.8 of the Plan.

1.97    ***Initial Class 8 Distribution Date*** means the later of (i) the Effective Date and (ii) twenty (20) Business Days after the first date on which there exist funds in the 1999 Insured

Tort Claims Escrow in an aggregate amount sufficient to pay each holder of a then-existing Allowed 1999 Insured Tort Claim a distribution of 50% of the amount of each such Allowed Claim.

      1.98  *Initial Member Distribution Date* means the later of (i) the Effective Date and (ii) twenty (20) Business Days after the first date on which all Senior Lender Claims and all General Unsecured Claims have been either Allowed, reserved for or estimated by the Bankruptcy Court and all of the Reserves provided for under the Plan to be established and maintained by the Liquidating LLC pursuant to Section 6.2 of the Plan (other than the Wind-Up Reserve) have been funded as required under the Plan, or as soon thereafter as is reasonably practicable.

      1.99  *Initial Stand-Alone Distribution Date* means the later of (i) the Effective Date and (ii) twenty (20) Business Days after the first date on which all Senior Lender Claims and all General Unsecured Claims have been either Allowed, reserved for or estimated by the Bankruptcy Court, or as soon thereafter as is reasonably practicable.

      1.100  *Insured Claim* means any Claim other than a 1999 Insured Tort Claim against any of the Debtors arising from an incident or occurrence, but only to the extent such Claim is covered by any of the Debtors' insurance policies.

      1.101  *ISDA Master Agreement* means the ISDA Master Agreement, dated as of March 3, 1997, between Citibank, N.A. and IHS, and confirmations issued thereunder between Citibank, N.A. and IHS.

      1.102  *Liquidating LLC* means a Delaware limited liability company, to be established in the event that the Sale Transactions are implemented, for the purpose of carrying out the implementation of the Plan as provided herein.

      1.103  *Liquidating LLC Agreement* means the operating agreement, to become effective in the event that the Sale Transactions are implemented, of the Liquidating LLC, which shall be approved in the Confirmation Order and entered into by the Debtors, for the benefit of the holders of Class 4 Membership Interests and Class 6 Membership Interests, and the Liquidating Manager on the Effective Date pursuant to the terms of the Plan.

      1.104  *Liquidating Manager* means an individual to be designated in the Confirmation Order, with the joint approval of the Debtors, the Creditors' Committee and the Unofficial Senior Lenders' Working Group, to serve, in the event that the Sale Transactions are implemented, as the manager of the Liquidating LLC, and any successor thereto.

      1.105  *Liquidating Manager Agreement* means the agreement between the Liquidating LLC and the Liquidating Manager, dated as of the date of the Confirmation Order.

      1.106  *LTC Subsidiary* means a new wholly-owned direct subsidiary of IHS, to be named IHS Long Term Care, Inc., a Delaware corporation, to be formed in connection with the Sale

13

Transactions, for the primary purpose of assigning to it all of the capital stock of certain of IHS' subsidiaries, pursuant to the terms of the Sale Agreement.

    1.107   *Majority Noteholders* means Capital Research and Management Company and Credit Suisse First Boston (or their respective affiliates) in their respective capacities as holders of Settled Senior Subordinated Debt Claims, and their successors or assigns.

    1.108   *Majority Noteholder Counsel* means Wachtell, Lipton, Rosen & Katz, as counsel to the Majority Noteholders in their respective capacities as holders of Settled Senior Subordinated Debt Claims.

    1.109   *Membership Interests* means, collectively, the Class 4 Membership Interests and the Class 6 Membership Interests.

    1.110   *New Common Stock* means the 2,500,000 shares of common stock of Reorganized IHS, par value $0.0001 per share, authorized under the Amended Certificate of Incorporation and to be issued hereunder on the Effective Date and any additional shares authorized for the purposes specified herein. The New Common Stock shall only be issued and become effective in the event that the Stand-Alone Transactions are implemented.

    1.111   *New Mexico Properties* means, collectively, the Debtors' skilled nursing facilities located in Farmington, New Mexico, Hobbs, New Mexico and Gallup, New Mexico, each of which is described more fully in the Participation Agreement, and each of which secures certain of the Class 2 B-Notes and certain of the Class 2 Certificates.

    1.112   *New Secured Note* means a note secured by the Collateral of a holder of an Allowed Other Secured Claim, providing for periodic Cash payments having a present value equal to the amount of the Allowed Other Secured Claim, to be distributed to such holder under the Plan.

    1.113   *New Subordinated Notes* means the senior subordinated debt securities of Reorganized IHS, to be issued under the New Subordinated Notes Indenture if the Stand-Alone Transactions are implemented, the material terms of which are described in the Disclosure Statement.

    1.114   *New Subordinated Notes Indenture* means the indenture between Reorganized IHS and the New Subordinated Notes Trustee, to be executed if the Stand-Alone Transactions are implemented.

    1.115   *New Subordinated Notes Trustee* means the bank or trust company that will serve as trustee under the New Subordinated Notes Indenture, and its successors and assigns.

    1.116   *Non-Debtor Affiliate* means a direct or indirect subsidiary of IHS that is not a Debtor.

1.117  **Omega Settlement Agreement** means the settlement and compromise between the Debtors and Omega Healthcare Investors, Inc., as approved by Order of the Bankruptcy Court dated December 18, 2002.

1.118  **Other Priority Claim** means any Claim against any of the Debtors entitled to priority in payment as specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.119  **Other Secured Claim** means any Secured Claim against any of the Debtors other than a Secured Synthetic Lease Claim or Senior Lender Claim.

1.120  **Participation Agreement** means that certain Participation Agreement, dated July 31, 1997, as amended, among IHS, Integrated Health Services at Highland Park, Inc. and IHS Development -- Highlands Park, Inc., as borrowers, State Street Bank and Trust Company of Connecticut, N.A., Eric J. Donaghey, Citicorp U.S.A., Inc., as the certificate holder, Citicorp U.S.A., Inc., as agent, and the lenders party thereto, and any and all of the documents and instruments relating thereto.

1.121  **Plan Documents** means the documents to be executed, delivered, assumed, and/or performed in conjunction with the consummation of the Plan of Reorganization on or about the Effective Date. If the Sale Transactions are implemented, the Plan Documents will include, without limitation, the (i) Sale Agreement; (ii) Liquidating LLC Agreement; (iii) Liquidating Manager Agreement; and (iv) United States Settlement Agreement. If the Stand-Alone Transactions are implemented, the Plan Documents will include, without limitation, the (a) Amended Certificate of Incorporation; (b) Amended Bylaws; (c) Exit Financing Facility; (d) New Subordinated Notes Indenture; (e) Registration Rights Agreement; (f) United States Settlement Agreement; and (g) the Stand-Alone LLC Agreement. Each of the Plan Documents shall be in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee and the Unofficial Senior Lenders' Working Group.

1.122  **Plan of Reorganization** or **Plan** means this joint Chapter 11 plan of reorganization of the Debtors, including the exhibits hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.123  **Plan Securities** means, if the Sale Transactions are implemented, the Class 4 Membership Interests and the Class 6 Membership Interests; and if the Stand-Alone Transactions are implemented, the New Common Stock, the New Subordinated Notes, the Class 4 Stand-Alone Membership Interests and the Class 6 Stand-Alone Membership Interests, in either case, distributed or to be distributed to creditors of the Debtors pursuant to the Plan.

1.124  **Plan Supplement** means a separate appendix to the Plan incorporated herein by reference, containing certain documents (substantially in final form) relevant to the implementation of the Plan. The Plan Supplement will be filed with the Clerk of the Bankruptcy Court no later than five (5) days prior to the deadline for soliciting votes to accept or reject the Plan.