1.125 *PLGL Claims* means any and all claims relating to professional and general liability with respect to the operation of the Debtors' businesses.

1.126 *Post-Confirmation Committee* means a committee, consisting of up to three (3) individuals or entities, and any duly designated successors to such individuals or entities. The initial members of the Post-Confirmation Committee shall be designated by the Creditors' Committee and shall be appointed pursuant to the Confirmation Order.

1.127 *Premiere Group Creditors' Committee* means the Official Committee of Unsecured Creditors for the Premiere Debtors appointed in the IHS Reorganization Cases by the Office of the United States Trustee on January 4, 2002, as constituted from time to time.

1.128 *Premiere Debtors* means Premiere Associates, Inc. and its subsidiaries that constitute Debtors.

1.129 *Premiere Unsecured Claim* means any Claim against a Premiere Debtor that is not a DIP Credit Facility Claim, Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Synthetic Lease Claim, Other Secured Claim, Senior Lender Claim, United States Claim, General Unsecured Claim, 1999 Insured Tort Claim, Settled Senior Subordinated Debt Claim, Convertible Senior Subordinated Debenture Claim, Punitive Damage Claim or an amount to be paid from the Expense Reserve Account.

1.130 *Priority Tax Claim* means any Claim of a governmental unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.131 *Professional* means a consultant, accountant, attorney or other professional service provider retained by the Debtors, the Liquidating Manager or any official committee pursuant to sections 327 and 1103 of the Bankruptcy Code or otherwise.

1.132 *Professional Claim* means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred after the Commencement Date and prior to and including the Effective Date pursuant to sections 330, 331 and 503 of the Bankruptcy Code. Until a timely filed Professional Claim is Allowed or Disallowed, it shall be considered a Disputed Administrative Expense Claim for purposes of Section 2.1.

1.133 *Pro Rata Share* means the ratio (expressed as a percentage) of the amount of an Allowed Claim in a Class to the aggregate amount of all Allowed Claims in the same Class.

1.134 *Punitive Damage Claim* means any Claim against any of the Debtors, whether secured or unsecured, for any fine, penalty, forfeiture, attorney's fees, or for multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, attorney's fees, or damages is not compensation for actual pecuniary loss suffered by the holder of such Claim.

16

1.135  *Purchased Subsidiaries* means, collectively, the LTC Subsidiary and Therapy Subsidiary.

1.136  *Purchaser* means Abe Briarwood Corp., as the Purchaser under the Sale Agreement.

1.137  *Purchaser-Assumed Administrative Expense Claims* means all Administrative Expense Claims other than those constituting Excluded Liabilities.

1.138  *Registration Rights Agreement* means the Registration Rights Agreement to be entered into by Reorganized IHS as of the Effective Date if the Stand-Alone Transactions are implemented, which shall be substantially in the form of the registration rights agreement to be included in the Plan Supplement.

1.139  *Remaining Funds* means, with respect to the Excluded Administrative Claims Reserve, the Disputed General Unsecured Claims Reserve, Disputed Other Priority Claims Account, Disputed Other Secured Claims Account, Disputed Priority Tax Claims Account, Disputed Premiere Unsecured Claims Account or any of the Disputed Claims Accounts, Cash remaining in such reserve or account after all distributions that are to be made from such reserve or account have been made. Remaining Funds also shall include the Expense Reserve Account Residual.

1.140  *Reorganized Debtors* means Reorganized IHS and each of the other Debtors upon the Effective Date.

1.141  *Reorganized IHS* means IHS upon the Effective Date.

1.142  *Reserves* means (i) the Excluded Administrative Claims Reserve, (ii) the Disputed Other Priority Claims Account, (iii) the Disputed Other Secured Claims Account, (iv) the Disputed Priority Tax Claims Account, (v) the Disputed General Unsecured Claims Reserve, (vi) Disputed Premiere Unsecured Claims Account (vii) the Unclaimed Distributions Reserve, (viii) the Distribution Reserve Account, (ix) the Expense Reserve Account, and (x) the Wind-Up Reserve.

1.143  *Rotech* means Rotech Medical Corporation, formerly a wholly-owned subsidiary of IHS.

1.144  *Rotech Debtors* means Rotech Medical Corporation and its direct and indirect subsidiaries, which were formerly debtors and debtors in possession whose Chapter 11 cases were jointly administered with the IHS Reorganization Cases, and which emerged from their Chapter 11 cases on March 26, 2002, pursuant to the Rotech Plan.

1.145  *Rotech Plan* means the Second Amended Joint Plan of Reorganization of Rotech Medical Corporation and Its Subsidiaries, dated February 7, 2002.

17

1.146  *Sale Agreement* means the Stock Purchase Agreement, dated as of January 28, 2003, by and between IHS, as Seller, and Abe Briarwood Corp., as Purchaser.

1.147  *Sale Approval Order* means the order of the Bankruptcy Court approving the Sale Agreement and authorizing the Debtors to implement the transactions contemplated thereunder.

1.148  *Sale Transactions* means the transactions contemplated to occur substantially contemporaneous with the Effective Date in connection with the sale of the Shares and/or IHS Shares in accordance with the terms and conditions set forth in the Sale Agreement, and the transfer of the Excluded Assets, assumption of Excluded Liabilities and distribution of Cash and Plan Securities to creditors of the Debtors as provided in the Plan.

1.149  *Sale Transaction Documents* means the material agreements entered into or to be entered into on the Effective Date in connection with the implementation of the Sale Transactions, including, without limitation, the: (i) Sale Agreement; (ii) Liquidating LLC Agreement; (iii) Liquidating Manager Agreement; and (iv) United States Settlement Agreement.

1.150  *Schedules* means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended through the Confirmation Date.

1.151  *Secured Claim* means a Claim to the extent (i) secured by Collateral the amount of which Claim is equal to or less than the value of such Collateral (a) as set forth in the Plan of Reorganization, (b) as agreed in writing by the holder of such Claim and the Debtors, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.152  *Secured Synthetic Lease Claim* means a Claim arising under the Participation Agreement, but only to the extent such Claim is a Secured Claim as provided under Section 4.2 of the Plan.

1.153  *Senior Lender Agreements* means the Credit Agreement, the Participation Agreement and the ISDA Master Agreement.

1.154  *Senior Lender Claim* means any Claim against any of the Debtors arising under, in connection with, or related to the Senior Lender Agreements, other than Secured Synthetic Lease Claims.

1.155  *Settled Senior Subordinated Debt Claims* means all Claims arising under, in connection with or related to any of the Class 9 Indentures or the 10¼% Notes, the 9½% Notes, the 9¼% Notes, the 9⅝% Notes, or the 10¾% Notes.

18

1.156  *Shares* means (i) an aggregate of 1,000 shares of common stock of the LTC Subsidiary, which will represent all of the issued and outstanding shares of capital stock of the LTC Subsidiary as of the Effective Date, and (ii) an aggregate of 1,000 shares of common stock of the Therapy Subsidiary, which will represent all of the issued and outstanding shares of capital stock of the Therapy Subsidiary as of the Effective Date.

1.157  *Stand-Alone LLC means* a Delaware limited liability company to be established in the event that the Stand-Alone Transactions are implemented for the purpose of prosecuting the Compensation Action.

1.158  *Stand-Alone LLC Agreement* means the operating agreement, to become effective in the event that the Stand-Alone Transactions are implemented, of the Stand-Alone LLC, which shall be approved in the Confirmation Order and entered into by the Debtors, for the benefit of the holders of Class 4 Stand-Alone Membership Interests and Class 6 Stand-Alone Membership Interests, on the Effective Date pursuant to the terms of the Plan.

1.159  *Stand-Alone LLC Manager* means an individual to be designated in the Confirmation Order, with the joint approval of the Debtors, the Creditors' Committee and the Unofficial Senior Lenders' Working Group, to serve, in the event that the Stand-Alone Transactions are implemented, as the manager of the Stand-Alone LLC, and any successor thereto.

1.160  *Stand-Alone Manager Agreement* means the agreement between the Stand-Alone LLC and the Stand-Alone LLC Manager, dated as of the date of the Confirmation Order.

1.161  *Stand-Alone Transactions* means the transactions contemplated to occur in connection with the stand-alone reorganization of the Debtors' businesses in the event the Sale Transactions do not occur, including without limitation, the issuance of the New Common Stock and New Subordinated Notes, all of which are to be implemented as provided in Section 5.10.

1.162  *Stand-Alone Transaction Documents* means the material agreements and other documents to be entered into and/or effectuated on the Effective Date in connection with the implementation of the Stand-Alone Transactions, including, without limitation:  the (i) Amended Certificate of Incorporation; (ii) Amended Bylaws; (iii) Exit Financing Facility; (iv) New Subordinated Notes Indenture; (v) Registration Rights Agreement; (vi) United States Settlement Agreement; (vii) the Stand-Alone LLC Agreement; and (viii) the Stand-Alone Manager Agreement.

1.163  *Subordinated Debt Claims* means, collectively, the Settled Senior Subordinated Debt Claims and the Convertible Senior Subordinated Debenture Claims.

1.164  *Subordinated Debt Percentage* means the ratio (expressed as a percentage) of the amount of the Subordinated Debt Claims to the aggregate amount of the sum of (i) Allowed General Unsecured Claims in Class 6 (less the aggregate amount of General Unsecured Claims in

19

respect of which Class 6 Cash-Out Elections have been made if made effective pursuant to Section 4.6(c) of the Plan), (ii) Allowed Senior Lender Claims in Class 4 (less the amount of the Class 4 Cash Fund), and (iii) the aggregate amount of all Subordinated Debt Claims.

1.165 **Subsidiary Equity Interest** means any Equity Interest in any Debtor other than IHS.

1.166 **Synthetic Lease Claim** means any Claim against any of the Debtors arising under the Participation Agreement.

1.167 **Therapy Subsidiary** means a new wholly-owned direct subsidiary of IHS, to be named IHS Therapy Care, Inc., a Delaware corporation, to be formed in connection with the Sale Transactions, for the primary purpose of assigning to it all of the capital stock of certain of IHS' subsidiaries, pursuant to the terms of the Sale Agreement.

1.168 **Tort Claims** means any Claims related to personal injury, property damage, products liability, wrongful death, employment litigation, or other similar Claims against any of the Debtors including, without limitation, any PLGL Claim.

1.169 **Unclaimed Distributions** means distributions to holders of Allowed Claims that are returned as undeliverable or not cashed.

1.170 **Unclaimed Distributions Reserve** means the reserve created with the Unclaimed Distributions, which may be claimed after the Effective Date.

1.171 **United States Claims** means all (i) civil or administrative monetary claims (e.g., claims seeking monetary remedies or payments) or civil or administrative monetary Causes of Action (including attorneys' fees, costs, and expenses of every kind) the United States of America, or its agencies, departments, officers, agents, employees and assigns, or third parties under 31 U.S.C. § 3730(b) or (d), has or may have against the Debtors under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; and/or common law doctrines of payment by mistake, unjust enrichment, breach of contract or fraud for the Covered Conduct (as defined in the United States Settlement Agreement); (ii) administrative overpayments, including claims or causes of action for services rendered or products supplied to beneficiaries, under the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395, under contracts with the Department of Veterans Affairs ("VA") and under the TRICARE Program (also known as the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS")), 10 U.S.C. 1071-1106; (iii) civil monetary penalties imposed pursuant to 42 U.S.C. § 1395i-3(h)(2)(B)(ii) and 42 U.S.C. § 1396r(h)(2)(A)(ii); and (iv) actions for permissive exclusion from Medicare, the Medicaid program and other federal health programs (as defined in 42 U.S.C. 1320a-7b(f)) under 42 U.S.C. § 1320a-7(b) and 42 U.S.C. § 1320a-7a for the Covered Conduct. All other Claims of the United States of America are expressly excluded from this definition.

1.172  *United States Settlement Agreement* means the settlement agreement entered into between the Debtors and the United States, a copy of which will be included in the Plan Supplement.

1.173  *Unofficial Senior Lenders' Working Group* means the unofficial working group of the holders of the Senior Lender Claims, as constituted from time to time.

1.174  *Voting Agent* means Poorman-Douglas Corporation.

1.175  *Wind-Up Reserve* means a Cash reserve to be established by the Liquidating Manager at the time of making a final distribution to creditors of the Debtors under the Plan for purposes of paying the expenses of such final distribution and winding up the affairs of the Liquidating LLC after such final distribution, including the projected costs of dissolving the Liquidating LLC, preparing final tax returns, filing reports or other documents in the IHS Reorganization Cases or under applicable nonbankruptcy law, and storing or disposing of records and any other property of the Liquidating LLC.

B.      *Interpretation; Application of Definitions and Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan of Reorganization are to the respective section in, or exhibit to, the Plan of Reorganization, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan of Reorganization as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan of Reorganization.

SECTION 2.  **ADMINISTRATIVE EXPENSE CLAIMS, DIP CREDIT FACILITY CLAIMS AND PRIORITY TAX CLAIMS**

2.1     *Administrative Expense Claims.*

(a)     *Treatment.* Each holder of an Allowed Administrative Expense Claim shall receive an amount in Cash equal to such Allowed Administrative Expense Claim on or as soon as is reasonably practicable after the later of (i) the Effective Date and (ii) the first Business Day that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, however, that Allowed Administrative Expense Claims in respect of Tort Claims arising after the Commencement Date (to the extent not an Insured Claim), liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, and liabilities arising under loans or advances to or other obligations incurred by the Debtors, as debtors in possession, whether or not incurred in the ordinary course of business, shall be liquidated and paid in the ordinary course of business, consistent with past practice and in accordance with the terms and

21

subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

(b)    *Sale Transactions.* If the Sale Transactions are implemented, all Allowed Purchaser-Assumed Administrative Expense Claims shall be paid by the Purchased Subsidiaries in accordance with subsection (a) above, and neither IHS nor the Liquidating LLC shall have any liability for Purchaser-Assumed Administrative Expense Claims. All Allowed Excluded Administrative Expense Claims shall be paid by the Liquidating LLC from the Excluded Administrative Expense Claims Reserve (and, if and to the extent necessary, from the Distribution Reserve Account) in accordance with Section 6.2 of the Plan.

(c)    *Stand-Alone Transactions.* If the Stand-Alone Transactions are implemented, all Administrative Expense Claims shall be paid by the Reorganized Debtors in accordance with subsection (a) above.

2.2    **Compensation and Reimbursement Claims.**

(a)    All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date; and (b) shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to the allowance of any such Administrative Expense Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense Claim and either the Liquidating LLC under the Sale Transactions or the Reorganized Debtors under the Stand-Alone Transactions, as applicable. The Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval. After the Effective Date, the Liquidating LLC or the Reorganized Debtors, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date (including, without limitation, compensation for services rendered and reimbursement of the expenses incurred by professionals retained by the Liquidating LLC or the Reorganized Debtors, as applicable, the Post-Confirmation Committee, the Liquidating Manager, the Stand-Alone LLC and the Stand-Alone LLC Manager), in the ordinary course and without the need for Bankruptcy Court approval.

(b)    *Payment of Professional Claims Under the Sale Transactions.* If the Sale Transactions are implemented, on the Effective Date, the Liquidating Manager shall deposit in the Excluded Administrative Claims Reserve sufficient Cash to pay all unpaid fees and expenses of Professionals incurred through the Effective Date. The Professionals shall serve estimates of fees and expenses due for periods that have not been billed as of the Effective Date so as to be received by the counsel for the Debtors within twenty (20) days after the Confirmation Date, and the Liquidating

Manager shall include such estimated fees and expenses in calculating the amount of the Excluded Administrative Claims Reserve. The Allowed amounts of such Professional Claims shall be paid by the Liquidating LLC out of the Excluded Administrative Claims Reserve and, if and to the extent necessary, the Distribution Reserve Account.

    2.3    ***DIP Credit Facility Claims.***

    (a)    *Payment of Outstanding Obligations.* On the Effective Date, all DIP Credit Facility Claims under or evidenced by amounts outstanding under the DIP Credit Facility (other than DIP Credit Facility Letters of Credit) shall be paid in full in Cash by the Liquidating LLC or the Reorganized Debtors, as applicable.

    (b)    *DIP Credit Facility Letters of Credit.* On the Effective Date, all outstanding DIP Credit Facility Letters of Credit shall be treated as follows:

    (1)    *Treatment Under the Sale Transactions.* If the Sale Transactions are implemented, the Purchaser shall either replace or secure each DIP Credit Facility Letter of Credit in accordance with the provisions of the DIP Credit Facility.

    (2)    *Treatment Under the Stand-Alone Transactions.* If the Stand-Alone Transactions are implemented, all outstanding DIP Credit Facility Letters of Credit shall either be replaced or secured by letters of credit issued under the Exit Financing Facility in accordance with the provisions of the DIP Credit Facility.

    2.4    ***Priority Tax Claims.***

    Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, Priority Tax Claims shall be treated as provided below.

    (a)    *Treatment Under the Sale Transactions.* If the Sale Transactions are implemented, each holder of an Allowed Priority Tax Claim shall receive from the Liquidating LLC Cash in an amount equal to such Allowed Priority Tax Claim, to be paid on or as soon as is reasonably practicable after the later of (i) the Effective Date and (ii) the first Business Day that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim.

    (b)    *Treatment Under the Stand-Alone Transactions.* If the Stand-Alone Transactions are implemented, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, either (i) Cash in an amount equal to such Allowed Priority Tax Claim, to be paid as soon as is reasonably practicable after the later of the Effective Date and the first Business Day that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (ii) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to six percent (6%), over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim,

or upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

### SECTION 3.   CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan. Each holder of a Claim in Classes 2, 3-E through 3-K, 4, 5, 6, 7 , 8 and 9 shall be entitled to vote separately to accept or reject the Plan. Classes 1, 3-A through 3-D and 12 are unimpaired and are deemed to accept the Plan. Because Classes 10, 11 and 13 are deemed to have rejected the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to Classes 10, 11 and 13. In the event that any impaired Class of Claims shall fail to accept the Plan, the Debtors reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) with respect to any such non-accepting Class.

(1)    *Classes.*

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Synthetic Lease Claims | Impaired | Yes |
| 3-A through 3-D | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3-E through 3-K | Other Secured Claims | Impaired | Yes |
| 4 | Senior Lender Claims | Impaired | Yes |
| 5 | United States Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Premiere Unsecured Claims | Impaired | Yes |
| 8 | 1999 Insured Tort Claims | Impaired | Yes |
| 9 | Settled Senior Subordinated Debt Claims | Impaired | Yes |
| 10 | Convertible Senior Subordinated Debenture Claims | Impaired | No (deemed to reject) |

24

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 11 | Punitive Damage Claims | Impaired | No (deemed to reject) |
| 12 | Subsidiary Equity Interests | Unimpaired | No (deemed to accept) |
| 13 | IHS Equity Interests | Impaired | No (deemed to reject) |

(2) *Subclasses for Class 3.* For convenience of identification, the Plan classifies the Claims in Class 3 as a single Class. This Class is, in fact, a group of subclasses, and depending on the underlying Collateral securing such Allowed Claims, each subclass is treated as a distinct Class for voting and distribution purposes. The following table identifies the material subclasses for Class 3.

| Class | Creditor | Collateral | Impairment | Entitled to Vote |
|-------|----------|------------|------------|------------------|
| 3-A | Beal Bank SSB | Clarkston facility | Unimpaired | No |
| 3-B | SBA | IHS-Mt. Pleasant, Mt. Pleasant Assisted Living Facility | Unimpaired | No |
| 3-C | Todd Alexander | Central Accounting Office of Florida | Unimpaired | No |
| 3-D | Canada Life Assurance Company | IHS-Texoma at Sherman | Unimpaired | No |
| 3-E | Bank of America | South Carolina laundry and billing facility | Impaired | Yes |
| 3-F | Bank of America | Inman Healthcare and Golden Age-Inman facilities | Impaired | Yes |
| 3-G | Finova | Houston Hospital | Impaired | Yes |
| 3-H | Omega Healthcare Investors, Inc. | various facilities | Impaired | Yes |
| 3-I | Omega Healthcare Investors, Inc. | various facilities | Impaired | Yes |
| 3-J | Omega Healthcare Investors, Inc. | Crystal Springs Nursing and Rehabilitation Center (closed) | Impaired | Yes |
| 3-K | Beal Bank SSB | Treyburn Rehabilitation and Nursing Center | Impaired | Yes |

SECTION 4.  **TREATMENT OF CLAIMS AND EQUITY INTERESTS**

4.1  *Other Priority Claims (Class 1).*

Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to a different treatment, each such holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, to be paid by the Liquidating LLC or the Reorganized Debtors, as applicable, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Other Priority Claim.

4.2  *Secured Synthetic Lease Claims (Class 2).*

(a)  *Allowance and Subclassification of Synthetic Lease Claims.* On the Effective Date, the Synthetic Lease Claims shall be subclassified and treated as follows: (i) $26,823,980.54 shall be deemed Allowed Claims arising under the Class 2 A-Notes; (ii) $10,575,855.71 plus all accrued interest with respect to the Class 2 B-Notes arising from the Commencement Date through the Effective Date, at the non-default contract rate, shall be deemed Allowed Claims arising under Class 2 B-Notes; and (iii) $2,901,701.33, plus all accrued interest with respect to the Class 2 Certificates arising from the Commencement Date through the Effective Date, at the non-default contract rate, shall be deemed Allowed Claims arising under Class 2 Certificates.

(b)  *Designation of Secured and Unsecured Synthetic Lease Claims.*

(1)  *Class 2 A-Notes -- Unsecured.* On the Effective Date, the Allowed Synthetic Lease Claims arising under Class 2 A-Notes shall be deemed unsecured and shall be treated as Senior Lender Claims in Class 4.

(2)  *Class 2 B-Notes -- Secured.* The Claims arising under Class 2 B-Notes shall be deemed and treated as Allowed Secured Synthetic Lease Claims in the aggregate amount of (i) $1,467,080.02, plus all accrued interest arising from the Commencement Date through the Effective Date, at the non-default contract rate, with respect to the Class 2 B-Notes secured by the New Mexico Properties; and (ii) $9,108,775.69, plus all accrued interest arising from the Commencement Date through the Effective Date, at the non-default contract rate, with respect to the Class 2 B-Notes secured by the Headquarters Property.

(3)  *Class 2 Certificates -- Secured.* The Claims arising under the Class 2 Certificates shall be deemed and treated as Allowed Secured Synthetic Lease Claims in the aggregate amount of (i) $400,234.67, plus all accrued interest arising from the Commencement Date, through the Effective Date, at the non-default contract rate, with respect to the Class 2 Certificates secured by the New Mexico Properties; and (ii) $2,501,466.66, plus all accrued interest arising from the Commencement Date through the Effective Date, at the non-default contract rate, with respect to the Class 2 Certificates secured by the Headquarters Property.

(c)    *Claims Disputed Pending Sale of Collateral.*  All Claims arising under the Class 2 B-Notes and the Class 2 Certificates secured by the Headquarters Property shall (notwithstanding Sections 4.2(b)(2)(ii) and 4.2(b)(3)(ii) above) be deemed to be Disputed until the Headquarters Property is sold as provided in Section (d) or (e) below, as applicable. If the proceeds from such sale actually paid to the holders of the Class 2 B-Notes and Class 2 Certificates secured by the Headquarters Property pursuant to Sections 4.2(d)(2) or 4.2(e)(2), as applicable, is less than the amount of $9,108,775.69 with respect to such Class 2 B-Notes and less than the amount of $2,501,466.66 with respect to such Class 2 Certificates, then the holders of the Class 2 B-Notes and Class 2 Certificates secured by the Headquarters Property shall have Allowed Senior Lender Claims in Class 4, respectively equal to the difference between the amounts set forth in this subsection (c) and the amounts actually paid to them.

(d)    *Treatment of Secured Synthetic Lease Claims Under Sale Transactions.*  If the Sale Transactions are implemented, the holders of Secured Synthetic Lease Claims shall receive the treatment set forth in subsections (1) and (2) of this Section 4.2(d) in full satisfaction of all Allowed Secured Synthetic Lease Claims.

(1)    On the Effective Date, or as soon thereafter as is practicable, the Liquidating LLC shall pay to the Disbursing Agent a Cash distribution in an amount equal to the sum of the amounts set forth in Sections 4.2(b)(2)(i) and 4.2(b)(3)(i), and, upon receipt thereof, all liens on the New Mexico Properties arising out of the Participation Agreement shall be deemed to have been released.

(2)    On the Effective Date, the Debtors' interests in the Headquarters Property shall be transferred to the Liquidating LLC, and the Disbursing Agent shall receive a mortgage note from and executed by the Liquidating LLC in a principal amount equal to the sum of the amounts set forth in Sections 4.2(b)(2)(ii) and 4.2(b)(3)(ii) (the "Restructured Headquarters Note"), for the benefit of the holders of Class 2 B-Notes and the Class 2 Certificates that were secured by the Headquarters Property.  The Restructured Headquarters Note will bear interest at 7% per year, will mature on the fifth anniversary of the Effective Date, and will be secured by the existing first mortgage lien on the Headquarters Property.  The Liquidating LLC shall sell the Headquarters Property, and upon such sale, shall pay to the Disbursing Agent from the proceeds of such sale a Cash distribution (which shall then be distributed ratably to the holders of the Class 2 B-Notes and the Class 2 Certificates) in an amount equal to the lesser of (i) the total then outstanding obligations under the Restructured Headquarters Note; and (ii) the net proceeds of the sale of the Headquarters Property. Upon such payment to the Disbursing Agent, all liens on the Headquarters Property shall be deemed to have been released, and to the extent such payment is less than the amounts set forth in Section 4.2(c) hereof, the holders of the Class 2 B-Notes and Class 2 Certificates shall have and shall be deemed to have Allowed Senior Lender Claims in Class 4 in the respective amounts and as provided in Section 4.2(c) hereof.

27

(e)    *Treatment of Secured Synthetic Lease Claims Under the Stand-Alone Transactions.*  If the Stand-Alone Transactions are implemented the holders of Allowed Secured Synthetic Lease Claims shall receive the treatment set forth in subsections (1) and (2) of this Section 4.2(d) in full satisfaction of all Allowed Secured Synthetic Lease Claims.

(1)    On the Effective Date or as soon thereafter as practicable, the Reorganized Debtors shall pay to the Disbursing Agent a Cash distribution in an amount equal to the sum of the amounts set forth in Sections 4.2(b)(2)(i) and 4.2(b)(3)(i), and, upon receipt thereof, all liens on the New Mexico Properties arising out of the Participation Agreement shall be deemed to have been released.

(2)    On the Effective Date, the Disbursing Agent shall receive a mortgage note from and executed by the Reorganized Debtors in a principal amount equal to the sum of the amounts set forth in Sections 4.2(b)(2)(ii) and 4.2(b)(3)(ii) (the "Restructured Headquarters Note"), for the benefit of the holders of Class 2 B-Notes and Class 2 Certificates which were secured by the Headquarters Property.  The Restructured Headquarters Note will bear interest at 7% per year, will mature on the fifth anniversary of the Effective Date, and will be secured by the existing first mortgage lien on the Headquarters Property.  The Reorganized Debtors shall sell the Headquarters Property, and upon such sale, shall pay to the Disbursing Agent from the proceeds of such sale a Cash distribution (which shall then be distributed ratably to the holders of the Class 2 B-Notes and Class 2 Certificates) in an amount equal to the lesser of (i) the total then outstanding obligations under the Restructured Headquarters Note; and (ii) the net proceeds of the sale of the Headquarters Property.  Upon such payment to the Disbursing Agent, all liens on the Headquarters Property shall be deemed to have been released, and to the extent such payment is less than the amounts set forth in Section 4.2(c) hereof, the holders of the Class 2 B-Notes and Class 2 Certificates shall have and shall be deemed to have Allowed Senior Lender Claims in Class 4 in the respective amounts and as provided in Section 4.2(c) hereof.

(f)    *Distributions to Individual Holders; Disbursing Agent.*  The aggregate distributions in respect of Secured Synthetic Lease Claims shall be made to Citicorp USA, Inc., as Disbursing Agent, which shall make distributions as provided herein to the individual holders of the Secured Synthetic Lease Claims as of the Distribution Record Date.  The delivery of such aggregate distributions to Citicorp USA, Inc. shall be in full satisfaction, release and discharge of all Secured Synthetic Lease Claims against the Debtors.  Citicorp USA, Inc. shall deduct from such distributions all costs and expenses (including all professional fees and disbursements) incurred by it and unpaid prior to making any distribution to the holders of Allowed Secured Synthetic Lease Claims.

4.3    ***Other Secured Claims (Class 3).***

(a)    *General Treatment.*  With respect to all Other Secured Claims not designated in one of Subclasses 3-A through 3-K (the treatment of which is set forth below):

(1)     *Sale Transactions*. If the Sale Transactions are implemented, on or as soon as reasonably practicable after the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Other Secured Claim becomes an Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Other Secured Claim, and the liens securing such Allowed Other Secured Claim shall be deemed released.

(2)     *Stand-Alone Transactions*. If the Stand-Alone Transactions are implemented, then on or as soon as reasonably practicable after the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Other Secured Claim becomes an Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Reorganized Debtors, either (a) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Other Secured Claim, (b) the net proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim; (c) the Collateral securing such Allowed Other Secured Claim; (d) a note with periodic Cash payments having a present value equal to the amount of the Allowed Other Secured Claim; or (e) such other distribution necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat an Allowed Other Secured Claim under clause (a) of this Section, the liens securing such Allowed Other Secured Claim shall be deemed released.

(b)     *Description and Treatment of Material Other Secured Claims*.

(1)     *Subclass 3-A (Secured Claim of Beal Bank SSB, IHS at Clarkston Facility)*.

Subclass 3-A consists of the Secured Claim of Beal Bank SSB ("Beal"), as the successor in interest to all the obligee/mortgagee's right, title and interest in and to the certain Mortgage Note, the certain Mortgage, and the certain Security Agreement, all as amended and/or supplemented, each dated as of December 17, 1985, between Ver Lee Associates, a Michigan co-partnership, as obligor, and Comerica Bank as obligee. The original principal amount of the Mortgage Note was $3,580,400.00; but, pursuant to the Modification of Mortgage and Mortgage Note instrument dated as of May 9, 1988, the principal amount of the Mortgage Note was reduced to $3,396,800.00.

On the Effective Date, the Mortgage Note will be reinstated in accordance with its terms, as modified on or prior to the Effective Date. Upon such reinstatement, any acceleration of any obligation and/or instrument or default in connection with the Mortgage Note will be deemed rescinded, waived or cured and of no force or effect, the terms of the Mortgage Note, as modified on or prior to the Effective Date and any liens created pursuant to the Mortgage Note will not be affected by Sections 10.2 or 10.3 of the Plan or section 1141 of the Bankruptcy Code.

(2)     *Subclass 3-B (U.S. Small Business Administration -- Horizon Assisted Living Facility).*

Subclass 3-B consists of the Secured Claim of the U.S. Small Business Administration (the "SBA"), as assignee under a Note in the principal amount of $500,000, dated September 6, 1985, between KCVT Nursing Centers, Inc, d/b/a Villa Nursing Center ("KCVT"), as obligor, and Ark-Tex Regional Development Company, Inc. ("Ark-Tex"), as obligee. The Note is secured by a Deed of Trust on the Horizon Assisted Living Facility in Mt. Pleasant, Texas. On the Effective Date, the Note and the Deed of Trust will be reinstated in accordance with their terms, as modified on or prior to the Effective Date. Upon such reinstatement, any acceleration of any obligation and/or instrument or default in connection therewith will be deemed rescinded, waived or cured and of no force or effect, and any liens created pursuant to the Note and the Deed of Trust will not be affected by Sections 10.2 or 10.3 of the Plan or section 1141 of the Bankruptcy Code.

(3)     *Subclass 3-C (Secured Claim of Todd Alexander -- Central Accounting Office of Florida).*

Subclass 3-C consists of the Secured Claim of Todd Alexander, as mortgagee under a secured note (the "Alexander Note"), which is secured by the Debtors' Central Accounting Office facility in Florida. On the Effective Date, the Alexander Note will be reinstated in accordance with its terms, as modified on or prior to the Effective Date. Upon such reinstatement, any acceleration of any obligation and/or instrument or default in connection with the Alexander Note will be deemed rescinded, waived or cured and of no force or effect, and any liens created pursuant to the Alexander Note will not be affected by Sections 10.2 or 10.3 of the Plan or section 1141 of the Bankruptcy Code.

(4)     *Subclass 3-D (Secured Claim of Canada Life Assurance Company -- IHS Texoma at Sherman).*

Subclass 3-D consists of the Secured Claim of Canada Life Assurance Company ("Canada Life"), as assignee under a Deed of Trust Note (the "Texoma Note"), dated as of December 16, 1987, in the original principal amount of $2,700,000, between Arbor Living Centers of Texas, Inc., as obligor, and Mortgage and Trust, Inc., as obligee. The Deed of Trust Note is secured by a mortgage on the IHS Texoma at Sherman facility. On the Effective Date, the Texoma Note will be reinstated in accordance with its terms, as modified on or prior to the Effective Date. Upon such reinstatement, any acceleration of any obligation and/or instrument or default in connection with the Texoma Note will be deemed rescinded, waived or cured and of no force or effect, and any liens created pursuant to the Texoma Note will not be affected by Sections 10.2 or 10.3 of the Plan or section 1141 of the Bankruptcy Code.

30

(5)     *Subclasses 3-E and 3-F (Secured Claims of Bank of America --*
*CAO of South Carolina, Inman Healthcare, Golden Age-Inman).*

Subclass 3-E consists of the Secured Claims of Bank of America, N.A. ("B of A"), as assignee under a note (the "Magnolia Note") dated May 27, 1993, between NationsBank, as obligee, and Magnolia Group, Inc. ("Magnolia"), as obligor, in the original principal amount of $700,000. The Magnolia Note is secured by a mortgage dated May 27, 1993 between NationsBank, as mortgagee, and Magnolia, as mortgagor.

Subclass 3-F consists of the Secured Claim of B of A, as assignee under a note (the "Inman Note") dated January 30, 1998, between NationsBank, as obligee, and Magnolia, as obligor is in the original principal amount of $1,840,000. The Inman Note is secured by two mortgages; a mortgage dated January 30, 1998, between NationsBank, as mortgagee and Inman Nursing Facilities, Inc., as mortgagor, and a mortgage dated January 30, 1998, between Nations Bank, as mortgagee, and a Non-Debtor Affiliate, C.W. Johnson Intermediate Care Facility, Inc., as mortgagor.

On the Effective Date, or as soon as reasonably practicable thereafter, B of A will receive a cash payment (the "B of A Payment") in the aggregate amount of $1,800,000, in full settlement and satisfaction of all Claims of B of A arising out of or related to the Magnolia Note and/ or the Inman Note, including without limitation, any Claims for principal, interest or fees. Pending the occurrence of the Effective Date and the receipt by B of A of the B of A Payment, the Stipulation and Order Pursuant to 11 U.S.C. Section 363(e) of the Bankruptcy Code, dated as of September 9, 2001 (the "B of A Stipulation") shall continue in full force and effect. Upon payment of the B of A Payment, all liens on the Collateral securing the Magnolia Note and the Inman Note shall be deemed to have been released, and B of A and the Debtors shall be deemed to have released each other from any and all Claims arising out of or related to the Magnolia Note and/ or the Inman Note, including, but not limited to, all obligations under the B of A Stipulation.

(6)     *Subclass 3-G (Secured Claim of Finova Capital Corporation (f/k/a*
*Greyhound Financial Corporation -- Houston Hospital Facility)).*

Subclass 3-G consists of the secured Claim of Finova Capital Corporation (f/k/a Greyhound Financial Corporation) ("Finova"), as assignee under the promissory note, dated December 30, 1994, in the principal sum of $10,000,000, between Integrated Health Services at Houston, Inc., as obligor and Greyhound Financial Corporation, as obligee, which is secured by the Debtors' interests in the IHS Hospital at Houston facility ("IHS at Houston"). Unless otherwise agreed by the parties, Finova shall receive (i) an Allowed Other Secured Claim equal to the value of the Debtors' interests in IHS at Houston as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code; and (ii) an Allowed General Unsecured Claim in an amount equal to the unsecured portion of the Claim of Finova, if any. In full satisfaction of its Allowed Other Secured Claim, Finova shall receive a new mortgage note (the "Restructured Finova Note") in a principal amount equal to its Allowed Other Secured Claim. The Restructured Finova Note will bear interest at 7% per year amortized over 25 years, and will mature on the fifth anniversary of the Effective

Date. The Restructured Finova Note will be secured by the collateral presently securing the Finova Note.

        (7)     *Subclasses 3-H, I, J (Secured Claim of Omega Healthcare Investors, Inc.).*

        Subclasses 3-H, I and J consist of the Secured Claims of Omega Healthcare Investors, Inc. ("Omega"), and shall be treated in accordance with the terms of the Omega Settlement Agreement. The Omega Settlement Agreement provides, among other things, that (i) the Debtors will transfer to Omega or its designee substantially all of the Debtors' real property and certain personal property serving as Collateral for the Other Secured Claims in Subclasses 3-H, 3-I and 3-J, pursuant to deeds in lieu of foreclosure and operations transfer agreements; (ii) Omega is deemed to have an Allowed Premiere Unsecured Claim of $406,000 against the estate of HCPIII Hillsborough, Inc., an Allowed Premiere Unsecured Claim of $992,000 jointly and severally against the estates of SHCM Bonterra, Inc. and SHCM Parkview, Inc., and an Allowed General Unsecured Claim of $3,102,000; and (iii) Omega is deemed to have released all other Claims it may have against the Debtors.

        (8)     *Subclass 3-K-(Secured Claim of Beal Bank SSB-IHS at Treyburn Facility).*

        Subclass 3-K consists of the Secured Claim of Beal, as the successor to all the obligee/mortgagee's right, title and interest in and to the certain Deed of Trust Note, the certain deed of Trust, and the certain Security Agreement, all as amended and/or supplemented, and with each dated as of January 28, 1993 (collectively, the "Treyburn Note"). The original principal amount of the Deed of Trust Note was $4,082,200.00. Pursuant to the Release, Assumption and Modification Agreement dated as of November 19, 1997, Integrated Health Services at Treyburn, Inc. agreed to be bound by the terms of the Treyburn Note. On the Effective Date, or as soon as reasonably practicable thereafter, at the option of the Debtors, Beal will receive either: (i) the net proceeds of the sale or disposition of the Collateral securing the Treyburn Note; or (ii) the Collateral securing the Treyburn Note, in full satisfaction and release of all Claims of Beal arising out of the Treyburn Note.

        4.4     **Senior Lender Claims (Class 4).**

        (a)     *Allowance of Senior Lender Claims.* On the Confirmation Date, the Senior Lender Claims will be deemed to be Allowed in the aggregate amount of (i) $1,260,379,079.40 in Allowed Claims arising under the Credit Agreement plus (ii) the aggregate amount of the Allowed unsecured Synthetic Lease Claims.

        (b)     *Enforcement of Subordination Rights.* The Plan shall give effect to the subordination rights of the Senior Lender Claims.

(c)    *Aggregate Distribution to Class 4.*

(1)    *Distribution of Class 4 Cash Fund.*  On the Effective Date, irrespective of whether the Sale Transactions or the Stand-Alone Transactions are implemented, the Liquidating LLC or the Reorganized Debtors, as applicable, shall deliver the Class 4 Cash Fund to the Disbursing Agent, which shall distribute to each holder of an Allowed Senior Lender Claim its Pro Rata Share thereof (after deducting all fees and expenses (including professional fees and disbursements) of the Disbursing Agent and the fees and expenses of the Class 10 Indenture Trustee as provided in Section 4.10(c) hereof).  To the extent that the Disbursing Agent elects to make a distribution prior to the allowance of all Senior Lender Claims (i.e., prior to the disposition of the collateral securing the Class 2 B-Notes and Class 2 Certificates), the Disbursing Agent shall reserve a portion of the Class 4 Cash Fund equal to the Pro Rata Share payable to the holders of Disputed Senior Lender Claims as if such Claims were allowed in their maximum amounts, and shall make a final distribution as soon as is reasonably practicable after such disposition has occurred.

(2)    *Pro Rata Distribution Under the Sale Transactions.*  If the Sale Transactions are implemented, then each holder of an Allowed Senior Lender Claim shall receive (a) its Class 4 Pro Rata Share of all Cash (other than Cash distributed to the holders of Allowed General Unsecured Claims which have made the Class 6 Cash-Out Election) distributed pursuant to Section 6.2(m), 6.2(n) and 6.2(p) of the Plan, and (b) a Class 4 Membership Interest representing the right to receive distributions contemplated by Sections 6.2(m), 6.2(n) and 6.2(p) of the Plan.

(3)    *Subordinated Debt Claim Exclusion.*  Notwithstanding subparagraph (2) above, solely with respect to the first $15 million of net proceeds, if any, to be distributed from a settlement or judgment obtained in the Compensation Action, the Class 4 Pro Rata Share and the Class 6 Pro Rata Share thereof shall be calculated as if there were no Subordinated Debt Claims.

(4)    *Pro Rata Distribution Under the Stand-Alone Transactions.*  If the Stand-Alone Transactions are implemented, then, in addition to the distribution provided in 4.4(c)(1) above, each holder of an Allowed Senior Lender Claim shall receive a Class 4 Pro Rata Share of:

(A)    2.5 million shares of New Common Stock, representing 100% of the total shares of New Common Stock to be issued and outstanding immediately as of the Effective Date;

(B)    the New Subordinated Notes; and

(C)    the Class 4 Stand-Alone Membership Interests representing the right to receive distributions of the net proceeds, if any, of any settlement or judgment obtained in the Compensation Action; provided, however, that solely with respect to the first $15 million of such net proceeds, if any, the Class 4 Pro Rata Share and the Class 6 Pro Rata Share of such net proceeds shall be calculated as if there were no Subordinated Debt Claims.

(d)     *Disbursing Agent.*  All aggregate distributions of Cash, Class 4 Membership Interests, Class 4 Stand-Alone Membership Interests, New Common Stock and/or New Subordinated Notes in respect of Senior Lender Claims shall be made to Citibank, N.A., as Disbursing Agent or its designee. Citibank, N.A. shall make distributions or cause its designee to make distributions to the individual holders of the Allowed Senior Lender Claims as of the Distribution Record Date. The delivery by the Debtors of such aggregate distribution to Citibank, N.A. (or its designee) shall be in full satisfaction, release and discharge of all Senior Lender Claims against the Debtors.

(e)     *Distributions to Individual Holders.*  Subject to the provisions of this Section and all other applicable provisions of the Plan, each holder of an Allowed Senior Lender Claim shall receive its Pro Rata Share of the Cash (less all amounts deducted by the Disbursing Agent as described in subsection (f) below), Class 4 Membership Interests, Class 4 Stand-Alone Membership Interests, New Common Stock and/or New Subordinated Notes, as applicable.

(f)     *Payment of Fees and Expenses of the Disbursing Agent.*  If the Sale Transactions are implemented, all fees and expenses incurred by the Disbursing Agent, including all Professional fees and expenses, shall be paid from the Cash distribution set forth in subsection 4.4(c)(1) above and the Disbursing Agent shall deduct from such distribution all costs and expenses incurred by it in connection with the IHS Reorganization Cases and unpaid prior to making any distribution to the holders of Allowed Senior Lender Claims. If the Stand-Alone Transactions are implemented, all unpaid fees and expenses of the Disbursing Agent shall be paid in Cash on the Effective Date by the Reorganized Debtors.

4.5     **United States Claims (Class 5).**

On the Effective Date, the Claims in Class 5 shall be settled pursuant to the United States Settlement Agreement.

4.6     **General Unsecured Claims (Class 6).**

(a)     *Pro Rata Distribution Under the Sale Transactions.*  If the Sale Transactions are implemented, then each holder of an Allowed General Unsecured Claim in Class 6 which has not made the Class 6 Cash-Out Election shall receive (a) its Class 6 Pro Rata Share of all Cash (other than Cash distributed to the holders of Allowed General Unsecured Claims which have made the Class 6 Cash-Out Election) distributed pursuant to Sections 6.2(m), 6.2(n) and 6.2(p) of the Plan and (b) a Class 6 Membership Interest representing the right to receive distributions contemplated by Sections 6.2(m), 6.2(n) and 6.2(p) of the Plan.

(b)     *Pro Rata Distribution Under the Stand-Alone Transactions.*  If the Stand-Alone Transactions are implemented, then each holder of an Allowed General Unsecured Claim in Class 6 (other than an Insured Claim and other than those which made the Class 6 Cash-Out Election, if made effective pursuant to Section 4.6(c) of the Plan) shall receive its Class 6 Pro Rata Share of:

34

(1)     2.5 million shares of New Common Stock, representing 100% of the total shares of New Common Stock to be issued and outstanding immediately as of the Effective Date;

(2)     the New Subordinated Notes; and

(3)     the Class 6 Stand-Alone Membership Interests representing the right to receive distributions of the net proceeds, if any, of any settlement or judgment obtained in the Compensation Action; provided, however, that solely with respect to the first $15 million of such net proceeds, if any, the Class 4 Pro Rata Share and the Class 6 Pro Rata Share of such net proceeds shall be calculated as if there were no Subordinated Debt Claims.

(c)     *Class 6 Cash-Out Election.* Each holder of a General Unsecured Claim in Class 6 may elect on its Ballot to receive, in lieu of the distributions set forth in Section 4.6(a) or 4.6(b) above, as applicable, a distribution of Cash in an amount equal to the lesser of (i) 3% of its Allowed General Unsecured Claim and (ii) $3,000.00.

(1)     *Mandatory Distributions In Respect of Class 6 Cash-Out Election Under the Sale Transactions.* If the Sale Transactions are implemented, each holder of an Allowed General Unsecured Claim in Class 6 which made the Class 6 Cash-Out Election shall receive, in lieu of the distributions set forth in Section 4.6(a) above, a distribution of Cash in an amount equal to the lesser of (i) 3% of its Allowed General Unsecured Claim and (ii) $3,000.00, which shall be paid by the Liquidating LLC on or as soon as reasonably practicable after the later of (i) the Initial Member Distribution Date and (ii) the date such Claim becomes an Allowed General Unsecured Claim.

(2)     *Optional Distributions In Respect of Class 6 Cash-Out Election Under the Stand-Alone Transactions.* If the Stand-Alone Transactions are implemented, then the Debtors, in their sole discretion shall determine whether they will give effect to the Class 6 Cash-Out Election. The Debtors shall disclose their determination no later than the Confirmation Hearing. If the Debtors determine that they will give effect to the Class 6 Cash-Out Election, then each holder of a General Unsecured Claim in Class 6 which made the Class 6 Cash-Out Election shall receive, in lieu of the distributions set forth in Section 4.6(b) above, a distribution of Cash in an amount equal to the lesser of (i) 3% of its Allowed General Unsecured Claim and (ii) $3,000.00, to be paid by the Reorganized Debtors on or as soon as reasonably practicable after the later of (i) the Initial Stand-Alone Distribution Date and (ii) the date such Claim becomes an Allowed General Unsecured Claim.

(d)     *Insured Claims.* Insured Claims shall be liquidated in the ordinary course of business following the Effective Date. Each holder of an Allowed General Unsecured Claim that is an Insured Claim (other than a 1999 Insured Tort Claim) shall be paid from the proceeds of any applicable insurance and shall have an Allowed General Unsecured Claim only to the extent the applicable insurance policy does not pay any portion of the Allowed Insured Claim.

4.7    *Premiere Unsecured Claims (Class 7).*

       *Treatment.* Irrespective of whether the Sale Transactions or the Stand-Alone Transactions are implemented each holder of an Allowed Premiere Unsecured Claim shall receive a distribution of Cash in an amount equal to 6% of its Allowed Premiere Unsecured Claim, provided, however, that (i) if the aggregate amount of the Allowed Premiere Unsecured Claims exceeds $22,000,000.00 but is less than or equal to $37,000,000.00, then in lieu of the foregoing, each holder of an Allowed Premiere Unsecured Claim shall receive a distribution of Cash in an amount equal to 3% of its Allowed Premiere Unsecured Claim plus such holder's Pro Rata Share of $660,000.00; and (ii) if the aggregate amount of the Allowed Premiere Unsecured Claims exceeds $37,000,000.00, then in lieu of all of the foregoing, each holder of an Allowed Premiere Unsecured Claim shall receive a distribution of Cash in an amount equal to its Pro Rata Share of $1,770,000.00. In no event shall the amount to be distributed to holders of Allowed Premiere Unsecured Claims exceed $1,770,000.00.

4.8    *1999 Insured Tort Claims (Class 8).*

      (a)    *Treatment.* Irrespective of whether the Sale Transactions or the Stand-Alone Transactions are implemented, each holder of an Allowed 1999 Insured Tort Claim shall be entitled to receive its Pro Rata Share of the aggregate sum of (i) the Available 1999 Insurance Proceeds; and (ii) 3% of the difference between the Available 1999 Insurance Proceeds and the total amount of Allowed 1999 Insured Tort Claims.

      (b)    *1999 Insured Tort Claims Escrow.* On the Effective Date, or as soon thereafter as is reasonably practicable, the Liquidating LLC or the Reorganized Debtors, as applicable, shall deposit an amount of Cash equal to 3% of the 1999 Unpaid Deductible Amount plus any Available 1999 Insurance Proceeds due and owing by the Debtors' insurance carriers in respect of Allowed 1999 Insured Tort Claims into the 1999 Insured Tort Claims Escrow. Thereafter, the Liquidating LLC or the Reorganized Debtors, as applicable, shall deposit all additional Available 1999 Insurance Proceeds which become due and owing by the Debtors' insurance carriers in respect of Allowed 1999 Insured Tort Claims into the 1999 Insured Tort Claims Escrow.

      (c)    *Initial Distributions.* On the Initial Class 8 Distribution Date, the Liquidating LLC or the Reorganized Debtors, as applicable, shall make an Initial Class 8 Distribution to each holder of an Allowed 1999 Insured Tort Claim in Cash in an amount equal to 50% of its Allowed Claim.

      (d)    *Interim Distributions.* After the Initial Class 8 Distribution Date but prior to the Final Class 8 Distribution Date, the Liquidating LLC or the Reorganized Debtors, as applicable:

      (1)    shall distribute to each holder of a Disputed 1999 Insured Tort Claim which becomes an Allowed 1999 Insured Tort Claim after the Initial Class 8 Distribution Date and did not receive an Initial Class 8 Distribution pursuant to Section 4.7(c), within thirty (30) days of such allowance, an amount in Cash equal to 50% of its Allowed 1999 Insured Tort Claim; and

(2)     may make additional distributions to holders of Allowed 1999 Insured Tort Claims prior to the Final Class 8 Distribution Date.

(3)     *Final Distributions.*  If necessary, on the Final Class 8 Distribution Date, the Liquidating LLC or the Reorganized Debtors, as applicable, shall distribute to each holder of an Allowed 1999 Insured Tort Claim a Catch-Up Distribution (or portion thereof), such that the total distribution of Cash received by such holder in respect of its Allowed 1999 Insured Tort Claim equals its Pro Rata Share of the aggregate sum of (i) the Available 1999 Insurance Proceeds; and (ii) 3% of the difference between the Available 1999 Insurance Proceeds and the total amount of Allowed 1999 Insured Tort Claims.  Upon payment of the total distribution to be received by holders of Allowed 1999 Insured Tort Claims, all Cash remaining in the 1999 Insured Tort Claims Escrow, if any, shall be returned to the Liquidating LLC or to the Reorganized Debtors, as applicable, for other uses in accordance with the Plan.

(e)     *Reliance Insurance Liquidation Proceedings.*  Holders of Allowed 1999 Insured Tort Claims will share in any available coverage under Debtors' 1999 matching-deductible professional and general insurance policy (the "Reliance Policy") with Reliance Insurance Company ("Reliance") only pursuant to the treatment provided in the Plan.  Holders of 1999 Insured Tort Claims are deemed to assign to the Debtors any rights such holders may have to file a  claim under the Reliance Policy in the liquidation proceedings presently pending with respect to Reliance in the Commonwealth Court of Pennsylvania (the "Reliance Liquidation Proceedings"), and the Debtors shall file a single claim in the Reliance Liquidation Proceeding on behalf of all holders of Allowed 1999 Insured Tort Claims.  To avoid duplication of claims under the Reliance Policy, any claim for proceeds of the Reliance Policy filed in the Reliance Liquidation Proceedings by a holder of an Allowed 1999 Insured Tort Claim shall be deemed void.  Any claim for proceeds of the Reliance Policy filed in the Reliance Liquidation Proceedings by the holder of a 1999 Insured Tort Claim shall not be deemed to cause the waiver of such claimant's 1999 Insured Tort Claim Against the Debtors.

### 4.9     *Settled Senior Subordinated Debt Claims (Class 9).*

(a)     *Allowance of Settled Senior Subordinated Debt Claims.*  On the Confirmation Date, the Settled Senior Subordinated Debt Claims shall be deemed Allowed in the aggregate amount of $1,150,814,148.09, consisting of (i) $161,616,667.67 arising under the 10-1/4% Notes, (ii) $466,625,000.00 arising under the 9-1/2% Notes, (iii) $522,432,775.00 arising under the 9-1/4% Notes; (iv) $26,251.00 arising under the 9⅝% Notes and (v) $113,454.42 arising under the 10¾% Notes.

(b)     *Enforcement of Subordination Provisions.*  As a result of enforcement of the subordination provisions of the Class 9 Indentures, the holders of Allowed Settled Senior Subordinated Debt Claims shall receive no property from the Debtors' estates.

(c)     *Distributions Pursuant to IHS Noteholder Settlement*. On the Effective Date, each holder of an Allowed Settled Senior Subordinated Debt Claim shall receive its Pro Rata Share of the IHS Noteholder Payment (including all actual interest and earnings thereon, and less the fees and expenses of the Majority Noteholder Counsel and the Class 9 Indenture Trustees as provided in subsections (d) and (e) below).

(d)     *Fees and Expenses of the Majority Noteholder Counsel*. On the Effective Date, the IHS Noteholder Escrow Agent will pay the Majority Noteholder Counsel's fees and expenses from the IHS Noteholder Escrow, in an amount not to exceed $200,000, and such payment shall not require further approval by the Bankruptcy Court.

(e)     *Fees and Expenses of the Class 9 Indenture Trustees*. On the Effective Date, the IHS Noteholder Escrow Agent will reimburse the Class 9 Indenture Trustees for their reasonable fees and expenses, including, without limitation, reasonable attorneys' fees and expenses and indemnification, from the IHS Noteholder Escrow Account to the extent permitted by the respective Class 9 Indentures, and such payment shall not require further approval by the Bankruptcy Court. Upon termination of the Class 9 Indentures, the Class 9 Indenture Trustees shall be released from any further obligation or duty under their respective Class 9 Indentures, except as necessary to effectuate distributions under the Plan.

(f)     *Certifications*. Subject to the occurrence of the Effective Date, IHS, Rotech, Citibank, N.A., the Majority Noteholders and the Class 9 Indenture Trustees shall execute and deliver to the IHS Noteholder Escrow Agent the written certifications and all other documents and information reasonably requested by the IHS Noteholder Escrow Agent to facilitate the distributions contemplated from the IHS Noteholder Escrow Account.

4.10   ***Convertible Senior Subordinated Debenture Claims (Class 10)***.

(a)     *Allowance of Convertible Senior Subordinated Debenture Claims*. On the Confirmation Date, the Convertible Subordinated Debenture Claims shall be deemed Allowed in the aggregate amount of $146,836,484.99.

(b)     *Enforcement of Subordination Provisions; No Distribution to Class 10*. As a result of enforcement of the subordination provisions of the Class 10 Indenture, no distribution shall be made to the holders of Allowed Convertible Senior Subordinated Debenture Claims.

(c)     *Payment of the Fees and Expenses of the Class 10 Indenture Trustee*. Subject to the occurrence of the Effective Date, the Class 10 Indenture Trustee shall be paid its outstanding fees and expenses accrued through the Effective Date (which shall in no event exceed $150,000) from the Class 4 Cash Fund prior to its distribution to the Disbursing Agent for Class 4, and any liens that the Class 10 Indenture Trustee had or asserted shall be deemed released upon such payment.

4.11    *Punitive Damage Claims (Class 11).*

Each holder of a Punitive Damage Claim shall receive no distribution under the Plan of Reorganization, but shall be paid in the ordinary course of business of the Reorganized Debtors solely from the proceeds of and to the extent such claims are covered by applicable insurance policies and such payment is permitted under governing state law.

4.12    *Subsidiary Equity Interests (Class 12).*

All existing Subsidiary Equity Interests will be retained by the holders thereof, provided, however, that if the Sale Transactions are implemented and the condition set forth in Section 7.9 of the Sale Agreement is satisfied, then IHS shall transfer certain Subsidiary Equity Interests identified in the Plan Supplement to either the LTC Subsidiary or the Therapy Subsidiary. Nothing in this Section 4.12 shall prohibit the Debtors, the Liquidating LLC or the Reorganized Debtors, as applicable, from merging or dissolving any of the Debtors' wholly-owned subsidiaries in accordance with any other provision of the Plan.

4.13    *IHS Equity Interests (Class 13).*

(a)    All IHS Equity Interests shall be deemed canceled as of the Effective Date, and the holder(s) of all IHS Equity Interests shall not receive or retain any property or interest in property on account of such IHS Equity Interests.

(b)    On the Effective Date, all IHS Equity Interests shall be extinguished, and the certificates and other documents representing such IHS Equity Interests shall be deemed canceled and of no force and effect.

SECTION 5.    **MEANS FOR IMPLEMENTATION**

5.1    *Substantive Consolidation of Debtors for Plan Purposes Only.*

Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated for the following purposes under the Plan: (a) no distributions shall be made under the Plan on account of intercompany claims among the Debtors; (b) all guarantees by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors; and (c) each and every Claim filed or to be filed in the IHS Reorganization Cases shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors. Notwithstanding the foregoing, with regard to Class 7, the Premiere Debtors will be separately consolidated with each other for purposes of effecting distributions to the holders of Allowed Premiere Unsecured Claims.

Such consolidation, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this Section) affect: (a) the legal and organizational structure of the Reorganized Debtors; (b) pre-and post-Commencement Date liens, guarantees and security interests that are required to be maintained (i) in connection with executory contracts or unexpired leases that were entered into during the IHS Reorganization Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code, (ii) pursuant to the Plan, or (iii) if the Stand-Alone Transactions are implemented, in connection with any financing entered into by the Reorganized Debtors on the Effective Date; and (c) distributions out of any insurance policies or proceeds of such policies. As of the Effective Date, each of the Reorganized Debtors shall be deemed to be properly capitalized, legally separate and distinct entities.

5.2 *Termination of Subordination Rights.*

The classification and treatment of Claims and Equity Interests under the Plan take into consideration all contractual, legal and equitable subordination and subrogation rights, whether arising under general principles of equitable subordination, section 510(c) of the Bankruptcy Code or otherwise, that any holder of a Claim or Equity Interest may have against any other holder with respect to any distribution to be made pursuant to the Plan. Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, all contractual, legal or equitable subordination or subrogation rights that a creditor or interest holder may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination or subrogation rights shall be permanently enjoined. Accordingly, except as otherwise provided in the Plan, holders of Allowed Claims shall not be subject to payment to a beneficiary of such terminated subordination or subrogation rights or to levy, garnishment, attachment or other legal process by any such beneficiary on account of such terminated subordination or subrogation rights.

5.3 *United States Settlement Agreement.*

Subject to the occurrence of the Effective Date, the Debtors are authorized to enter into and perform under the United States Settlement Agreement.

5.4 *Release of Non-Debtor Affiliates.*

As of the Effective Date, any non-Debtor corporate, partnership, and joint venture subsidiaries of the Debtors who are obligors under any of the Senior Lender Agreements, shall be deemed released by IHS and the holders of the Senior Lender Claims from all such obligations, and IHS and the holders of the Senior Lender Claims shall take all reasonable action to confirm such release.

40

### 5.5    *Release of Representatives.*

As of the Effective Date, the respective officers, directors, agents, employees, representatives, financial advisors, professionals, accountants, and attorneys of the Debtors, solely to the extent of their direct and indirect participation in the business and financial affairs of the Debtors, shall be deemed released by the Debtors and the Debtors' estates from any and all Claims against them held by the Debtors or the Debtors' estates solely to the extent such Claims relate to their conduct in their respective capacities as representatives of the Debtors, except as otherwise expressly provided in the Plan or the Confirmation Order.

### 5.6    *Limitation on Releases, Indemnification and Exculpation of Directors.*

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, no provision of the Plan or the Confirmation Order, including, without limitation, Sections 5.5, 8.4 and 10.7 of the Plan, will in any way modify, release, limit or be deemed in any way to modify, release or limit, the liability of any officer or director from any claims or Causes of Action that are or may be asserted in the Compensation Action, subject to, and in accordance with, the Order, dated January 24, 2002, authorizing the Creditors' Committee to commence the Compensation Action.

### 5.7    *Cancellation of Existing Securities and Agreements.*

Except for purposes of evidencing a right to distributions under the Plan or as otherwise provided hereunder, on the Effective Date all agreements and other documents evidencing Claims or rights of any holder of a Claim against any of the Debtors, including all indentures and notes evidencing such Claims, shall be canceled and deemed null and void and of no force and effect as against the Debtors; provided, however, that (a) the Class 9 Indentures shall continue in effect for the purposes of (i) allowing the Class 9 Indenture Trustees to make any distributions on account of the respective Settled Senior Subordinated Debt Claims pursuant to the Plan and to perform such other necessary administrative functions with respect thereto, and (ii) permitting the Class 9 Indenture Trustees to maintain and assert any rights or liens for reasonable fees, costs and expenses under the Class 9 Indentures; and (b) the Class 10 Indenture shall continue in effect for the purpose of allowing the Class 10 Indenture Trustee to retain its charging lien until payment of its fees pursuant to Section 4.10(c) of the Plan. Upon termination of the indentures, the indenture trustees shall be released from any further obligation or duty under their respective indentures, except as necessary to effectuate distributions under the Plan.

### 5.8    *Merger and Liquidation of Subsidiaries.*

Except as otherwise set forth herein, prior to or as of the Effective Date, the Debtors may cause any or all of the Debtors to engage in any corporate restructuring transactions deemed reasonably necessary or appropriate to effectuate the implementation of the Plan, including, without limitation, merging, dissolving or transferring assets between or among Debtors.

5.9    *The Sale Transactions.*

(a)    *Authorization to Implement the Sale Transactions.* The Debtors are authorized to implement the transactions set forth in this Section 5.9 <u>unless</u> either (i) the conditions to Closing (as defined in the Sale Agreement) under the Sale Agreement have not been satisfied by July 31, 2003 and the Sale Agreement is terminated or (ii) the Debtors earlier determine that Purchaser will not proceed with a Closing under the Sale Agreement or the Sale Agreement is otherwise terminated. Upon the occurrence of (i) or (ii) above, the Stand-Alone Transactions set forth in Section 5.10 shall be implemented in lieu of the transactions set forth in this Section 5.9.

(b)    *The Sale Agreement; Formation of LTC Subsidiary and Therapy Subsidiary.* Subject to (a) above, the occurrence of the Closing and the occurrence of the Effective Date, IHS is authorized to perform its obligations under the Sale Agreement. The Sale Agreement provides for the formation of the LTC Subsidiary and the Therapy Subsidiary. The Sale Agreement further provides that simultaneously with the Closing, IHS will (i) contribute and assign to the LTC Subsidiary all of its assets and liabilities not described in clause (ii) below, including without limitation the capital stock of all of the Subsidiaries (as defined in the Sale Agreement) that conduct IHS's long-term care business and any and all past, current and future PLGL Claims arising after the Commencement Date, but excluding the Excluded Assets and the Excluded Liabilities (each as defined in the Sale Agreement), and (ii) contribute and assign to the Therapy Subsidiary all of its assets and liabilities that relate to IHS's contract rehabilitation therapy business, including without limitation the capital stock of all of the Subsidiaries that conduct IHS's contract rehabilitation therapy business, but excluding the Excluded Assets and the Excluded Liabilities.

(c)    *Formation of the Liquidating LLC.* The Liquidating LLC shall be established in accordance with the terms of the Liquidating LLC Agreement prior to the Effective Date. Upon execution and delivery of the Liquidating LLC Agreement, the Liquidating Manager shall be authorized to take any other steps necessary to complete the organization of the Liquidating LLC and to manage the Liquidating LLC, provided that prior to the Effective Date, the Debtors or the Liquidating Manager, as applicable, are authorized to act as organizers of the Liquidating LLC and take such steps in furtherance thereof as may be reasonably necessary or appropriate to ensure that the Liquidating LLC shall be formed and in existence as of the Effective Date. The Liquidating LLC Agreement shall be substantially in the form contained in the Plan Supplement and shall contain provisions customary for agreements of Delaware limited liability companies utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Liquidating LLC as a partnership for federal income tax purposes.

(d)    *Purpose and Operation of the Liquidating LLC.* The principal purpose of the Liquidating LLC shall be to liquidate, collect and maximize the Cash value of the assets of the Debtors remaining after the Sale Agreement is consummated and make distributions in respect of Allowed Claims in accordance with the terms of the Plan. During the term of its existence, the Liquidating LLC shall comply with all of its obligations, including but not limited to obligations arising under the Plan or by operation of law.

(e)     *Assets of the Liquidating LLC.*  On the Effective Date, the Debtors shall transfer and assign to the Liquidating LLC (i) all assets of the Debtors or their estates which are neither distributed nor abandoned by the Debtors on the Effective Date, including, without limitation, all Cash and Cash proceeds of the Sale Agreement, all Excluded Assets (including the claims and Causes of Action that are or may be asserted in the Compensation Action) and all Excluded Subsidiaries; and (ii) the Excluded Liabilities, subject to their treatment under the Plan.  On the Effective Date, the Liquidating Manager shall establish the Distribution Reserve Account, in which the Liquidating Manager shall deposit (i) all Cash and cash equivalents received from the Debtors on the Effective Date; and (ii) any net realized Cash proceeds received by the Liquidating Manager thereafter from, among other things, the liquidation of non-Cash assets and prosecution of the Debtors' Claims.  On the Effective Date, the Liquidating Manager shall establish the Excluded Administrative Expense Claims Reserve, the Disputed Other Priority Claims Account, the Disputed Other Secured Claims Account, the Disputed Priority Tax Claims Account, the Disputed General Unsecured Claims Reserve, the Unclaimed Distribution Reserve and the Expense Reserve Account, and shall transfer funds from the Distribution Reserve Account to such respective Reserves and Accounts as provided in Section 6.2.  The Liquidating LLC will hold and administer the following assets: (i) the Excluded Administrative Expense Claims Reserve; (ii) the Disputed Other Priority Claims Account, (iii) the Disputed Other Secured Claims Account, (iv) the Disputed Priority Tax Claims Account, (v) the Unclaimed Distributions Reserve; (vi) the Expense Reserve Account; (vii) the Disputed Premiere Unsecured Claims Account; (viii) the Disputed General Unsecured Claims Reserve; (ix) the 1999 Insured Tort Claims Escrow; (x) the Distribution Reserve Account; (xi) all Debtors' Claims; (xii) the Wind-Up Reserve; and (xiii) any other assets of the Debtors that are neither abandoned nor distributed on the Effective Date.

(f)     *Selection, Removal and Replacement of the Liquidating Manager.*  The Liquidating Manager shall be selected jointly by the Debtors, the Creditors' Committee and the Unofficial Senior Lenders' Working Group and appointed pursuant to the Confirmation Order.  The identity of the Liquidating Manager shall be disclosed in the Confirmation Order.  After the Effective Date, the Liquidating Manager may be removed and/or replaced by a successor in accordance with the terms of the Liquidating LLC Agreement.

(g)     *Powers and Duties of the Liquidating Manager.*  The Liquidating Manager shall be deemed the representative of the estate under section 1123(b)(3)(B) of the Bankruptcy Code, and shall have all rights associated therewith.  Pursuant to the terms of the Liquidating LLC Agreement, the Liquidating Manager shall have all duties, powers, and standing and authority necessary to implement the Plan and to administer and liquidate the assets of the Liquidating LLC for the benefit of holders of Allowed Claims.  These powers shall include, without limitation, the following:

(1)     Administering the Reserves;

(2)     Investing any Cash of the Liquidating LLC;

43

(3)    Selling or otherwise transferring for value any non-Cash assets that are included in the Liquidating LLC;

(4)    Filing with the Bankruptcy Court reports and other documents required by the Plan or otherwise required to close the IHS Reorganization Cases;

(5)    Preparing and filing tax and informational returns for the Debtors, the Liquidating LLC, the Disputed General Unsecured Claims Reserve and the 1999 Insured Tort Claims Escrow;

(6)    Retaining such Professionals as the Liquidating Manager may in his or her discretion deem necessary for the operation and management of the Liquidating LLC, including entering into contingent fee arrangements with respect to the prosecution of Debtors' Claims;

(7)    Litigating or settling any Claims or causes of action asserted against the Debtors or the Liquidating LLC and using all commercially reasonable efforts to cooperate with other parties in such litigation;

(8)    Prosecuting objections to Claims;

(9)    Evaluating, filing, litigating, prosecuting, settling or abandoning Debtors' Claims and/or causes of action of the Liquidating LLC;

(10)    Setting off amounts owed to the Debtors or the Liquidating LLC against any amounts otherwise due to be distributed to the holder of an Allowed Claim and holder of Membership Interests;

(11)    Abandoning any property of the Debtors or the Liquidating LLC that cannot be sold or otherwise disposed of for value and whose distribution to holders of Allowed Claims would not be feasible or cost-effective in the reasonable judgment of the Liquidating Manager;

(12)    Administering the Disputed General Unsecured Claims Reserve and the 1999 Insured Tort Claims Escrow, each of which shall be maintained as a separate, segregated fund. The Liquidating Manager's service as manager of the Liquidating LLC and administrator of the Disputed General Unsecured Claims Reserve and the 1999 Insured Tort Claims Escrow shall be considered as being provided in separate capacities. The Liquidating LLC shall indemnify the Liquidating Manager for its actions as administrator of the Disputed General Unsecured Claims Reserve and the 1999 Insured Tort Claims Escrow to the fullest extent permitted by law;

(13)    Making interim and final distributions of Liquidating LLC assets;

(14)    Winding up the affairs of the Debtors, the Non-Debtor Affiliates, and the Liquidating LLC and dissolving them under applicable law as appropriate;

(15)    Providing for storage and disposal of records;

(16)    Incurring such charges, costs, and fees as are necessary to wind down or sell any operating assets of the Liquidating LLC; and

(17)    Taking any other actions that the Liquidating Manager, in his or her reasonable discretion, determines to be in the best interest of the Debtors' estates.

(h)    *Exculpation and Indemnification of Liquidating Manager.* The Liquidating Manager Agreement shall provide for and govern the exculpation and indemnification of the Liquidating Manager.

(i)    *Tax Valuation of Assets.* As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the Liquidating Manager shall determine, in good faith, the value of the assets (other than Cash) transferred to the Liquidating LLC under the Plan. The value determined by the Liquidating Manager shall be conclusive absent manifest error. All parties (including, without limitation, the Debtors, the Liquidating Manager and the holders of Allowed Claims) shall use this valuation for all federal income tax purposes. This valuation shall be made available by the Liquidating Manager upon written request of the holders of Membership Interests or their assigns.

(j)    *Distributions by the Liquidating Manager.* The Liquidating Manager is authorized to make all distributions required under the Plan in accordance with Section 6.2 of the Plan.

(k)    *Wind-Up and Dissolution of Debtors and Non-Debtor Affiliates.* The Liquidating Manager shall be responsible for winding up the affairs any Debtor and any Non-Debtor Affiliate transferred to the Liquidating LLC on or after the Effective Date which is not sold, transferred or otherwise disposed of by the Liquidating Manager, including but not limited to preparing and filing final tax returns, filing dissolution documents pursuant to applicable law, paying any franchise taxes and other fees that are due in connection with such dissolution, and taking any other actions that are necessary to wind up the affairs of the Debtors and such Non-Debtor Affiliates.

(l)    *Compensation of Liquidating Manager.* The compensation of the Liquidating Manager shall be as specified in the Liquidating Manager Agreement and shall be paid by the Liquidating LLC. The Liquidating Manager shall also be entitled to reimbursement of his or her reasonable expenses, which expenses shall include the reasonable fees and expenses of attorneys and/or accountants and other Professionals retained by the Liquidating Manager, as more fully described in the Liquidating Manager Agreement. Such compensation and expenses shall be paid solely from the Expense Reserve Account.

(m)    *Membership Interests in the Liquidating LLC.* On the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed Senior Lender Claim in Class 4, each holder of an Allowed General Unsecured Claim in Class 6 (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made), and the Disputed General Unsecured

45

Claims Reserve, for the benefit of the holders of the deemed Disputed Claims referred to in Sections 4.2(c) and 4.2(d)(2), and Disputed Claims in Class 6 (other than a Disputed General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made), by operation of the Plan, shall: (i) be admitted to the Liquidating LLC as a member of the Liquidating LLC, (ii) become bound by the Liquidating LLC Agreement, and (iii) receive a Membership Interest in the Liquidating LLC conferring membership in the Liquidating LLC and representing the rights conferred upon such holder by the Plan. No other entity, including the Debtors, shall have any interest, legal, beneficial, or otherwise, in the Liquidating LLC or its assets. The Liquidating Manager shall maintain a registry of the Membership Interests in the Liquidating LLC.

(n)     *Non-Transferability of Membership Interests in the Liquidating LLC.* Except as otherwise provided in the Liquidating LLC Agreement, Membership Interests will be non-transferable.

(o)     *Termination of the Liquidating LLC; Discharge of the Liquidating Manager.* In accordance with Section 6.2 of the Plan, as soon as practicable after the Final Liquidating LLC Distribution Date, the Liquidating Manager shall wind up the affairs of the Liquidating LLC, file final tax returns, arrange for storage of its records and dissolve it pursuant to applicable law. As soon as practicable thereafter, the Liquidating Manager shall file with the Bankruptcy Court a final report of distributions and perform such other duties as are specified in the Plan, whereupon the Liquidating Manager shall have no further duties under the Plan.

### 5.10     *The Stand-Alone Transactions.*

(a)     *Authorization to Implement the Stand-Alone Transactions.* If the Sale Transactions are not implemented, the Debtors are authorized to implement the transactions set forth in this Section 5.10 on and subject to the occurrence of the Effective Date.

(b)     *Formation of the Stand-Alone LLC.* The Stand-Alone LLC shall be established in accordance with the terms of the Stand-Alone LLC Agreement prior to the Effective Date. Upon execution and delivery of the Stand-Alone LLC Agreement, the Stand-Alone LLC Manager shall be authorized to take any other steps necessary to complete the organization of the Stand-Alone LLC and to manage the Stand-Alone LLC, provided, that prior to the Effective Date, the Debtors or the Stand-Alone LLC Manager, as applicable, are authorized to act as organizers of the Stand-Alone LLC and take such steps in furtherance thereof as may be reasonably necessary or appropriate to ensure that the Stand-Alone LLC shall be formed and in existence as of the Effective Date. The Stand-Alone LLC Agreement shall be substantially in the form contained in the Plan Supplement and shall contain provisions customary for agreements of Delaware limited liability companies utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Stand-Alone LLC as a partnership for federal income tax purposes.

46

      (c)    *Purpose and Operation of the Stand-Alone LLC.* The principal purposes of the Stand-Alone LLC shall be to prosecute the Compensation Action and to make distributions, if any, in respect of proceeds received in connection therewith, to holders of Allowed Claims in Class 4 and Class 6 in accordance with the terms of the Plan. During the term of its existence, the Stand-Alone LLC shall comply with all of its obligations, including, but not limited to, obligations arising under the Plan or by operation of law.

      (d)    *Assets of the Stand-Alone LLC.* On the Effective Date, the Debtors shall transfer and assign to the Stand-Alone LLC the Claims and Causes of Action of the Debtors' estates that are or may be asserted in the Compensation Action. On the Effective Date, if the Stand-Alone LLC has insufficient Cash to pay the expenses associated with the prosecution of the Compensation Action, the Reorganized Debtors shall advance to the Stand-Alone LLC funds for such purpose. In such event, the Stand-Alone LLC Manager shall establish an account in which the Stand-Alone LLC Manager shall deposit all advances, if any, received from the Debtors.

      (e)    *Selection, Removal and Replacement of the Stand-Alone LLC Manager.* The Stand-Alone LLC Manager shall be selected jointly by the Creditors' Committee and the Unofficial Senior Lenders' Working Group and appointed pursuant to the Confirmation Order. The identity of the Stand-Alone LLC Manager shall be disclosed in the Confirmation Order. After the Effective Date, the Stand-Alone LLC Manager may be removed and/or replaced by a successor in accordance with the terms of the Stand-Alone LLC Agreement.

      (f)    *Powers and Duties of the Stand-Alone LLC Manager.* Pursuant to the terms of the Stand-Alone LLC Agreement, the Stand-Alone LLC Manager shall have all duties, powers, and standing and authority necessary to administer and liquidate the assets of the Stand-Alone LLC, to prepare and file tax and informational returns for the Stand-Alone LLC, to set off amounts owed to the Debtors or the Stand-Alone LLC against any amounts otherwise due to be distributed to the holders of membership interests in the Stand-Alone LLC and to prosecute the Compensation Action.

      (g)    *Exculpation and Indemnification of Stand-Alone LLC Manager.* The Stand-Alone LLC Agreement shall provide for and govern the exculpation and indemnification of the Stand-Alone LLC Manager.

      (h)    *Distributions by the Stand-Alone LLC Manager.* The Stand-Alone LLC Manager is authorized to make all distributions required under the Plan or the Stand-Alone LLC Agreement.

      (i)    *Tax Valuation of Assets.* As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the Stand-Alone LLC Manager shall determine, in good faith, the value of the assets (other than Cash, if any) transferred to the Stand-Alone LLC under the Plan. The value determined by the Stand-Alone LLC Manager shall be conclusive absent manifest error. All parties (including, without limitation, the Stand-Alone LLC Manager and the holders of

Allowed Claims) shall use this valuation for all federal income tax purposes. This valuation shall be made available by the Stand-Alone LLC Manager upon written request of the holders of membership interests in the Stand-Alone LLC or their assigns.

(j)    *Compensation of Stand-Alone LLC Manager.*  The compensation of the Stand-Alone LLC Manager shall be as specified in the Stand-Alone LLC Agreement and shall be paid by the Stand-Alone LLC. The Stand-Alone LLC Manager shall also be entitled to reimbursement of his or her reasonable expenses, which expenses shall include the reasonable fees and expenses of attorneys and/or accountants and other Professionals retained by the Stand-Alone LLC Manager, as more fully described in the Stand-Alone LLC Agreement. Such compensation and expenses shall be paid in accordance with Section 5.10(d) of the Plan.

(k)    *Membership Interests in the Stand-Alone LLC.*  On the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed Senior Lender Claim in Class 4, each holder of an Allowed General Unsecured Claim in Class 6 (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made), and the Disputed General Unsecured Claims Reserve, for the benefit of the holders of the deemed Disputed Claims referred to in Sections 4.2(c) and 4.2(e)(2), and Disputed Claims in Class 6 (other than a Disputed General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c)(2) of the Plan), by operation of the Plan, shall:  (i) be admitted to the Stand-Alone LLC as a member of the Stand-Alone LLC, (ii) become bound by the Stand-Alone LLC Agreement, and (iii) receive a Stand-Alone membership interest in the Stand-Alone LLC conferring membership in the Stand-Alone LLC and representing the rights conferred upon such holder by the Plan. No other entity, including the Debtors and the Reorganized Debtors shall have any interest, legal, beneficial, or otherwise, in the Stand-Alone LLC or its assets. The Stand-Alone LLC Manager shall maintain a registry of the membership interests in the Stand-Alone LLC.

(l)    *Non-Transferability of Membership Interests in the Stand-Alone LLC.* Except as otherwise provided in the Stand-Alone LLC Agreement, membership interests in the Stand-Alone LLC will be non-transferable.

(m)    *Termination of the Stand-Alone LLC; Discharge of the Stand-Alone LLC Manager.*  In accordance with Section 6.3 of the Plan, as soon as practicable after the Final Stand-Alone Distribution Date, the Stand-Alone LLC Manager shall wind up the affairs of the Stand-Alone LLC, file final tax returns, arrange for storage of its records and dissolve it pursuant to applicable law. As soon as practicable thereafter, the Stand-Alone LLC Manager shall file with the Bankruptcy Court a final report of distributions and perform such other duties as are specified in the Plan, whereupon the Stand-Alone LLC Manager shall have no further duties under the Plan.

(n)    *Exit Financing Facility.*  The Debtors are authorized to enter into the Exit Financing Facility for purposes of funding obligations under the Plan and providing for the working capital and capital expenditure needs of the Reorganized Debtors.

(o)    *Authorization of Plan Securities*. The Reorganized Debtors are authorized to issue the Plan Securities without the need for further corporate action.

(p)    *New Subordinated Note Indenture*. The Reorganized Debtors are authorized to enter into the New Subordinated Note Indenture and issue New Subordinated Notes to the holders of Allowed Senior Lender Claims and Allowed General Unsecured Claims in Class 6 (other than General Unsecured Claims in respect of which a Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c)(2) of the Plan), as provided in the Plan in an aggregate principal amount of up to $40,000,000.00.

(q)    *Registration Rights Agreement*. On the Effective Date, Reorganized IHS shall execute and deliver a Registration Rights Agreement substantially in the form set forth in the Plan Supplement obligating Reorganized IHS under certain circumstances to register the New Common Stock under the Securities Act of 1933, as amended, all as more fully set forth in the Registration Rights Agreement.

(r)    *Board of Directors*. The initial board of directors of Reorganized IHS shall consist of up to nine (9) members whose names, qualifications and compensation shall be disclosed at or prior to the Confirmation Hearing. A majority of the members of the board of directors of Reorganized IHS will be selected by the holders of the Senior Lender Claims. After the Effective Date, the holders of the New Common Stock will elect members of the board of directors of Reorganized IHS in accordance with the Amended Certificate of Incorporation and Amended Bylaws and applicable nonbankruptcy law.

(s)    *Corporate Action*. Reorganized IHS shall file the Amended Certificate of Incorporation with the Secretary of State of the State of Delaware on the Effective Date, and each of the Debtors that is a corporation shall file its respective amended certificate of incorporation with the Secretary of State of the applicable jurisdiction on the Effective Date. The Amended Certificate of Incorporation and the amended certificates of incorporation for each of the Reorganized Debtors that are corporations shall prohibit the issuance of nonvoting equity securities, subject to further amendment of such certificates of incorporation as permitted by applicable law. The Amended Bylaws shall be deemed adopted by the board of directors of Reorganized IHS as of the Effective Date. All partnership and limited liability company agreements to which any of the Debtors are parties shall be treated in accordance with Section 8 hereof. The Amended Certificate of Incorporation shall, inter alia, authorize the cancellation of all IHS Equity Interests and authorize the issuance of up to 50,000,000 shares of New Common Stock, of which 2,500,000 shares shall be issued to holders of Allowed Claims in Classes 4 and 6 pursuant to the Plan.

The adoption of the Amended Certificate of Incorporation and the Amended Bylaws shall be authorized and approved in all respects to be effective as of the Effective Date, in each case without further action under applicable law, regulation, order or rule, including, without limitation, any action by the shareholders of Reorganized IHS. On the Effective Date, the cancellation of all IHS Equity Interests, the authorization and issuance of the New Common Stock and all other matters

49

provided in the Plan involving the corporate structure of the Reorganized Debtors or corporate action by any of the Reorganized Debtors shall be deemed to have occurred, be authorized, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or directors of any of the Debtors or any of the Reorganized Debtors.

### 5.11    *Termination of Security Interests Granted Under DIP Credit Facility.*

Upon the payment or satisfaction in full of all DIP Credit Facility Claims (a) all liens and security interests granted to secure such obligations shall be deemed terminated and shall be of no further force and (b) the lenders under the DIP Credit Facility shall, at the Debtors' expense, take all reasonable action necessary to confirm the removal of any claims and liens on the properties of the Debtors securing the DIP Credit Facility.

## SECTION 6.    DISTRIBUTION PROCEDURES

### 6.1    *General Provisions.*

(a)    *Distribution Record Date.*  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their representatives shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests. The Debtors, the Liquidating LLC, the Stand-Alone LLC or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors, the Liquidating LLC, the Stand-Alone LLC or the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

(b)    *Date of Distributions.*  Any distributions or payments to be made pursuant to the Plan shall be deemed to be timely made if made within thirty (30) days after the dates specified in the Plan. In the event that any payment or act under the Plan is required to be made, or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(c)    *Disbursing Agent.*  If the Sale Transactions are implemented, all distributions under the Plan (other than distributions described in the next sentences) shall be made by the Liquidating LLC, as Disbursing Agent, or such other entity designated by the Liquidating LLC as a Disbursing Agent on or after the Effective Date. If the Stand-Alone Transactions are implemented, all distributions under the Plan (other than distributions described in the next sentences) shall be made by Reorganized IHS, as Disbursing Agent, or such other entity designated by Reorganized IHS as a Disbursing Agent or the Stand-Alone LLC, as applicable, on or after the Effective Date. Citibank,

50

N.A., as administrative agent under the Credit Agreement and/or such other entity as it may reasonably designate, shall be the Disbursing Agent for the holders of Claims in Class 4. Citicorp USA, Inc., as administrative agent under the Participation Agreement, and/or such other entity as it may reasonably designate, shall be the Disbursing Agent for the holders of Claims in Class 2. U.S. Bank, N.A., shall be the Disbursing Agent for holders of Claims in Class 9. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Liquidating LLC, the Stand-Alone LLC or Reorganized IHS, as applicable.

       (d)    *Rights and Powers of Disbursing Agent.*

       (1)    *Powers of the Disbursing Agent.* The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ Professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

       (2)    *Expenses Incurred on or After the Effective Date.* Except as otherwise stated herein or ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by any Disbursing Agent on or after the Effective Date (including, without limitation, reasonable attorney's fees and expenses) shall be paid out of the distribution to the Class (other than Class 7) for which the Disbursing Agent's services were rendered and/or expenses were incurred.

       (e)    *Surrender of Instruments.* From and after the Effective Date, except as provided otherwise herein, each certificated instrument or note which represents a Claim or Equity Interest against any of the Debtors shall be deemed to be null and void and of no force and effect. Except as Reorganized IHS may otherwise agree, as a condition to receiving any distribution under the Plan, each holder of a certificated instrument or note (other than a holder of an Allowed Senior Lender Claim) must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any holder of such instrument or note that fails to (a) surrender such instrument or note, or (b) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and/or furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the first anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Plan of Reorganization. Any distribution so forfeited shall become property of the Liquidating LLC, the Stand-Alone LLC or Reorganized IHS, as applicable.

       (f)    *Delivery of Distributions.* Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim, except the holders of Claims in Classes 2, 4 and 9, shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the

books and records of the Debtors or their agents or in a letter of transmittal, unless the Debtors, the Liquidating LLC or the Reorganized Debtors, as applicable, have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder. Any distributions to Citibank, N.A., as administrative agent under the Credit Agreement, shall be deemed a distribution to the holders of Senior Lender Claims. Any distributions to Citicorp USA, Inc., as agent under the Participation Agreement, shall be deemed a distribution to the holders of Secured Synthetic Lease Claims. In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest or accruals of any kind; provided, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to the Liquidating LLC, the Stand-Alone LLC or Reorganized IHS, as applicable, and the Claim of any holder to such property or interest in property shall be discharged and forever barred.

     (g)    *Manner of Payment Under Plan of Reorganization.*

     (1)    All distributions of Cash, New Common Stock, Membership Interests, New Subordinated Notes, Class 4 Stand-Alone Membership Interests and Class 6 Stand-Alone Membership Interests, if any, to the creditors of each of the Debtors under the Plan of Reorganization shall be made by, or on behalf of, the applicable Debtor.

     (2)    At the option of the Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer.

     (h)    *Fractional Shares.*

If the Stand-Alone Transactions are implemented, no fractional shares of New Common Stock shall be distributed. For purposes of distribution, fractional shares of New Common Stock shall be rounded up to the next whole number.

     (i)    *Set offs.*

The Reorganized Debtors, the Stand-Alone LLC or the Liquidating LLC, as applicable, may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors, the Stand-Alone LLC or the Liquidating LLC of any such claim the Debtors may have against the holder of such Claim.

52

(j)        *Compliance With Tax Requirements.*

To the extent applicable, the Liquidating LLC, the Stand-Alone LLC or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them or on the Disputed General Unsecured Claims Reserve or on the 1999 Insured Tort Claims Escrow by any governmental unit, and all distributions pursuant to the Plan of Reorganization shall be subject to such withholding and reporting requirements.

(k)        *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

6.2    ***Distribution Procedures in the Event the Sale Transactions are Implemented.***

The following procedures for making distributions under the Plan shall, unless otherwise indicated, only be applicable in the event that the Sale Transactions are implemented.

(a)        *Expense Reserve Account for Operation of the Liquidating LLC.*

(1)        On the Effective Date, or as soon as reasonably practicable thereafter, the Liquidating Manager shall deposit in the Expense Reserve Account sufficient funds from the Distribution Reserve Account to pay all accrued and projected expenses and costs (including, without limitation, the Wind-Up Reserve) of the Liquidating LLC to be incurred through the Final Liquidating LLC Distribution Date.

(2)        Subject to the terms of the Liquidating LLC Agreement, the Liquidating Manager may, from time to time, transfer Cash from the Expense Reserve Account to the Distribution Reserve Account for interim distributions to creditors to the extent that the amount of Cash held in the Expense Reserve Account exceeds the amount that the Liquidating Manager determines, from time to time, should be retained for purposes of paying the fees and expenses of the Liquidating LLC.

(b)        *Excluded Administrative Expense Claims.*

(1)        On the Effective Date, or as soon thereafter as is reasonably practicable, the Liquidating Manager shall:

(A)        pay in full all Excluded Administrative Expense Claims which have become Allowed as of the Effective Date; and

53

(B)     deposit in the Excluded Administrative Expense Claims Reserve sufficient funds from the Distribution Reserve Account to pay all Disputed Excluded Administrative Expense Claims in full.

(2)     Each Disputed Excluded Administrative Expense Claim shall be paid from the Excluded Administrative Expense Claims Reserve on the first Business Day after the date that is thirty (30) calendar days after the date such Disputed Excluded Administrative Expense Claim becomes an Allowed Excluded Administrative Expense Claim, or as soon thereafter as is reasonably practicable.

(3)     If the Excluded Administrative Expense Claims Reserve has insufficient funds to satisfy the aggregate amount of Allowed Excluded Administrative Expense Claims, the Liquidating Manager shall satisfy the excess Allowed Excluded Administrative Expense Claims from the Distribution Reserve Account.  If excess funds remain in the Excluded Administrative Expense Claims Reserve after all such Allowed Excluded Administrative Expense Claims have been paid, disallowed or withdrawn, such excess funds shall be transferred to the Distribution Reserve Account.

(c)     *Priority Tax Claims.*

(1)     On the Effective Date, or as soon thereafter as is reasonably practicable, the Liquidating Manager shall

(A)     pay in full all Priority Tax Claims which have become Allowed as of the Effective Date; and

(B)     transfer to the Disputed Priority Tax Claims Account sufficient funds from the Distribution Reserve Account to pay all Disputed Priority Tax Claims in full.

(2)     Each Disputed Priority Tax Claim shall be paid from the Disputed Priority Tax Claims Account on the first Business Day after the date that is thirty (30) calendar days after the date such Disputed Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable.

(3)     When all Disputed Priority Tax Claims have been either Allowed and paid, disallowed, or withdrawn, the Liquidating Manager shall transfer to the Distribution Reserve Account any Remaining Funds from the Disputed Priority Tax Claims Account.

(d)     *Other Priority Claims.*

(1)     On the Effective Date, or as soon thereafter as is reasonably practicable, the Liquidating Manager shall

54

(A)    pay in full all Other Priority Claims which have become Allowed as of the Effective Date; and

(B)    transfer to the Disputed Other Priority Claims Account sufficient funds from the Distribution Reserve Account to pay all Disputed Other Priority Claims in full.

(2)    Each Disputed Other Priority Claim shall be paid from the Disputed Other Priority Claims Account on the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Disputed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is reasonably practicable.

(3)    When all Disputed Other Priority Claims have been either Allowed and paid, disallowed, or withdrawn, the Liquidating Manager shall transfer to the Distribution Reserve Account any Remaining Funds from the Disputed Other Priority Claims Account.

(e)    *Secured Synthetic Lease Claims.*

(1)    On the Effective Date, or as soon thereafter as is reasonably practicable, the Liquidating Manager shall deliver the Restructured Headquarters Note and pay all amounts payable pursuant to Section 4.2(d)(1) hereof, to Citicorp USA, Inc., as Disbursing Agent.

(2)    The Liquidating LLC shall sell the Headquarters Property as provided in Section 4.2(d)(2) hereof, and make all payments as provided therein. The Liquidating Manager shall deposit any proceeds from such sale which are in excess of the amounts required to be paid pursuant to Section 4.2(d)(2) into the Distribution Reserve Account.

(f)    *Other Secured Claims.*

(1)    On the Effective Date, or as soon thereafter as is reasonably practicable, with respect to each Other Secured Claim (other than those for which the Debtors' obligations are being assumed by the Purchaser), the Liquidating Manager shall

(A)    pay in full from the Distribution Reserve Account all Allowed Other Secured Claims or provide for such other treatment as may have otherwise been agreed upon by such holder and the Debtors or the Liquidating Manager, as the case may be; and

(B)    transfer to the Disputed Other Secured Claims Account sufficient funds from the Distribution Reserve Account to pay all Other Secured Claims that are Disputed Claims in full if and to the extent they are Allowed.

55

(2)    If and to the extent an Other Secured Claim that is a Disputed Claim becomes an Allowed Other Secured Claim, the Liquidating Manager shall pay such Claim in Cash in an amount equal to the Allowed Amount of such Claim from the Disputed Other Secured Claims Account on the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Other Secured Claim that is a Disputed Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is reasonably practicable.

(3)    When all Other Secured Claims that are Disputed Claims have been either Allowed and paid or satisfied, disallowed, or withdrawn, the Liquidating Manager shall transfer to the Distribution Reserve Account any Remaining Funds from the Disputed Other Secured Claims Account.

(g)    *Senior Lender Claims.*

On the Effective Date, or as soon thereafter as is reasonably practicable, the Liquidating Manager shall deliver to Citibank, N.A., as Disbursing Agent, or its designee, the Class 4 Cash Fund. In addition, each holder of an Allowed Senior Lender Claim shall be entitled to a Class 4 Membership Interest and all distributions as provided in Section 4.4(c)(2) above pursuant to which it shall be entitled to receive its Class 4 Pro Rata Share of all distributions made pursuant to Sections 6.2(m), 6.2(n) and 6.2(p) below, taking into account an appropriate reserve amount for any potential Allowed Senior Lender Claim arising in favor of holders of Class 2 B-Notes and Class 2 Certificates as described in Sections 4.2(c) and 4.2(d)(2).

(h)    *General Unsecured Claims.*

On the Effective Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed General Unsecured Claim which has not made the Class 6 Cash-Out Election shall be entitled to a Class 6 Membership Interest as provided in Section 4.6(a)(1) above, pursuant to which it shall be entitled to receive its Class 6 Pro Rata Share of all distributions made pursuant to Sections 6.2(m), 6.2(n) and 6.2(p) below, taking into account an appropriate reserve amount for any potential Allowed Senior Lender Claim arising in favor of holders of Class 2 B-Notes and Class 2 Certificates as described in Sections 4.2(c) and 4.2(d)(2).

(i)    *Premiere Unsecured Claims.*

(1)    Irrespective of whether the Sale Transactions or the Stand-Alone Transactions are implemented, on the Effective Date, or as soon thereafter as is reasonably practicable, the Liquidating Manager or the Reorganized Debtors, as applicable, shall:

(A)    pay to each holder of an Allowed Premiere Unsecured Claim an initial distribution as provided for under Section 4.7 of the Plan; and