(B)    transfer to the Disputed Premiere Unsecured Claims Account the Cash equal to the difference between the total amounts paid pursuant to subsection (1) above and $1,770,000.00.

(2)    When all Disputed Premiere Unsecured Claims have been either Allowed and paid in accordance with Section 4.7 of the Plan, disallowed, or withdrawn, all Remaining Funds shall be transferred to the Distribution Reserve Account or to the Reorganized Debtors, as applicable, from the Disputed Premiere Unsecured Claims Account.

(j)    *Disputed General Unsecured Claims Reserve.*  The Liquidating Manager shall set aside, segregate and hold in the Disputed General Unsecured Claims Reserve on account of (A) any Disputed General Unsecured Claims in Class 6, any Class 6 Membership Interests and any Cash that may be distributable if such Disputed Claims become Allowed General Unsecured Claims in Class 6; and (B) any Disputed Claims referred to in Sections 4.2(c) and 4.2(d)(2), any Class 4 Membership Interests and any Cash that may be distributable if such Claims become Allowed Senior Lender Claims in Class 4.  The amount of such funds and Membership Interests to be deposited in the Disputed General Unsecured Claims Reserve referred to in clause (A) above shall be determined by the Bankruptcy Court upon a motion of the Debtors or upon a motion of the Liquidating Manager, in accordance with Section 7.4 hereof.

(k)    *1999 Insured Tort Claims.*

(1)    On the Effective Date, the Liquidating Manager shall deposit the sum of 3% of the 1999 Unpaid Deductible Amount into the 1999 Insured Tort Claims Escrow.  From the Effective Date until the Final Class 8 Distribution Date, the Debtors' insurance carriers shall pay to the Liquidating Manager all insurance proceeds which become due and owing in respect of 1999 Insured Tort Claims, and the Liquidating Manager shall deposit all such amounts into the 1999 Insured Tort Claims Escrow.

(2)    On the Initial Class 8 Distribution Date, or as soon thereafter as is reasonably practicable, the Liquidating Manager shall make an Initial Class 8 Distribution to each holder of an Allowed 1999 Insured Tort Claim on the Initial Class 8 Distribution Date, in an amount equal to 50% of the Allowed amount of such 1999 Insured Tort Claim.

(3)    After the Initial Class 8 Distribution Date but prior to the Final Class 8 Distribution Date, the Liquidating Manager:

(A)    shall distribute a Catch-Up Distribution of Cash from the 1999 Insured Tort Claims Escrow to each holder of a Disputed 1999 Insured Tort Claim which becomes an Allowed 1999 Insured Tort Claim after the Initial Class 8 Distribution Date, within thirty (30) days of such allowance, such that the holder of such Claim receives the same amount of Cash that such holder would have received had its

Claim been an Allowed 1999 Insured Tort Claim in such amount as of the Initial Class 8 Distribution Date; and

(B)    may make additional distributions from the 1999 Insured Tort Claims Escrow to each holder of an Allowed 1999 Insured Tort Claim, as additional funds become available, and as the Liquidating Manager deems reasonably necessary and appropriate.

(4)    On the Final Class 8 Distribution Date, the Liquidating Manager shall distribute Cash to each holder of Allowed 1999 Insured Tort Claims from the 1999 Insured Tort Claims Escrow, such that the total distribution of Cash received by each holder of an Allowed 1999 Insured Tort Claim under the Plan equals its Pro Rata Share of the sum of 3% of the 1999 Unpaid Deductible Amount plus the Available 1999 Insurance Proceeds, not to exceed 100% of such Allowed 1999 Insured Tort Claim. Any funds remaining in the 1999 Insured Tort Claims Escrow shall be transferred to the Distribution Reserve Account.

(l)    *The Unclaimed Distributions Reserve.*  Unclaimed Distributions to holders of Claims shall be held by the Liquidating Manager in the Unclaimed Distributions Reserve. If the creditor to whom an Unclaimed Distribution was payable makes a claim for such distribution within the earlier of six (6) months after such Unclaimed Distribution was made and the Final Liquidating LLC Distribution Date, the Liquidating Manager shall deliver such Unclaimed Distribution to such creditor upon proof of such creditor's entitlement thereto, without any interest with respect thereto. Unclaimed Distributions that remain unclaimed at the expiration of such period shall be transferred and deposited into the Distribution Reserve Account.

(m)    *Initial and Interim Member Distributions.*

Pursuant to the provisions set forth in this Section, the Liquidating Manager shall provide for the payment of a Pro Rata Share of available funds to each holder of an Allowed General Unsecured Claim in Class 6 (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made) and each holder of an Allowed Senior Lender Claim.

(1)    *Initial Distributions.*  On the Initial Member Distribution Date, the Liquidating Manager shall pay from the Distribution Reserve Account (including, but not limited to, the amount of Cash that would otherwise be distributed to the holders of Subordinated Debt Claims):

(A)    first, to each holder of an Allowed General Unsecured Claim in Class 6 which made the Class 6 Cash-Out Election, Cash equal to the lesser of (i) 3% of such Allowed General Unsecured Claim and (ii) $3,000.00; and then

(B)    second, (i) to the Disbursing Agent for Class 4, Cash equal to the aggregate of all funds in the Distribution Reserve Account allocable to the holders of Class 4 Membership Interests, taking into account an appropriate reserve amount for

any potential Allowed Senior Lender Claim arising under Sections 4.2(c) and 4.2(d)(2); and (ii) to each holder of an Allowed General Unsecured Claim in Class 6 (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made), Cash equal to such holder's Class 6 Pro Rata Share of all funds in the Distribution Reserve Account, taking into account an appropriate reserve amount for any potential Allowed Senior Lender Claim arising under Sections 4.2(c), 4.2(d)(2) and 4.2(e)(2).

(2)     *Interim Distributions.*  After the Initial Member Distribution Date but prior to the Final Liquidating LLC Distribution Date, the Liquidating Manager:

(A)     shall distribute from the Disputed General Unsecured Claims Reserve a Catch-Up Distribution (net of such holder's proportionate share of any taxes incurred by the Disputed General Unsecured Claims Reserve with respect to income on such holder's Membership Interests) to each holder of a Disputed Claim in Class 4 and Class 6 (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made) which becomes an Allowed Claim in Class 4 or Class 6 after the Initial Member Distribution Date, within thirty (30) days after such allowance, such that the holder of such Allowed Senior Lender Claim or Allowed General Unsecured Claim in Class 6 receives the same consideration that such holder would have received had its Claim been an Allowed Senior Lender Claim in Class 4 or an Allowed General Unsecured Claim in Class 6, respectively, in such Allowed amount on the Effective Date, taking into account an appropriate reserve amount for any potential Allowed Senior Lender Claim arising under Sections 4.2(c) and 4.2(d)(2); and

(B)     may make additional Class 4 Pro Rata Share Distributions and Class 6 Pro Rata Share Distributions from the Distribution Reserve Account to the Disbursing Agent for Class 4 and to the individual holders of Class 6 Membership Interests as the case may be, as additional funds become available, and as the Liquidating Manager reasonably deems necessary and appropriate, taking into account an appropriate reserve amount for any potential Allowed Senior Lender Claim arising under Sections 4.2(c) and 4.2(d)(2).

(n)     *Final Liquidating LLC Distribution Date.*  The Final Liquidating LLC Distribution Date shall occur as soon as reasonably practicable after: (i) in the reasonable judgment of the Liquidating Manager, all assets of the Liquidating LLC have been liquidated; (ii) there remain no Disputed Claims; and (iii) the Liquidating Manager is in a position to cause the Final Liquidating LLC Distribution Date to occur in accordance with applicable law, provided, however, that unless the terms of the Liquidating LLC Agreement provide otherwise, the Final Liquidating LLC Distribution Date shall occur no later than five (5) years after the Effective Date. The Liquidating Manager shall provide at least thirty (30) days prior notice of the Final Liquidating LLC Distribution Date to the holders of all Claims, except to the extent such Claims have been disallowed, withdrawn or paid or satisfied in full as of the time such notice is provided.

59

(1)    *Final Liquidating LLC Distributions.*  On the Final Liquidating LLC Distribution Date, the Liquidating Manager shall

(A)    establish the Wind-Up Reserve with funds from the Expense Reserve Account;

(B)    transfer the Expense Reserve Account Residual to the Distribution Reserve Account;

(C)    transfer to the extent not already transferred all Remaining Funds to the Distribution Reserve Account;

(D)    pay from the Distribution Reserve Account

(i)    to the Disbursing Agent for Class 4, Cash equal to the aggregate Class 4 Pro Rata Share of all funds in the Distribution Reserve Account allocable to the holders of Class 4 Membership Interests; and

(ii)    to each holder of a Class 6 Membership Interest, Cash equal to such holder's Class 6 Pro Rata Share of all funds in the Distribution Reserve Account allocable to such holder's Class 6 Membership Interest.

(E)    promptly thereafter, request the Bankruptcy Court to enter an order closing the IHS Reorganization Cases.

(2)    *Remaining Funds.*  If funds remain in the Wind-Up Reserve, the Unclaimed Distributions Reserve or the Distribution Reserve Account after the Liquidating Manager has performed all of its responsibilities under the Plan, such remaining funds shall be paid or distributed as determined in accordance with the Liquidating LLC Agreement.  The Liquidating Manager shall be entitled to deduct from any such supplemental distribution its fees and expenses for making such supplemental distribution.

(o)    *Reports of Distributions by the Liquidating LLC.*

Every one hundred twenty (120) days after the Effective Date, the Liquidating Manager shall provide to the Post-Confirmation Committee a report detailing the calculation of Cash for the immediately preceding 120-day period (including a summary of costs incurred, any receipts of the Liquidating LLC, and a summary of disbursements from, or increases in the amount of, any Reserve).  A copy of such report shall be furnished to any holder of a Membership Interest in the Liquidating LLC that delivers to the Liquidating Manager a written request for a copy of such report.

(p)    *Subordinated Debt Claim Exclusion.*

Notwithstanding anything in the Plan to the contrary, the net proceeds, if any, of any settlement or judgment obtained in the Compensation Action shall be distributed by the Liquidating Manager to the holders of Allowed Claims in Classes 4 and 6 (other than holders of Claims in Class 6 which made the Class 6 Cash-Out Election), in accordance with Section 4.4(c)(3) of the Plan.

6.3    ***Distribution Procedures for Classes 4 and 6 under the Stand-Alone Transactions.***

(a)    *Initial Distribution; Reserve for Disputed Claims.*  If the Stand-Alone Transactions are implemented, then (i) on the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall deliver to Citibank, N.A., as Disbursing Agent, or its designee, the Class 4 Cash Fund; and (ii) on the Initial Stand-Alone Distribution Date, the Reorganized Debtors shall distribute to each holder of an Allowed Senior Lender Claim in Class 4 and each holder of an Allowed General Unsecured Claim in Class 6 the consideration provided for in Sections 4.4(c)(4) and 4.6(b) hereof, calculated by (A) treating all Disputed General Unsecured Claims in Class 6 (other than those in respect of which the Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c) of the Plan), as though they will become Allowed General Unsecured Claims in Class 6 in the amounts asserted, or otherwise as estimated or reserved for by the Bankruptcy Court, as applicable; and (B) taking into account an appropriate reserve amount for any potential Allowed Senior Lender Claim arising under Sections 4.2(c) and 4.2(e)(2).  Any New Common Stock, New Subordinated Notes, Class 4 Stand-Alone Membership Interests, Class 6 Stand-Alone Membership Interests and Cash reserved as provided in clauses (ii)(A) and (B) of this paragraph shall be transferred to the Disputed General Unsecured Claims Reserve.

(b)    *Interim Distributions.*  After the Initial Stand-Alone Distribution Date but prior to the Final Stand-Alone Distribution Date, the Reorganized Debtors (or the Stand-Alone LLC Manager, if applicable) shall distribute from the Disputed General Unsecured Claims Reserve (in accordance with Section 7 of the Plan) the consideration provided for in Sections 4.4(c)(4) and 4.6(b) hereof (including any Cash relating to any proceeds realized in the Compensation Action, any dividends previously declared and paid or accrued interest previously paid with respect to the New Subordinated Notes and New Common Stock, net of their proportionate share of any taxes or expenses incurred by the Disputed General Unsecured Claims Reserve with respect thereto), to each holder of a Disputed Claim in Class 4 and Class 6 (other than a General Unsecured Claim in respect of which the Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c)(2) of the Plan) which becomes an Allowed Claim in such Class after the Effective Date within thirty (30) days after such allowance, such that the holder of such Claim receives the same amount of consideration that such holder would have received had its Claim been an Allowed Claim in Class 4 or 6, as applicable, in such Allowed amount as of the Initial Stand-Alone Distribution Date.

(c)    *Final Distributions.*  If necessary, on the Final Stand-Alone Distribution Date, the Reorganized Debtors shall distribute from the Disputed General Unsecured Claims Reserve:

(1)    to the Disbursing Agent for Class 4, New Common Stock, New Subordinated Notes, Class 4 Stand-Alone Membership Interests and Cash, if any, equal to the aggregate Class 4 Pro Rata Share of all remaining consideration required to be distributed under the Plan but not yet distributed; and

(2)    to each holder of an Allowed General Unsecured Claim in Class 6 (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c)(2) of the Plan), New Common Stock, New Subordinated Notes, Class 6 Stand-Alone Membership Interests and Cash, if any, equal to such holder's Class 6 Pro Rata Share of all remaining consideration required to be distributed under the Plan but not yet distributed.

(d)    In the event that, at any time, any proceeds are realized in the Compensation Action, as soon thereafter as is practicable, but in no event later than 45 days after receipt of such proceeds, the Stand-Alone LLC shall distribute to each holder of Class 4 Stand-Alone Membership Interests and each holder of Class 6 Stand-Alone Membership Interests its portion of the proceeds in accordance with Sections 4.4(c)(4)(C) and 4.6(b)(3), respectively (and a portion of such proceeds will be deposited in the Disputed General Unsecured Claims Reserve, if the Stand-Alone LLC Manager deems it reasonable and necessary).

SECTION 7.  **PROCEDURES FOR DISPUTED CLAIMS**

7.1    *Objections to Claims.*

The Liquidating LLC or the Reorganized Debtors, as applicable, shall be entitled to object to any and all Claims. Any objections to Claims shall be served and filed on or before the later of (i) one hundred twenty (120) days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court. All objections shall be litigated to Final Order or compromised and settled or otherwise resolved, subject to approval of the Bankruptcy Court. Notwithstanding the foregoing, neither the Debtors, the Reorganized Debtors, the Liquidating LLC nor the Stand-Alone LLC, as applicable, shall be entitled to (i) seek to allocate among the Premiere Debtors and the other Debtors an obligation to pay the fees and expenses of any Professionals retained by the Premiere Group Creditors' Committee in connection with the Debtors' Chapter 11 cases or (ii) object to any Claim for fees or expenses of the Professionals retained by the Premiere Group Creditors' Committee on the ground that the Premiere Debtors do not have sufficient assets to satisfy obligations in respect of Administrative Expense Claims.

7.2    *Payments and Distributions with Respect to Disputed Claims.*

(a)    *General.* Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. Any claim subject to a

62

pending objection on or prior to the Initial Member Distribution Date, the Initial Stand-Alone Distribution Date, or the Initial Class 8 Distribution Date (as applicable) shall be deemed to be a Disputed Claim.

(b)    *Disputed Claims Reserves and Accounts Under the Sale Transactions.* If the Sale Transactions are implemented, all distributions with respect to (A) Disputed Excluded Administrative Claims shall be deposited in the Excluded Administrative Expense Claims Reserve, (B) Disputed General Unsecured Claims (including all deemed Disputed Claims referred to in Section 4.2(c)) shall be deposited in the Disputed General Unsecured Claims Reserve, (C) Disputed Premiere Unsecured Claims shall be deposited in the Disputed Premiere Unsecured Claims Account and (D) other Disputed Claims shall be accounted for by entry on the books of the Liquidating LLC in the Disputed Claims account applicable to such Disputed Claim. All cash and cash equivalents held by the Disputed General Unsecured Claims Reserve and earnings of the Disputed General Unsecured Claims Reserve thereon shall be used to satisfy any expenses incurred in connection with the maintenance of the Disputed General Unsecured Claims Reserve, including taxes payable on interest income. If the Stand-Alone Transactions are implemented and there is insufficient Cash to pay such expenses, such expenses shall be paid by the Reorganized Debtors.

(c)    *Tax Treatment of Disputed General Unsecured Claims Reserve.* Subject to definitive guidance from the Internal Revenue Service (the "IRS") or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent shall (i) treat the Disputed General Unsecured Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim, in accordance with the trust provisions of the Tax Code (sections 641 et seq.), and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties (including holders of Disputed Claims) shall report consistently with such treatment.

(d)    *Tort Claims.* All Tort Claims shall be deemed Disputed Claims unless and until they are liquidated. Any Tort Claim which has not been liquidated prior to the Effective Date and as to which a proof of claim was timely filed in the IHS Reorganization Cases shall be determined and liquidated in the administrative or judicial tribunal in which it is pending on the Effective Date or in any administrative or judicial tribunal of appropriate jurisdiction, or in accordance with any alternative dispute resolution or similar proceeding as may be approved by order of a court of competent jurisdiction. Any Tort Claim determined and liquidated (i) pursuant to a judgment obtained in accordance with this Section and applicable nonbankruptcy law which is no longer appealable or subject to review, or (ii) in an alternative dispute resolution or similar proceeding approved by order of a court of competent jurisdiction, shall be deemed, to the extent applicable, an Allowed Claim in Class 6 or 8 (as applicable), in such liquidated amount (provided that for Insured Claims, such amount shall not exceed the liquidated amount of the Claim less the amount paid by the insurer) and treated in accordance with Section 4.6 or 4.8 (as applicable) hereof. Nothing contained in this Section shall

63

constitute or be deemed a waiver of any Claim, right, or cause of action that any of the Debtors may have against any person in connection with or arising out of any Tort Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

### 7.3    *Distributions After Allowance.*

*Disputed Claims.* After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the applicable Disbursing Agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan as of such date. No interest shall be paid on any Disputed Claim that later becomes Allowed (other than as provided in Section 6.3(b) with respect to any dividends previously declared and paid, or accrued interest previously paid, with respect to the New Common Stock and New Subordinated Notes, respectively).

### 7.4    *Estimations and Reserves for Contingent, Unliquidated and Disputed Claims.*

The Debtors, the Liquidating LLC or the Reorganized Debtors, as the case may be, in consultation with the Creditors' Committee or the Post-Confirmation Committee, as the case may be, shall request estimation or establishment of a reserve pursuant to section 502(c) of the Bankruptcy Code for every Disputed Claim that is contingent or unliquidated and the fixing or liquidation of which, as the case may be, would unduly delay distributions, regardless of whether any Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

## SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1    *Assumption of Executory Contracts and Unexpired Leases.*

Any executory contracts or unexpired leases listed on the Schedule of Assumed Leases and Executory Contracts and Cure Amounts that will be part of the Plan Supplement or which are the subject of a pending motion to assume as of the Confirmation Date shall be deemed to have been assumed by the applicable Debtor effective on the Effective Date, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval

64

of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the
Bankruptcy Court that each such assumption is in the best interest of the applicable Debtor, its estate,
and all parties in interest in the IHS Reorganization Cases. With respect to each such executory
contract or unexpired lease assumed by a Reorganized Debtor, any monetary amounts required as cure
payments shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the
cure amount in Cash as soon as practicable after and in no event later than 30 days after the Effective
Date or upon such other terms as the parties to such executory contracts or unexpired leases otherwise
may agree. In the event of a dispute regarding (i) the amount of any cure payment, (ii) the ability of the
applicable Debtor, Reorganized Debtor or any assignee to provide "adequate assurance of future
performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease
to be assumed or (iii) any other matter pertaining to assumption, the cure payments required by
section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving
such dispute.

### 8.2    *Rejection of Executory Contracts and Unexpired Leases.*

Any executory contracts or unexpired leases (a) which are not listed on the Schedule of
Assumed Leases and Executory Contracts and Cure Amounts that will be included in the Plan
Supplement; (b) which have not been assumed with the approval of the Bankruptcy Court as of the
Effective Date; or (c) which are not the subject of a motion to assume the same pending as of the
Effective Date, shall be deemed to have been rejected by the applicable Debtor as of the Effective
Date. The Plan of Reorganization shall constitute a motion to reject such executory contracts and
unexpired leases, and the Reorganized Debtors shall have no liability thereunder except as is specifically
provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall
constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding
by the Bankruptcy Court that each such rejected executory contract or unexpired lease is burdensome
and that the rejection thereof is in the best interest of the applicable Debtor, its estate, and all parties in
interest in the IHS Reorganization Cases.

### 8.3    *Rejection Claims.*

Claims arising from the rejection of executory contracts or unexpired leases (including,
without limitation, the rejection provided in Section 8.2 of the Plan) or the expiration or termination of
any executory contract or unexpired lease prior to the Confirmation Date must be filed with the
Bankruptcy Court and served on the Debtors no later than thirty (30) days after (i) in the case of an
executory contract or unexpired lease that was terminated or expired by its terms prior to the
Confirmation Date, the Confirmation Date, (ii) in the case of an executory contract or unexpired lease
rejected by any Debtor, the entry of the order of the Bankruptcy Court authorizing such rejection, or
(iii) in the case of an executory contract or unexpired lease that is deemed rejected pursuant to
Section 8.2 of the Plan of Reorganization, the Confirmation Date. Any Claims for which a proof of
claim is not filed and served within such time will be forever barred from assertion and shall not be
enforceable against the Debtors or their estates, assets, properties, or interests in property, or against
the Reorganized Debtors or their estates, assets, properties, or interests in property. All claims arising

from the rejection of executory contracts or unexpired leases that are timely filed as provided herein shall be treated under the Plan as General Unsecured Claims in Class 6.

### 8.4    *Survival of the Debtors' Corporate Indemnities.*

Any obligations of the Debtors pursuant to their corporate charters and bylaws or agreements, entered into at any time prior to the Effective Date or pursuant to the Elkins Settlement Agreement, to the extent permitted by applicable law, to indemnify current directors, officers, agents, and/or employees, or the Elkins Released Parties with respect to all present and future claims, actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan of Reorganization, provided, however, that this provision shall not affect the priority of any claim for indemnification under the applicable provisions of the Bankruptcy Code and applicable law, as to which all rights are reserved. Notwithstanding the foregoing, the current directors, officers, agents and/or employees of the Debtors who are defendants in the Compensation Action shall be entitled to the advancement and/or reimbursement of the reasonable fees and expenses of their respective legal counsel incurred in connection with the Compensation Action.

## SECTION 9.    CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

### 9.1    *Conditions Precedent to Confirmation.*

Confirmation of the Plan will not occur unless each of the following conditions has been satisfied or has been waived in accordance with Section 9.4 of the Plan:

(a)    The Confirmation Date shall occur on or prior to May 30, 2003.

(b)    If the Debtors seek to have the Sale Transactions approved, the Sale Approval Order in form and substance satisfactory to the Debtors, the Purchaser, the Creditors' Committee and the Unofficial Senior Lenders' Working Group, shall have been entered and shall have become a Final Order.

(c)    If the Debtors seek to have the Stand-Alone Transactions approved, IHS shall have received a commitment for the Exit Financing Facility which is acceptable to the Debtors, the Creditors' Committee and the Unofficial Senior Lenders' Working Group.

### 9.2    *Conditions Precedent to the Effective Date.*

The Effective Date of the Plan will not occur unless each of the following conditions has been satisfied or has been waived in accordance with Section 9.4 of the Plan:

(a)     The Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee, the Premiere Group Creditors' Committee (only insofar as holders of Premiere Unsecured Claims would be adversely affected thereby) and the Unofficial Senior Lenders' Working Group, shall have been issued and entered by the Bankruptcy Court and shall have become a Final Order.

(b)     Either the conditions precedent to the Sale Transactions shall have occurred, or the conditions precedent to implementation of the Stand-Alone Transactions shall have occurred, each as set forth below.

(1)     *Conditions precedent to the Sale Transactions.* The Sale Transactions shall not be implemented unless:

(A)     each of the conditions to Closing (as defined in the Sale Agreement) under the Sale Agreement shall have been satisfied or waived in accordance with the provisions thereof; and

(B)     each of the Sale Transaction Documents, in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee, the Premiere Group Creditors' Committee (only insofar as holders of Premiere Unsecured Claims would be adversely affected thereby) and the Unofficial Senior Lenders' Working Group, shall have been effected or executed.

(2)     *Conditions Precedent to the Stand-Alone Transactions.* The Stand-Alone Transactions shall not be implemented unless:

(A)     either (i) the conditions to Closing have not been satisfied by July 31, 2003 and the Sale Agreement is terminated, (ii) the Debtors have earlier determined that Purchaser will not proceed with a Closing under the Sale Agreement or (iii) the Sale Agreement is otherwise terminated or the Sale Transactions do not occur; and

(B)     each of the Stand-Alone Transaction Documents, in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee, the Premiere Group Creditors' Committee (only insofar as holders of Premiere Unsecured Claims would be adversely affected thereby) and the Unofficial Senior Lenders' Working Group, shall have been effected or executed, in which case, the Stand-Alone Transactions shall be implemented.

(c)     All authorizations, consents, and regulatory approvals (if any) necessary to effectuate the Plan shall have been obtained.

(d)    The Effective Date shall occur by July 31, 2003, or such later date as may be agreed to by the Debtors, the Creditors' Committee, the Premiere Group Creditors' Committee (only insofar as holders of Premiere Unsecured Claims would be adversely affected thereby) and the Unofficial Senior Lenders' Working Group.

### 9.3    *Effect of Failure of Conditions to Effective Date.*

In the event the conditions specified in Section 9.2 have not been satisfied or waived, and upon written notification submitted by the Debtors, the Creditors Committee or the Unofficial Senior Lenders' Working Group to the Bankruptcy Court, (a) the Confirmation Order shall be vacated; (b) no distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors, the Creditors' Committee, the Premiere Group Creditors' Committee (only insofar as holders of Premiere Unsecured Claims would be adversely affected thereby), the Unofficial Senior Lenders' Working Group or any other entity in any further proceedings involving the Debtors.

### 9.4    *Waiver of Conditions.*

The Debtors, the Creditors' Committee, the Premiere Group Creditors' Committee (only insofar as holders of Premiere Unsecured Claims would be adversely affected thereby) and the Unofficial Senior Lenders' Working Group by unanimous consent, in their sole discretion, may waive, in whole or in part, any of the conditions to the effectiveness of the Plan. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

## SECTION 10. EFFECT OF CONFIRMATION

### 10.1    *Vesting of Assets.*

Except as provided in the Plan or the DIP Credit Facility, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' bankruptcy estates shall vest in either the Liquidating LLC or the Reorganized Debtors, as applicable, free and clear of all Claims, liens, encumbrances, charges, and other interests not specifically contemplated by the Plan to either survive the IHS Reorganization Cases or to be created or granted in connection therewith. The Liquidating LLC or the Reorganized Debtors, as applicable, may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

10.2   *Discharge of Claims and Termination of Equity Interests.*

Except as provided in the DIP Credit Facility, the rights afforded in the Plan of
Reorganization and the payments and distributions to be made hereunder shall completely satisfy and
discharge all existing debts and Claims, and terminate all Equity Interests, of any kind, nature, or
description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent
permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan of Reorganization
or the DIP Credit Facility, upon the Effective Date, all existing Claims against and Equity Interests in the
Debtors, shall be, and shall be deemed to be, discharged, satisfied, released and terminated in full, and
all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the
Liquidating LLC or the Reorganized Debtors, as applicable, their successors and assigns, or any of
their respective assets or properties, any other or further Claim or Equity Interest based upon any act
or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date,
whether or not such holder has filed a proof of claim or proof of equity interest and whether or not the
facts or legal bases therefor were known or existed prior to the Effective Date. Notwithstanding the
foregoing, the Claims and Causes of Action against IHS in the Compensation Action are preserved.

10.3   *Discharge of Debtors.*

Upon the Effective Date and in consideration of the distributions to be made hereunder,
except as otherwise expressly provided in the Plan or the DIP Credit Facility each holder (as well as
any trustee or agent on behalf of such holder) of a Claim or Equity Interest and any affiliate of such
holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest
extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity
Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such
persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code,
from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the
Debtors.

10.4   *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the
IHS Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in
existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective
Date and the date indicated in the order providing for such injunction or stay. Notwithstanding the
foregoing, on the earlier of the Confirmation Date and April 29, 2003: (i) the adversary proceeding
pending in the IHS Reorganization Cases captioned *Integrated Health Services, Inc. and Premiere
Associates, Inc. v. Don G. Angell, D. Gray Angell, Jr., and Don R. House, individually and in
their capacities as Co-Trustees of the Don Angell Irrevocable Trust Under Instrument dated July
24, 1992; Angell Care Incorporated; Angell Family Limited Partnership; and Bermuda Village
Retirement Center Limited Partnership,* Adv. Pro. No. 01-1030 (the "Angell Injunction Action")
shall be deemed to be dismissed with prejudice; (ii) the Stipulation and Order, dated June 12, 2001,
effective as of April 19, 2001 [Docket No. 20] entered in the Angell Injunction Action shall be deemed

to be vacated, and (iii) to the extent any stay pursuant to Section 362 or 105 is applicable to the civil action, pending in the United States District Court for the Middle District of North Carolina, captioned *Don G. Angell; D. Gray Angell, Jr., and Don R. House, in their capacities as Co-Trustees of the Don Angell Irrevocable Trust Under Instrument Dated July 24, 1992; and Angell Care Incorporated, v. Elizabeth B. Kelly, C. Taylor Pickett, Daniel J. Booth and Ronald L. Lord*, [Case No. 01-CV-435] (the "Angell Action"), such stay shall be deemed modified to allow the Angell Action to be prosecuted; provided, however, that nothing herein shall be construed as waiving or limiting the right of any defendant in the Angell Action to raise any defenses or counterclaims it may have, including without limitation, that the claims asserted in the Angell Action are property of the Debtors' estates and that the plaintiffs do not have standing to assert such claims; and further provided, that any Premiere Unsecured Creditors or their professionals, including without limitation, the plaintiffs in the Angell Action and any of their affiliates, shall waive any claim they may have in the IHS Reorganization Cases for substantial contribution pursuant to section 503(b) of the Bankruptcy Code.

The Debtors and the plaintiffs in the Angell Action agree to bear their own fees and expenses, including attorneys' fees, incurred in connection with the Angell Injunction Action. Nothing contained in the Disclosure Statement, the Plan or the Confirmation Order shall be construed as discharging or releasing the third party claims held by the plaintiffs in the Angell Action against any non-Debtor party including the defendants in the Angell Action.

### 10.5   *Injunction Against Interference With Plan.*

Upon the entry of the Confirmation Order and except as otherwise provided in the DIP Credit Facility, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employers, agents, officers, directors, or principals, shall be permanently and forever barred, restrained and enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 10.6   *Injunction Against Suits Against IHS Under the Sale Transactions.*

If the Sale Transactions are implemented, then upon consummation thereof and effective as of the Confirmation Date, and except as otherwise provided in the Plan or the DIP Credit Facility, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employers, agents, officers, directors, or principals, shall be permanently and forever barred, restrained and enjoined from taking any action, directly or indirectly, against IHS, to collect, recover or receive payment of, on, or with respect to any Claim or Equity Interest arising on or before the date of the Confirmation Order, including claims (within the meaning of section 101(5) of the Bankruptcy Code) against IHS relating to any asset or liability being purchased or assumed by the Purchaser under the Sale Agreement.

70

10.7    *Exculpation.*

Neither the Debtors, Alvarez & Marsal, Inc., any Disbursing Agent, the Liquidating LLC, the Liquidating Manager, the Creditors' Committee, the Premiere Group Creditors' Committee, the Post-Confirmation Committee, the Unofficial Senior Lenders' Working Group, nor any of their respective members, officers, directors, employees, agents, counsel or other professionals that served at any time after the Commencement Date shall have or incur any liability to any holder of any Claim or Equity Interest or any other entity for any act or omission in connection with, or arising out of, the IHS Reorganization Cases, the formulation, dissemination, implementation or confirmation of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or property to be distributed under the Plan of Reorganization, or any other act or omission in connection with the Plan of Reorganization, the Disclosure Statement, or any contract, instrument, release or other document or agreement related thereto, provided, however, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted gross negligence or willful misconduct. Any of the foregoing parties in all respects shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities in connection with the Plan of Reorganization, and all other matters referred to in this Section 10.7.

10.8    *Retention of Causes of Action/Reservation of Rights.*

(a)    Nothing contained in the Plan of Reorganization (except for the dismissal of actions referred to in Section 10.4 of the Plan) or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors, the Debtors' estates, the Liquidating LLC, the Stand-Alone LLC, the Post-Confirmation Committee or the Reorganized Debtors may have or which the Liquidating LLC, the Stand-Alone LLC or the Reorganized Debtors, as applicable, may choose to assert under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against any of the Debtors, the Liquidating LLC, the Stand-Alone LLC, the Reorganized Debtors, their officers, directors, or representatives, and (ii) the turnover of any property of any of the Debtors' estates.

(b)    Notwithstanding the foregoing, the Debtors and the Liquidating LLC, the Reorganized Debtors or the Stand-Alone LLC, as applicable, waive all Avoidance Claims except as set forth in the Plan Supplement.

(c)    Nothing contained in the Plan of Reorganization (except for the dismissal of certain actions described in section 10.4 of the Plan) or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which any of the Debtors or the Debtors' estates had immediately prior to the Commencement Date or thereafter, against or with respect to any Claim left unimpaired by the Plan of Reorganization. The Liquidating LLC, the Reorganized Debtors or the Stand-Alone LLC, as applicable, shall have,

retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date or thereafter fully as if the IHS Reorganization Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan of Reorganization may be asserted after the Confirmation Date to the same extent as if the IHS Reorganization Cases had not been commenced.

10.9    *Dismissal of Premiere Committee Matters.*

As of the Effective Date, the motion pending in the IHS Reorganization Cases entitled *Motion of the Official Committee of Unsecured Creditors of Premiere Associates, Inc. and its Subsidiaries for Leave to File an Adversary Proceeding Complaint on Behalf of Premiere Associates, Inc. and its Subsidiaries* filed on January 9, 2002 [Docket No. 6126] ("the Premiere Avoidance Motion") and the adversary complaint filed in the IHS Reorganization cases captioned *Official Committee of Unsecured Creditors of Premiere Associates, Inc. and its Subsidiaries, on behalf of Premiere Associates, Inc., et al., v. Daniel J. Booth, Ronald L. Lord, C. Taylor Pickett, Marshall Elkins and Marc Levin*, filed on February 1, 2002 [Docket No. 6376](the "Premiere D&O Action") shall each be deemed to be dismissed with prejudice.

## SECTION 11. RETENTION OF JURISDICTION

11.1    *Exclusive Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over all matters arising in, arising under, or related to the IHS Reorganization Cases, or that relate to any of the following:

(a)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom.

(b)    To hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date.

(c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein.

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Administrative Expense Claim, or Equity Interest.

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated.

(f)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan of Reorganization, the Confirmation Order, or any other order of the Bankruptcy Court.

(g)     To hear and determine any application to modify the Plan of Reorganization in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in or technical changes to the Plan of Reorganization, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

(h)     To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date.

(i)     To hear and determine disputes arising in connection with the Plan of Reorganization, any of the Plan Documents or the Confirmation Order, or the interpretation, implementation, or enforcement of the Plan of Reorganization, any of the Plan Documents, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing.

(j)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan of Reorganization or to maintain the integrity of the Plan of Reorganization following consummation.

(k)     To hear any disputes arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation, and similar claims pursuant to section 105(a) of the Bankruptcy Code.

(l)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

(m)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

(n)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

(o)     To enter a final decree closing the IHS Reorganization Cases.

(p)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located.

(q)    To determine any other matters that may arise in connection with or are related to the Plan of Reorganization, the Disclosure Statement, the Confirmation Order, any of the Plan Documents, or any other contract, instrument, release or other agreement or document related to the Plan of Reorganization, the Disclosure Statement or the Plan Supplement.

(r)    To hear and determine any rights, claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory.

11.2    *Jurisdiction Over Compensation Action.*  On and after the Effective Date, the Bankruptcy Court shall have jurisdiction over the Compensation Action; provided, however, that notwithstanding the foregoing or any other provision in the Plan, nothing in the Plan shall be construed as conferring upon the Bankruptcy Court exclusive jurisdiction over the Compensation Action.

## SECTION 12. MISCELLANEOUS PROVISIONS

12.1    *Payment of Statutory Fees.*

On the Effective Date, and thereafter as may be required, the Liquidating LLC or the Reorganized Debtors, as applicable, shall pay all fees required to be paid pursuant to section 1930 of title 28 of the United States Code.

12.2    *Retiree Benefits.*

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, if the Stand-Alone Transactions are implemented, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors had obligated themselves to provide such benefits.

12.3    *Dissolution of Statutory Committees of Unsecured Creditors.*

The statutory committees of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code in the IHS Reorganization Cases shall dissolve on the Effective Date, and the members of such committees shall be released and discharged from all duties and obligations arising from or related to the IHS Reorganization Cases.

12.4  *Post-Confirmation Committee.*

(a)     On the Effective Date, the Post-Confirmation Committee shall succeed, in all respects to all of the rights, privileges and immunities of the Creditors' Committee including, without limitation, the attorney-client and work product privileges and any other evidentiary privileges of the Creditors' Committee.

(b)     On the Effective Date, the Claims or Causes of Action in the Compensation Action shall be deemed to have been irrevocably transferred by the Debtors' estates to the Liquidating LLC if the Sale Transactions are implemented or to the Stand-Alone LLC if the Stand-Alone Transactions are implemented, as provided for under the Plan, in each case, with no reversionary interest.

(c)     *Function of the Post-Confirmation Committee.*  The Post-Confirmation Committee's functions shall include: (A) monitoring the Reorganized Debtors' or Liquidating Managers' activities in reconciling and resolving Disputed Claims; (B) monitoring the resolution of the avoidance actions; (C) monitoring the making of distributions on account of the Disputed Claims once resolved; (D) reviewing and asserting objections to the reasonableness of settlements or compromises of Disputed Claims and avoidance actions; and (E) prosecuting and/or settling the Compensation Action on behalf of the Debtors' estates.  The Post-Confirmation Committee, shall among other things, be authorized to continue in place and stead of the Creditors' Committee as the Plaintiff in the Compensation Action and shall be substituted in the Compensation Action for all purposes.  The Post-Confirmation Committee shall have full authority, in the exercise of its business judgment, to prosecute and settle the Compensation Action without the need or consent of the Liquidating LLC or the Stand-Alone LLC, as applicable.  Any proceeds arising from the Compensation Action will be distributed pursuant to the terms of the Plan.

(d)     *Employment of Professionals by the Post-Confirmation Committee and Reimbursement of Committee Members.*  The Post-Confirmation Committee may employ, without further order of the Court, professionals to assist it in carrying out its duties, including any professionals retained in the IHS Reorganization Cases, and the Reorganized Debtors or Liquidating Manager shall pay the reasonable costs and expenses of the Post-Confirmation Committee, including reasonable professional fees, in the ordinary course within ten (10) days of invoicing, without submission to or approval by the Bankruptcy Court.  Other than as specified in the preceding sentence, the members of the Post-Confirmation Committee will serve without compensation.  If there is any unresolved dispute between the Reorganized Debtors and the Post-Confirmation Committee, its professionals or a member thereof as to any fees or expenses, such dispute will be submitted to the Bankruptcy Court for resolution.

12.5  *Substantial Consummation.*

On the Effective Date, the Plan of Reorganization shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

75

## 12.6    *Amendments.*

(a)    *Plan of Reorganization Modifications.* The Plan of Reorganization may be amended, modified, or supplemented by the Debtors, the Liquidating LLC or the Reorganized Debtors with the consent of the Creditors' Committee and the Unofficial Senior Lenders' Working Group, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan of Reorganization, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan of Reorganization or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan of Reorganization.

(b)    *Other Amendments.* Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

## 12.7    *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors take such action, the Plan of Reorganization shall be deemed null and void.

## 12.8    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan of Reorganization is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, and with the consent of the Creditors' Committee and the Unofficial Senior Lenders' Working Group, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan of Reorganization will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan of Reorganization, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## 12.9    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a document in the Plan Supplement provides otherwise, the rights, duties,

and obligations arising under the Plan of Reorganization shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

### 12.10  *Time.*

In computing any period of time prescribed or allowed by the Plan of Reorganization, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.11  *Section Headings.*

The Section headings contained in the Plan of Reorganization are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan of Reorganization.

### 12.12  *Exemption from Transfer Taxes.*

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan of Reorganization, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan of Reorganization, shall not be subject to any stamp, real estate transfer, sales, use, mortgage recording or other similar tax.

### 12.13  *Effectuating Documents and Further Transactions.*

Each of the officers of the Debtors and either the Liquidating LLC or the Reorganized Debtors, as applicable, is authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and provisions of the Plan of Reorganization.

### 12.14  *Injunction Regarding Worthless Stock Deductions.*

Unless otherwise ordered by the Bankruptcy Court, on and after the Confirmation Date, any "fifty percent shareholder" within the meaning of section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended, shall be enjoined from claiming a worthless stock deduction with respect to any Equity Interests held by such entity for any taxable year of such shareholder ending prior to the Effective Date.

77

12.15 *Exhibits.*

All Schedules and Exhibits to the Plan of Reorganization and Plan Supplement are incorporated into and are a part of the Plan of Reorganization as if set forth in full herein.

12.16 *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Integrated Health Services, Inc.
> The Highlands
> 910 Ridgebrook Road
> Sparks, MD 21152
> Attn:   General Counsel
> Telephone:  (410) 773-1000
> Telecopier:  (410) 773-1325

> -and-

> Kaye Scholer LLP
> 425 Park Avenue
> New York, NY 10022-3598
> Attn:   Michael J. Crames, Esq.
>         Arthur Steinberg, Esq.
>         Marc D. Rosenberg, Esq.
> Telephone:  (212) 836-8000
> Telecopier:  (212) 836-7151

> -and-

> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE 19899-0391
> Attn:   James J. Patton, Esq.
>         Robert S. Brady, Esq.
> Telephone:  (302) 571-6600
> Telecopier:  (302) 571-1253

78

-and-

Jenkens & Gilchrist—Parker Chapin LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Attn:   Charles P. Greenman, Esq.
          Lee W. Stremba, Esq.
Telephone: (212) 704-6000
Telecopier: (212) 704-6288

-and-

Dewey Ballantine LLP
1301 Avenue of the Americas
New York, New York 10019-6092
Attn:   Stuart Hirshfield, Esq.
          Marc Hirschfield, Esq.
Telephone: (212) 259-8000
Telecopier: (212) 259-6333

Dated: New York, New York
      March 13, 2003

Respectfully submitted,

INTEGRATED HEALTH SERVICES, INC., for itself and as agent and attorney-in-fact for each of the Debtors

By: _____

Name: Guy Sansone
Title:  Senior Vice President

COUNSEL:

_____
James P. Patton, Esq.
Robert S. Brady, Esq.
YOUNG, CONAWAY, STARGATT & TAYLOR LLP,
Co-Attorneys for the Debtors and Debtors in Possession
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

Michael J. Crames, Esq.
Arthur Steinberg, Esq.
Marc D. Rosenberg, Esq.
KAYE SCHOLER LLP
Co-Attorneys for the Debtors and Debtors in Possession
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

Charles P. Greenman, Esq.
Lee W. Stremba, Esq.
Mitchel H. Perkiel, Esq.
JENKENS & GILCHRIST–PARKER CHAPIN LLP
Co-Attorneys for the Debtors and Debtors in Possession
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 704-6000

# **Exhibit C**

**CIGNA Property & Casualty**



## *Declarations*
## *Excess Liability Catastrophe Policy*

**CIGNA**

| PRODUCER CODE | OFFICE | PREVIOUS POLICY NUMBER | |
|---|---|---|---|
| 228384 | New York | XLX G19524139 | |

| AUDIT FREQUENCY | PRODUCER | | |
|---|---|---|---|
| None | TRI CITY INSURANCE BROKERS INC | | |

| NAMED INSURED IS: | BUSINESS OF INSURED | | PIIC |
|---|---|---|---|
| Corporation | On File With Company | | 8093 |

Policy Number: **XLX G19545507**

Policy Period: From **01/01/1999** to **01/01/2000**

       12:01 A.M. Standard Time at the Address of the Named Insured as stated herein

| NAMED INSURED AND ADDRESS | COVERAGE IS PROVIDED IN THE COMPANY DESIGNATED BELOW |
|---|---|
| INTEGRATED HEALTH SERVICES, INC.<br>10065 RED RUN BOULEVARD<br>OWINGS MILLS, MD 21117 | Indemnity Insurance Company of North America |

### Limits of Insurance

$ **50,000,000**    Each Occurrence      $ **50,000,000**    Aggregate

### Underlying Insurance Limits

$ **50,000,000**    Each Occurrence      $ **50,000,000**    Aggregate

### Premium

Basis of Premium: **Flat Charge.**

$ **45,000**    Advance Premium      $ **45,000**    Annual Minimum Premium

### Schedule of Underlying Insurance
### First Policy of Underlying Insurance

Company **Zurich Insurance Company**

Policy Number **On file with Co.**

Expiration Date **01/01/2000**

Limits of Insurance

$ **50,000,000**   Each Occurrence

$ **50,000,000**   Aggregate

### Endorsements Attached to and forming a part of this Policy at inception:

CC-1K11A   **Signature Endorsement**

XS-1V24    **Maryland Changes - Cancellation Non-Renewal & State Required Conditions**

| DATE OF ISSUE | SIGNATURE OF AUTHORIZED AGENT |
|---|---|
| 05/18/1999 | |

XS-9U59 (12/94)

## SIGNATURES

| Named Insured | Endorsement Number |
|---|---|

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|

| Issued By (Name of Insurance Company) | | | |
|---|---|---|---|

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

GEORGE D. MULLIGAN, Secretary

DENNIS KANE, President

**BANKERS STANDARD FIRE AND MARINE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**BANKERS STANDARD INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**CIGNA INDEMNITY INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**CIGNA INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**CIGNA PROPERTY AND CASUALTY INSURANCE COMPANY**
900 Cottage Grove Road, Bloomfield, Connecticut 06002

**INSURANCE COMPANY OF NORTH AMERICA**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**PACIFIC EMPLOYERS INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**CIGNA FIRE UNDERWRITERS INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

GEORGE D. MULLIGAN, Secretary

RICHARD C. FRANKLIN, President

Authorized Agent

CC-1K11a (5/96) Ptd. in U.S.A.

**MARYL⟋ ⟩ CHANGES — CANCELLATION, ⟩ONRENEWAL AND STATE REQUIRED CONDITIONS**

| Name Insured | | | | Endorsement Number |
|---|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period | TO | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifes insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY POLICY**
**EXCESS LIABILITY POLICY**
**EXCESS LIABILITY CATASTROPHE POLICY**

I.  The following is added to **SECTION IV - CONDITIONS:**

NONRENEWAL

If we decide not to renew this Policy we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 45 days before the expiration date. Even if we do not comply with these terms, this Policy will terminate:

(1)  On the expiration date, if:

(a)  You fail to perform any of your obligations in connection with the payment of premium for the Policy or the renewal of the Policy or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit;

(b)  We have indicated our willingness to renew this Policy to you or your representative;

(c)  You have notified us or our agent that you do not want to renew this Policy; or

(2)  On the effective date of any other insurance policy issued as a replacement for any insurance afforded by this policy, with respect to insurance to which both policies apply.

Authorized Agent

XS-1V24 (1/95) Printed in U.S.A.

# Excess Liability C.. astrophe Policy

CIGNA Property & Casualty



CIGNA

WE, the Company named in the Declarations, relying upon the statements shown on the Declarations page and in the Schedule of UNDERLYING INSURANCE attached to this policy, and in return for the payment of the premium and subject to the terms, conditions, exclusions, and limits of insurance of this policy, agree with YOU as follows:

## SECTION I
## INSURING AGREEMENTS

### A.   COVERAGE

WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.

The Definitions, Terms, Conditions, Limitations, and Exclusions of the "first policy of UNDERLYING INSURANCE", in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy, or relate to premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement.

### B.   LIMITS OF INSURANCE

The Limit of Insurance stated in the Declarations as applicable to "each OCCURRENCE" shall be the total limit of OUR liability for all covered damages sustained as the result of any one OCCURRENCE.

The Limit of Insurance stated in the Declarations as "aggregate" shall be the total limit of OUR liability for all covered damages sustained during each annual period of this policy; and for which any UNDERLYING INSURANCE provides coverage that is subject to an aggregate limit. If the UNDERLYING INSURANCE limit has been reduced or exhausted solely by reason of losses paid thereunder arising out of OCCURRENCES which take place during OUR policy period, then this policy shall:

1.   in the event of reduction, pay the excess of the reduced underlying limit;

2.   in the event of exhaustion continue in force as UNDERLYING INSURANCE.

The aggregate limit in this policy shall apply separately for each coverage as to which all underlying policies provide an aggregate limit.

### C.   DEFENSE PROVISIONS AND SUPPLEMENTAL PAYMENTS

1.   DEFENSE PROVISIONS

When insurance is available to YOU in any UNDERLYING INSURANCE, WE shall not be called upon to assume charge of the investigation, settlement or defense of any SUIT brought against YOU, but WE shall have the right and be given the opportunity to be associated in the defense and trial of any SUITS relative to any occurrence which, in OUR opinion, may create liability on the part of US under the terms of this policy.

We will assume charge of the settlement or defense of any SUIT brought against YOU to which this policy applies and to which no UNDERLYING INSURANCE applies because of the exhaustion of aggregate limits of insurance.

If WE assume any right, opportunity or obligation, WE shall not be obligated to defend any SUIT after the applicable limits of this policy have been exhausted.

2.   SUPPLEMENTAL PAYMENTS

The only Supplemental Payments and expenses that WE shall pay under this policy are as follows:

a.   All expenses incurred by US;

b.   All interest on that part of any judgement which accrues after entry of the judgement and before WE have paid, offered to pay, or deposited in court that part of the judgement which does not exceed the limit of liability, and to which this policy applies;

c.   If all UNDERLYING INSURANCE pays pre-judgement interest, then WE will pay related pre-judgement interest awarded against YOU on that part of the judgement WE pay. If WE make an offer to pay the applicable limit of insurance, WE will not pay any pre-judgement interest based on that period of time after the offer.

3.   Subject to all of the foregoing:

a.   If Defense and/or Supplemental payment expenses are included within the limit of insurance of any UNDERLYING INSURANCE, then any such expense payment WE make shall reduce the limit of insurance of this policy.

XS-4U19  (5/94)

b. If none of the policies of UNDERLYING INSURANCE include Defense and/or Supplemental payment expenses within the limit of insurance, then any such expense payment WE make shall not reduce the limit of insurance of this policy.

## SECTION II (EXCLUSIONS)
## WHAT IS NOT COVERED BY THIS POLICY

This insurance does not apply:

A. To any injury, damage, expense, cost, loss, liability, or legal obligation arising out of or in any way related to asbestos or asbestos-containing materials.

B. To any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to pollution, however caused.

Pollution includes the actual, alleged or potential presence in or introduction into the environment of any substance, if such substance has or is alleged to have the effect of making the environment impure, harmful, or dangerous. Environment includes any air, land, structure or the air therein, watercourse or water, including underground water.

If such insurance is available to YOU in the UNDERLYING INSURANCE and for the full limits of liability shown therein, this exclusion does not apply to liability caused by heat, smoke or fumes from a hostile fire. As used in the exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

C. To any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to the toxic properties of lead or lead-containing products, materials or substances. This exclusion applies to all forms of lead, including but not limited to solid, liquid, vapor and fumes.

D. To any claim or claims arising out of the Employee Retirement Income Security Act (ERISA) of 1974, Public Law 93-406, commonly referred to as the Pension Reform Act of 1974, including any amendments or revisions thereto.

E. To any liability for injury or damages due to war, whether or not declared, or any act or condition incident to war. War includes civil war, acts of terrorism, insurrection, rebellion or revolution.

F. To any liability:

1. With respect to which the insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability; or

2. Resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any aggreement entered into by the United States of America, or any agency thereof, with any person or organization; or

3. Resulting from the hazardous properties of nuclear material, if:

a. The nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of the insured or (b) has been discharged or dispersed therefrom;

b. The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the insured; or

c. The injury or damage arises out of the furnishing by the insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to any property at the nuclear facility.

As used in this exclusion:

a. Hazardous properties include radioactive, toxic, or explosive properties;

b. Nuclear material means source material, special nuclear material, or byproduct material;

c. Source material, special nuclear material, and byproduct material have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

d. Spent fuel means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

e. Waste means any waste material (1) containing byproduct material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (2) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

f.  Nuclear facility means:

1.  Any nuclear reactor;

2.  Any equipment or device designed or used for (a) separating the isotopes of uranium or plutonium, (b) processing or utilizing spent fuel, or (c) handling, processing or packaging waste;

3.  Any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

4.  Any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of waste; and

5.  The site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

g.  Nuclear reactor means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

h.  Property damage includes all forms of radioactive contamination of property.

We shall have no duty or obligation to provide or pay for the investigation or defense of any suit excluded in this section, and in connection therewith Defense Provisions and Supplemental Payments shall not apply.

## SECTION III
## DEFINITIONS

A.  OCCURRENCE means an accident including continuous or repeated exposure to substantially the same general harmful conditions.

B.  OTHER INSURANCE means insurance, other than UNDERLYING INSURANCE, which has been provided to YOU and affords coverage with respect to injury or damage to which this policy also applies.

C.  ULTIMATE NET LOSS means the amount paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages.

Defense expense payments shall be included within the ULTIMATE NET LOSS, provided that such expenses are included within the terms, conditions, and limits of insurance of any UNDERLYING INSURANCE.

D.  UNDERLYING INSURANCE means the policy or policies of insurance as described in the Declarations and Schedule of Underlying Insurance forming a part of this policy.

E.  WE, US and OUR means the company shown in the Declarations as providing this insurance.

F.  YOU and YOUR means a person or organization who qualifies as an insured in all of the underlying policies.

## SECTION IV
## CONDITIONS

A.  APPEALS

If YOU or any of the underlying insurers elect not to appeal a judgement in excess of the limits of liability afforded by the UNDERLYING INSURANCE, or any OTHER INSURANCE available to YOU, WE may elect to appeal. OUR limit of liability shall not be increased because of the appeal, except that WE will make the appeal at OUR cost and expense.

B.  ASSIGNMENT

Interest in this policy may not be transferred to another, except by an endorsement issued by US which gives OUR consent. If YOU are bankrupt or insolvent or if YOU die, this policy shall cover YOUR legal representative(s), but only while acting within the scope of their duties as such.

C.  BANKRUPTCY AND INSOLVENCY

Bankruptcy and insolvency of YOU, or YOUR estate will not relieve US of OUR obligations under this policy.

D.  CANCELLATION

This policy may be cancelled by the first Named Insured by mailing to US written notice stating when such cancellation shall be effective.

This policy may be cancelled by US by mailing to the first Named Insured at YOUR last known address, written notice stating when, not less than sixty (60) days thereafter, fifteen (15) days if cancellation is for non-payment of any unpaid portion of the premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The effective date and hour of cancellation stated in the notice shall be the end of the policy period.

If YOU cancel, earned premium shall be computed in accordance with the applicable short rate table or procedure. If WE cancel, earned premium shall be computed pro-rata. Premium adjustment may be made at the time cancellation becomes effective. OUR check or the check of OUR representative mailed to YOU shall be sufficient proof of any refund or premium due YOU.

E.  CHANGES

This policy may be changed only by an endorsement issued by US to form a part of the policy.

F.  DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT

1.  YOU must see to it that WE receive prompt written notice of an OCCURRENCE or an offense which may result in a claim. Notice should include:

a.  How, when and where the OCCURRENCE or offense took place;

b.  The names and addresses of any injured persons and witnesses.

2.  If a claim is made or suit brought against YOU, YOU must see to it that WE receive written notice of the claim or suit as soon as practicable.

3.  YOU and any other involved insured must:

a.  Immediately send US copies of any demands, notices, summons or legal papers received in connection with the claim or suit.

b.  Authorize US to obtain records and other information;

c.  Cooperate with US in the investigation, settlement or defense of the claim or suit;

d.  Assist US, upon OUR request, in the enforcement of any right against any person or organization which may be liable to YOU because of injury or damage to which this policy may also apply.

4.  YOU shall not make or authorize an admission of liability or attempt to settle or otherwise dispose of any claim or suit without OUR written consent.

G.  INSPECTION AND AUDIT

WE shall be permitted but not obligated to inspect YOUR property and operations. Neither OUR right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of YOU or others, to determine or warrant that such property or operations are safe.

WE may examine and audit YOUR books and records during this policy period and extensions thereof and within three (3) years after the final termination of this policy.

H.  LEGAL ACTION AGAINST US

No person or organization has a right under this policy to:

1.  Join US as a party or otherwise bring US into a SUIT asking for damages from YOU;

2.  Sue US, unless all of the terms of this policy have been fully complied with.

A person or organization may sue US to recover on an agreed settlement or on a final judgement against YOU obtained after trial. WE will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of this policy. An agreed settlement means a settlement and release of liability signed by US, YOU, and the claimant or the claimant's legal representative.

I.  MAINTENANCE OF UNDERLYING INSURANCE

The policy or policies referred to in the Declarations and schedule of UNDERLYING INSURANCE or renewals or replacements thereof not more restrictive in coverage shall be maintained in full effect during this policy period, except for any reduction in the aggregate limits solely by payment of covered claims and/or claims expense.

If such UNDERLYING INSURANCE is not maintained in full effect, or if any limits of liability of UNDERLYING INSURANCE are:

1.  less than as stated in the schedule of UNDERLYING INSURANCE; or

2.  unavailable due to bankruptcy or insolvency of an underlying insurer; or

3.  if there is any material change in the coverage of any UNDERLYING INSURANCE;

then the insurance afforded by this policy shall apply in the same manner as if such UNDERLYING INSURANCE and limits of liability had been in effect, available, so maintained and unchanged.

J.  OTHER INSURANCE

If OTHER INSURANCE, whether collectible or not, is available to YOU covering a loss also covered by this policy, other than a policy that is specifically written to apply in excess of this policy, the insurance afforded by this policy shall apply in excess of and shall not contribute with such OTHER INSURANCE.

XS-4U19 (5/94)

K. PREMIUM

Unless otherwise provided, the premium for this policy is a flat premium and is not subject to adjustment except as provided herein or amended by endorsement.

L. YOUR REPRESENTATIONS

By accepting this policy, YOU agree that:

1. The statements in the Declarations, Schedule of UNDERLYING INSURANCE, and Application for this policy are accurate and complete;

2. Those statements are based upon representations YOU made to US;

3. This policy has been issued in reliance upon YOUR representations.

M. SEPARATION OF INSUREDS

Except with respect to the Limits of Insurance, this policy applies:

1. As if each insured were the only insured;

2. Separately to each insured against whom claim is made or suit brought.

N. SUBROGATION

In the event of any payment under this policy by US, WE shall be subrogated to all of YOUR rights of recovery against any person or organization, and YOU shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. YOU shall do nothing after loss to prejudice such rights.

The amount recovered through subrogation shall be apportioned in the inverse order of payment of the ULTIMATE NET LOSS to the extent of the actual payment. The expenses of all recovery proceedings shall be apportioned in the ratio of respective recoveries.

WE have no duty to provide coverage under this policy unless YOU and any other involved insureds have fully complied with the conditions of this policy.

IN WITNESS WHEREOF, the company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

XS-4U19 (5/94)

# __Exhibit D__

Ana Alfonso

04/15/2005 03:11 PM
Phone: 212 836 7896

To: "Marc Casarino" <CASARINOM@whiteandwilliams.com>
cc: abackenroth@bfklaw.com; fjdeasey@dmbphila.com; "Leonard
    Goldberger" <GOLDBERGERL@whiteandwilliams.com>;
    warivers@dmbphila.com
bcc:
Subject: Re: IICNA v. IHS and Briarwood - amended complaint 

Gentlemen:
I have reviewed your proposed amended complaint and have discussed it with my client, IHS Liquidating
LLC, which is the entity responsible for implementing the Debtors' Plan as it relates to prepetition
creditors. Our view is that the new issues in the complaint concerning the 1999 excess policy should be
asserted in a separate action. Those claims are not liabilities that were transferred to IHS Long Term
Care, Inc., but rather are subject to the distribution provisions set forth in the Debtors' plan. IHS
Liquidating LLC is not a party to the current action, and as I discussed with Lenny when he first filed the
complaint, IHS is a nominal party in that dispute. If you have a different understanding, please call me to
discuss it.
In any case, we think it is unduly cumbersome to combine these separate policy disputes into one
litigation, and we would prefer that you commence a separate action. In that regard, please note that we
view any issues relating to the 1999 policy as core matters that should be heard before the Bankruptcy
Court and not the District Court. If you assert these claims in the District Court by amendment or by a new
complaint, we will request that they be referred back to Judge Walrath.
I am generally available on Monday or Tuesday if you would like to discuss this matter further.
Regards.

Ana M. Alfonso
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022-3598
phone: (212) 836-7896
fax: (212) 836-6440
"Marc Casarino" <CASARINOM@whiteandwilliams.com>

"Marc Casarino"
<CASARINOM@whitea
ndwilliams.com>

04/14/2005 04:30 PM

To: <abackenroth@bfklaw.com>; <aalfonso@kayescholer.com>
cc: <fjdeasey@dmbphila.com>; <warivers@dmbphila.com>; "Leonard
    Goldberger" <GOLDBERGERL@whiteandwilliams.com>
bcc:
Subject: IICNA v. IHS and Briarwood - amended complaint

Counsel:

Attached for your review is an amended complaint that we intend to file on behalf of the
plaintiff. Pursuant to the applicable local rules, we are providing you a clean and redlined
version of the amended complaint demonstrating all proposed changes from the original for your
consideration and stipulation. Please advise immediately if you will stipulate to our filing the
attached amended complaint.

If you are unwilling to stipulate to our filing the amended complaint, we will seek relief to do so
from the court on April 19th. If there are any questions about the attached, please contact me.

Very truly yours,

MARC S. CASARINO, ESQUIRE
WHITE AND WILLIAMS LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
(302) 654-0424 (phone)
(302) 654-0245 (fax)
(302) 467-4520 (direct dial)
(302) 467-4550 (direct fax)
casarinom@whiteandwilliams.com

****CONFIDENTIALITY NOTICE****

This E-Mail message and any documents accompanying this E-Mail transmission contain
information from the law firm of White and Williams LLP which is "Privileged and confidential
attorney-client communication and/or work product of counsel." If you are not the intended
recipient, you are hereby notified that any disclosure, copying, distribution and/or the taking of
or refraining from taking of any action in reliance on the contents of this E-Mail information is
strictly prohibited and may result in legal action being instituted against you. Please reply to the
sender advising of the error in transmission and delete the message and any accompanying

documents from your system immediately.  Thank you. Amended Complaint.pdf

Amended Complaint (Redline).pdf

# **<u>Exhibit E</u>**

2002 U.S. Dist. LEXIS 12609, *

LEXSEE 2002 US DIST LEXIS 12609

**In re: BIG V HOLDING CORP., et al., Debtors. WAKEFERN FOOD CORP.,
Plaintiff, v. C&S WHOLESALE GROCERS, INC., Defendant.**

**Chapter 11, Case No. 00-04372 (RTL), (Jointly Administered), Adversary
Proceeding No. 01-758, Civil Action No. 01-233 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 12609*

**July 11, 2002, Decided**

**DISPOSITION:** Plaintiff's motion to withdraw reference to bankruptcy was denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1]  For BIG V HOLDING CORP., debtor: Gregg Mattisen Galardi, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE.

For WAKEFERN FOOD CORP., plaintiff: Daniel J. DeFranceschi, Richards, Layton & Finger, Wilmington, DE.

For C & S WHOLESALE GROCERS, INC., defendant: Gregory W. Werkheiser, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory Moneta Sleet

**OPINION:**

MEMORANDUM AND ORDER

I. INTRODUCTION

On November 22, 2000, the Debtors, Big V Holding Corp., *et al.*, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to *28 U.S.C. § 157*(a), the bankruptcy cases were referred from the United States District Court for the District of Delaware to the United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"). n1 Since

the petition date, the Debtors have continued in possession of their properties and the management and operation of their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On December 6, 2000, an Official Committee of Unsecured Creditors ("the Creditors' Committee") was [*2] appointed by the United States Trustee pursuant to *§ 1102 of the Bankruptcy Code.* Presently before the court is the Creditors' Committee's March 20, 2001 motion to withdraw the reference to the Bankruptcy Court. Since Wakefern has yet to assert a proper jury demand, and since considerations of judicial economy favor leaving the adversary proceeding in the Bankruptcy Court until it is ready for trial, Wakefern's motion to withdraw the reference will be denied at this time.

n1 Referral of Title 11 proceedings from the United States District Court for the District of Delaware to the United States Bankruptcy Court for the District of Delaware is automatic pursuant to a Standing Order of Reference dated July 23, 1984.

II. FACTS

Wakefern Food Corporation ("Wakefern"), the plaintiff in this adversary proceeding (the "C&S Action"), is a food cooperative wholesaler that centralizes the purchasing of inventory and supplies for its members. The Debtors have been a member of the Wakefern cooperative since 1959. [*3] Pursuant to the stockholder agreement and by-laws governing Wakefern members, the Debtors are obligated to purchase

2002 U.S. Dist. LEXIS 12609, *

approximately 85% of their products from Wakefern.

On August 3, 2000, the Debtors decided that their continued participation in Wakefern was detrimental to their business and, as a result, entered into a supply agreement with C&S Wholesale Grocers, Inc. ("C&S"), a direct competitor of Wakefern. On November 28, 2001, six days after the Debtors filed for relief under chapter 11, Wakefern filed suit against C&S in New Jersey state court. The complaint alleged that C&S, by executing an agreement with the Debtors, had engaged in tortious interference with Wakefern's contractual relations and had aided and abetted the Debtors' breach of fiduciary duty. The complaint seeks preliminary and permanent injunctions as well as damages. The C&S Action was removed to the United States Bankruptcy Court for the District of New Jersey and was subsequently transferred to the United States Bankruptcy Court for the District of Delaware, the Honorable Raymond T. Lyons presiding. n2

n2 Judge Lyons is a visiting United States Bankruptcy Judge from the District of New Jersey.

[*4]

On March 20, 2001, Wakefern filed a motion to withdraw the reference of the C&S Action to the Bankruptcy Court. C&S objected, arguing that Wakefern had failed to make a simultaneous motion to the Bankruptcy Court for a determination of whether the C&S Action was a "core" or "non-core" proceeding as required by Delaware Local Bankruptcy Rule 5011-1. On May 25, 2001, the Bankruptcy Court issued an order designating the C&S Action as a "non-core" proceeding. Therefore, C&S withdrew its objection to Wakefern's motion to withdraw the reference. The Debtors and the Creditors' Committee, however, have continued to oppose the motion. On January 31, 2001, the Creditors' Committee filed a motion to intervene in the C&S Action, which was granted by the bankruptcy court on February 15, 2001. The court has no record of a motion to intervene being filed by the Debtors.

Central to the C&S Action is the Debtors' termination of the Wakefern supply agreement and execution of the C&S Supply agreement. Before proceeding with the C&S supply agreement, the Debtors sought a declaratory judgment from the Bankruptcy Court in order to determine whether the Debtors would owe a large withdrawal payment to Wakefern [*5] if they proceeded with the C&S supply agreement. On September 14, 2001, in *Big V Supermarkets, Inc. v.*

*Wakefern Food Corp., 267 B.R. 71, 111 (Bankr. D. Del. 2001),* the Bankruptcy Court held that the Debtors would be obligated to make the withdrawal payment. The Bankruptcy Court also made specific findings as to what would constitute a breach of good faith and fair dealing with regards to the Debtors' attempts to abandon the Wakefern supply agreement.

Apart from the declaratory judgment action, the Bankruptcy court has presided over numerous scheduling and pretrial conferences and disputes, including Wakefern's February 9, 2001 motion to compel the Debtors' assumption/rejection of the Wakefern Agreement and C&S's March 28, 2001 motion to dismiss, or in the alternative, to stay proceedings. In sum, the C&S Action is intertwined with several proceedings and matters which are or were before the Bankruptcy Court. Furthermore, Bankruptcy Court Judge Lyons stated that he believes the C&S Action should be adjudicated together with the other actions relating to the bankruptcy case. During a March 28, 2001 scheduling conference, Judge Lyons stated, "I think this is a three [*6] party dispute that should be dealt with together."

One final fact is crucial to the court's analysis of Wakefern's motion. To date, Wakefern has not made any formal demand for a jury trial. However, Wakefern has indicated that they plan to file an amended complaint with the formal jury trial demand after the court decides this motion to withdraw the reference. Wakefern refuses to file the amended complaint for fear that filing a claim in the Bankruptcy Court could constitute consent to the jurisdiction of the Bankruptcy Court and consequently, waiver of the right to a jury trial.

III. DISCUSSION

A. Intervention

Neither the Debtors or the Creditors' Committee are parties to the C&S Action. Therefore, in order for their objection to be heard, they must have properly intervened in the adversary action.

*Federal Rule of Civil Procedure 24(a)(1)* provides that upon timely application anyone shall be permitted to intervene in an action "when a statute of the United States confers an unconditional right to intervene." Both the Debtors and the Creditors Committee believe that they have an unconditional right to be heard under *11 U.S.C. § 1109* [*7] (b), which states, in part, "A party in interest, including the debtor, . . . [or] a creditors' committee . . . may raise and may appear and be heard on any issue in a case under this chapter." Wakefern argues that the C&S Action, an adversary proceeding, is not a "case under this chapter" as required by the statute.

Although the circuits are split on whether section 1109(b) confers an unconditional right to intervene, n3 the Third Circuit has taken a clear position on the issue. In *Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1241 (3d Cir. 1994)*, the Third Circuit held that section 1109(b) gives a creditors' committee an unconditional right to intervene in a non-core adversarial proceeding in federal district court which is "related to" a bankruptcy case.

> n3 The Fourth, Fifth, and Eleventh Circuits have held that § 1109(b) does not create an absolute right of intervention in any adversary proceedings, not even those that are brought "under" chapter 11. *See Fuel Oil Supply and Terminaling v. Gulf Oil Corp., 762 F.2d 1283, 1286-1287 (5th Cir. 1985); In re Charter Co., 876 F.2d 866, 871 (11th Cir. 1989); Matter of Richman, 104 F.3d 654, 658 (4th Cir. 1997)*.

[*8]

A civil proceeding is "related to" bankruptcy when the outcome of that proceeding could conceivably have any effect on the estate being administered. *See Halper v. Halper, 164 F.3d 830, 837 (3d Cir. 1999)*. The complaint in the adversary proceeding between Wakefern and C&S seeks an injunction against the Debtors' supply agreement with C&S. Thus the adversary proceeding clearly affects the Debtors' estate and their ability to reorganize. Moreover, the procedural history of the C&S Action indicates that it is "related to" the bankruptcy. The proceeding was removed from state court pursuant to *28 U.S.C. § 1452*(a), which allows a party to remove a cause of action that is "related to" a bankruptcy case. Furthermore, the C&S Action was referred to the Bankruptcy Court pursuant to *28 U.S.C. § 157*(a), which mandates that proceedings "related to" a case under title 11 shall be referred to the bankruptcy judges for the district. Therefore, the C&S Action clearly satisfies the "related to" requirement.

Since the C&S Action is "related to" the bankruptcy, the *Phar-Mor* holding dictates that the Debtors and Creditors' Committee [*9] have an unconditional right to intervene under section 1109(b). n4 In the instant proceeding, the Creditors' Committee has properly filed a motion to intervene and has otherwise complied with the requirements for intervention pursuant to Rule 24(c). Therefore, since *11 U.S.C. § 1109*(b) gives a creditors' committee an unconditional right to intervene in light of *Phar-Mor*, the Creditors' Committee is a proper intervenor in this matter pursuant to Rule 24(a)(1). n5

n4 Bankruptcy Rule 7024, the sole Bankruptcy rule governing intervention in an adversary proceeding, merely adopts *Federal Rule of Civil Procedure 24*.

n5 Based upon the current record, the court has been unable to determine whether the Debtors have filed a timely motion to intervene. Therefore the Debtors will not be considered a proper intervenor in this proceeding for purposes of Wakefern's motion to withdraw the reference; however, the Creditors' Committee's opposition to the motion should adequately represent the interest of the Debtors.

[*10]

B. Mandatory v. Permissive Withdrawal of the Reference

The C&S Action was referred to the Bankruptcy Court pursuant to *28 U.S.C. § 157*(a). The procedure governing withdrawal of the reference to the Bankruptcy Court is stated in *28 U.S.C. § 157*(d), which reads,

> "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." *28 U.S.C. § 157*(d).

The first sentence of this statute describes the conditions under which withdrawal is permissive, while the second sentence describes the conditions under which withdrawal is mandatory. Since the C&S Action involves only state law tort and contract claims, it clearly does not meet the requirements for mandatory withdrawal. Therefore, the permissive withdrawal standard [*11] applies. Under this standard, the court may withdraw the reference of the adversary proceeding "for cause shown." *See 28 U.S.C. § 157*(d).

As the movant in this case, Wakefern bears the burden to show cause. *NDEP Corp. v. Handl-It, Inc., 203 B.R. 905, 907 (D. Del. 1996)*. The statute does not define "cause," but guideposts exist to elucidate the meaning of the word. The Third Circuit has stated that a

court should consider: "the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." *In re Pruitt, 910 F.2d 1160, 1168 (3d Cir. 1990).* However, the "factors listed in *Pruitt* were not designed to be exhaustive; they are only minimal standards." *NDEP Corp., 203 B.R. at 908.* Relevant considerations might also include "the nature of the proceedings (*i.e.*, core or non-core) and judicial economy." *Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc., 107 B.R. 34, 39 (D. Del. 1989).* Another factor which should be considered is "whether the [*12] parties have requested a jury trial." *Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec. Corp., 106 B.R. 367, 371 (D. Del. 1989).* The court will now consider these factors.

C. Factors to Consider in Determining Whether to Withdraw the Reference

1. Core v. Non-Core and Judicial Economy

There are strictures upon the Bankruptcy Court's authority to hear and determine non-core proceedings that do not apply in the instance of core proceedings. *See 28 U.S.C. § 157(b)(1).* Thus, a determination of whether the C&S Action is a core or non-core proceeding is crucial to the determination of the Creditors' Committee's motion. In an Order dated May 25, 2001, the Bankruptcy Court declared that the current adversary proceeding is non-core. No party has challenged the Bankruptcy Court's ruling, therefore, the court concludes the C&S Action is a non-core proceeding.

Moving to the question of judicial economy, the court believes the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process, as [*13] set forth in *Pruitt, 910 F.2d at 1168,* would seem to be best served by leaving the C&S Action in the Bankruptcy Court. n6

n6 The court is aware that courts in this district have held that "judicial economy favors permissive withdrawal of the reference of a non-core proceeding, since the district court would still need to review the merits of the dispute when considering the bankruptcy court's proposed findings of fact and conclusions of law." *NDEP Corp., 203 B.R. at 908,* (paraphrasing *Hatzel & Buehler, Inc. v. Orange & Rockland Utils., Inc., 107 B.R. 34, 39 (D. Del. 1989)).* Given the facts and circumstances of this case, the court declines

to follow this precedent.

The Bankruptcy Court is intimately familiar with the numerous complex issues surrounding the C&S Action. In fact, on September 14, 2001, the Bankruptcy Court issued a declaratory judgment in a separate adversary proceeding to this bankruptcy case which is interrelated with the C&S Action. *See Big V Supermarkets, Inc., 267 B.R. 71.* [*14] In that proceeding, the Bankruptcy Court held that Wakefern would be entitled to a withdrawal payment if the Debtors were to proceed with their supply agreement with C&S. *Id. at 111.* Furthermore, the Bankruptcy Court made specific findings as to what would constitute a breach of good faith and fair dealing with regard to the Debtors' attempts to abandon the Wakefern supply agreement. *Id.* Thus, it is apparent that the Bankruptcy Court is very familiar with the facts and issues which are crucial to the determination of the C&S Action. Specifically, the Bankruptcy Court has become familiar with important provisions of Wakefern's By-Laws and Stockholders' Agreement, all of which are crucial to the C&S Action. In sum, the Bankruptcy Court has already expended invaluable time and energy familiarizing itself with the facts and issues surrounding the C&S Action. Considerations of judicial economy thus weigh in favor of leaving the case with the Bankruptcy Court. *See Northwestern Institute of Psychiatry, Inc. v. Travelers Indem. Co., 272 B.R. 104, 109 (E.D. Pa. 2001)* ("The bankruptcy court is familiar with the parties, the factual background of the case [*15] and the legal issues involved. Therefore, this court finds no reason to disturb the present course and it declines to withdraw the reference as judicial economy will be served by allowing the adversary action to remain in bankruptcy court").

2. Right to a Jury Trial

The right to a jury trial is an important factor in determining a motion to withdraw the reference. This is so because absent the express consent of both parties and a special designation of jurisdiction by the district court, the Bankruptcy Court may not hold a jury trial in a non-core proceeding. *See 28 U.S.C. § 157(e).*

It is clear that Wakefern has a constitutional right to a jury trial in this case. The Seventh Amendment states, "In Suits at common law where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . ." U.S. CONST. amend. VII. In *Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 41, 106 L. Ed. 2d 26, 109 S. Ct. 2782 (1989),* the Supreme Court explained that "suits at common law" referred to controversies in which legal rights were to be determined, as distinguished from cases in which only equitable rights were [*16] recognized and only

equitable remedies were administered. Furthermore, the Court stated that the Seventh Amendment only requires a jury trial if a cause of action is legal in nature and it involves a matter of private right. *Id. at 42 n.4.* The C&S Action, a contract and tort action for damages, is clearly legal in nature and involves a matter of private right. *See NDEP Corp., 203 B.R. at 909.*

However, although Wakefern has a right to a jury trial of the C&S Action, a proper jury demand has not been made. Wakefern has stated that upon the court's determination of this motion to withdraw the reference, it will file the amended complaint containing a demand for a jury trial. While Wakefern's intention to formally demand a jury trial is duly noted, the fact remains that they have not yet done so. Wakefern is reluctant to file an amended complaint with a jury demand because it believes, not without reason, that filing an amended complaint could quite possibly constitute waiver of their Seventh Amendment right to have their claims tried by jury. *See Billing v. Ravin, Greenberg & Zackin, P.A., 22 F.3d 1242, 1250-1253 (3d Cir. 1993)* (identifying [*17] two theories whereby courts have divested parties of their rights to a jury in the bankruptcy context. Under the "waiver theory," a party can lose its right to a jury trial by voluntarily submitting to the jurisdiction of the bankruptcy court through the filing of a petition or claim in the bankruptcy court).

Although Wakefern may be entitled to a jury trial, their potential entitlement at some future date is not sufficient grounds to withdraw the reference at this time. Withdrawal of the reference based on the ground that a party is entitled to a jury trial should be deferred until the case is "trial ready." *See In re Northwestern Institute of Psychiatry, Inc., 268 B.R. 79, 84 (E.D. Pa. 2001)* (citing *In re Commercial Financial Services, Inc., 239 B.R. 586, 596 (N.D. Okla. 1999); see also Barlow & Peek, Inc. v. Manke Truck Lines, Inc., 163 B.R. 177, 179 (D. Nev. 1993)* (refusing to withdraw reference until "it is clear that a jury trial will be necessary and that the case is prepared and ready for such trial to commence"). It would be premature to withdraw the reference to the bankruptcy court based upon the unfixed proposition that [*18] a jury trial may occur in the future. At the present time, the case is not ready for trial. Assuming that Wakefern does file the amended complaint containing a proper jury demand, a jury trial may not be necessary in

order to resolve the C&S Action. During the March 28, 2001 scheduling conference in connection with the C&S Action, Bankruptcy Court Judge Lyons stated that this case "cries out for settlement." Until Wakefern properly asserts their right to a jury trial, the C&S Action should remain in the Bankruptcy Court.

The court is persuaded that Wakefern's right to a jury trial, if properly asserted in the future, will not be adversely affected by having the Bankruptcy Court preside over pretrial matters until the case is ready to be tried in the District Court. Until that time, the bankruptcy judge can serve basically the same function as a magistrate. *See In re Delaware and Hudson Ry. Co., 122 B.R. 887, 897 (D. Del. 1991).*

IV. CONCLUSION

In this case, judicial economy weighs heavily in favor of leaving the C&S Action in the Bankruptcy Court, since that court has already issued a declaratory judgment in an adversarial proceeding which is factually [*19] and legally interrelated with the C&S Action. Withdrawal of the reference at this point based on Wakefern's right to a jury trial would be premature, since Wakefern has yet to officially file a jury demand.

The court will deny Wakefern's motion to withdraw the reference, but will do so without prejudice. When the C&S Action is ready for trial, Wakefern may file a renewed motion to withdraw the reference.

For the foregoing reasons, IT IS HEREBY ORDERED that:

>   1. Wakefern's request for withdrawal of the reference to bankruptcy is DENIED;

>   2. This denial is without prejudice to Wakefern's ability to renew its request for withdrawal of the reference at a later time, when a jury trial has been properly demanded and the case becomes ready for trial.

Dated: July 11, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# **Exhibit F**

2004 U.S. Dist. LEXIS 19868, *

LEXSEE 2004 US DIST LEXIS 19868

**KAISER ALUMINUM & CHEMICAL CORPORATION, Plaintiff, v. MONUMENT SELECT INSURANCE CORPORATION, Incorrectly named as Monument Select Insurance Company, Defendant.**

**Civil Action No. 03-889-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 19868*

**September 30, 2004, Decided**

**DISPOSITION:** [*1] Motion To Refer Case To Delaware Bankruptcy Court was granted. Cross-Motion To Remand Case To United States District Court For Eastern District Of Louisiana was denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** Daniel J. DeFranceschi, Esquire and Kimberly D. Newmarch, Esquire of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware. Of Counsel: Danny G. Shaw, Esquire and Mark W. Mercante, Esquire of SHAW NORTON DEGAN, L.L.P., Mandeville, Louisiana. Gregory M. Gordon, Esquire, Daniel P. Winikka, Esquire and David G. Adams, Esquire of JONES DAY, Dallas, Texas. Attorneys for Plaintiff.

Joseph H. Huston, Jr., Esquire and Marnie E. Simon, Esquire of STEVENS & LEE, Wilmington, Delaware. Of Counsel: Sidney L. Shushan, Esquire and Jonathan M. Shushan, Esquire of GUSTE, BARNETT & SHUSHAN, L.L.P., New Orleans, Louisiana. Attorneys for Defendant.

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:**

### MEMORANDUM OPINION

Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is a Motion To Refer Case To Delaware Bankruptcy Court (D.I. 108) filed [*2] by Plaintiff, Kaiser Aluminum Chemical Corporation ("Kaiser Aluminum") and a Cross-Motion To Remand Case To The United States District Court For The Eastern District Of Louisiana (D.I. 112) filed by Defendant, Monument Select Insurance Corporation ("Monument"). For the reasons set forth below, the Court will grant Kaiser Aluminum's Motion and deny Monument's Cross-Motion.

### I. BACKGROUND

This action was originally filed by Kaiser Aluminum against Travelers Indemnity Company of Illinois ("Travelers"), Monument and Willis of Maryland ("Willis") in December 2001 in Louisiana state court. Citing diversity jurisdiction, Monument removed this case to the United States District Court for the Eastern District of Louisiana (the "Louisiana District Court") with the consent of Kaiser Aluminum. The case proceeded in the Louisiana District Court for nearly two years through discovery and the filing of dispositive motions. Monument's parent company, Kaiser Group International, Inc. ("KGI"), a company with no affiliation to Kaiser Aluminum, then filed an adversary proceeding in its bankruptcy case in Delaware against Travelers raising similar issues to the instant case. Citing multiple [*3] concerns including (1) avoiding piecemeal litigation, (2) the possibility of inconsistent liabilities among the parties involved, and (3) that KGI's action might be a violation of the automatic stay in Kaiser Aluminum's bankruptcy proceeding (also filed in Delaware), the Louisiana District Court reluctantly

transferred this action to this Court.

## II. Parties' Contentions

By its Motion, Kaiser Aluminum requests the Court to refer this case to the Bankruptcy Court. In particular, Kaiser Aluminum requests that the case be assigned to Judge Fitzgerald because she is familiar with the procedural history and merits of the parties' claims as a result of her approval of a settlement agreement between Kaiser Aluminum and Travelers in this case. Judge Fitzgerald also granted a motion to stay a related adversary proceeding filed by KGI against Travelers in the KGI bankruptcy litigation. In granting the stay, Judge Fitzgerald found that Kaiser Aluminum was the real party in interest in KGI's adversary proceeding and that KGI's lawsuit violated the automatic stay protection afforded Kaiser Aluminum as a result of its bankruptcy.

In response, Monument contends that the Bankruptcy Court [*4] lacks jurisdiction to consider this case, because it involves pre-petition, non-core claims primarily under state law. Monument also contends that its defense raises constitutional issues under the *5th* and *14th Amendments* concerning the constitutionality of the Louisiana state statute at issue, and that the Bankruptcy Court is not equipped to render a decision on these issues. In the alternative, Monument requests the Court to abstain under *28 U.S.C. § 1334*, and to remand this case back to the Louisiana state court or the Louisiana District Court pursuant to *28 U.S.C. § 1447*.

## III. DISCUSSION

The Court's subject matter jurisdiction over this case arises under *28 U.S.C. § 1334(b)*, which confers on this Court "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Pursuant to *28 U.S.C. § 157(a)*, the Court has further discretion to refer "any or all cases under title 11 or any or all proceedings arising under title 11 or arising in or related to a case under title 11 ... to the bankruptcy judges for [*5]  [its] district." See e.g. *Corestates Bank v. Huls Am., Inc., 176 F.3d 187, 195 (3d Cir. 1999)*.

The Court agrees with Kaiser Aluminum that this case falls within the category of "related to" jurisdiction contemplated by *Section 157*, because the outcome of this case will affect the amount of property available in the debtors' estate. See e.g. *Miller v. Vigilant Ins. Co. (In re Eagle Enters.), 259 B.R. 83, 87 (Bankr. E.D. Pa. 2001)*; *Peterson v. 610 W. 142 Owners Corp. (In re 610 W. 142 Owners Corp.), 219 B.R. 363, 370-371 (Bankr. S.D.N.Y. 1998)*; *S.N.A. Nut Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa. (In re S.N.A. Nut Co.), 210*

*B.R. 140, 142 (Bankr. N.D. Ill. 1997)*. If Kaiser Aluminum is successful in its claims for return of certain insurance premiums in dispute, Kaiser Aluminum's estate will have more money available for distribution to its creditors. As Monument points out, however, this case is a non-core proceeding, because it involves state law contract claims based on pre-petition contracts. See e.g. *Beard v. Braunstein, 914 F.2d 434 (3d Cir. 1990)*; *Peter J. Schmitt Co. v. Firestone Star Market, Inc., 150 B.R. 556 (Bankr. D. Del. 1993)*. [*6] As a non-core proceeding, the Bankruptcy Court can only make recommended findings of fact and conclusions of law. It cannot enter a final judgment, and all the findings and conclusions of the Bankruptcy Court are subject to de novo review by this Court. *28 U.S.C. § 157(c)(1)*; see *Copelin v. Spirco, Inc., 182 F.3d 174, 179 (3d Cir. 1999)*; *Continental Airlines v. First Sec. Bank, 146 B.R. 534, 535 (Bankr. D. Del. 1992)*.

The status of this proceeding as a non-core proceeding is not sufficient to preclude the Court from referring this case to the Bankruptcy Court. *Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1234 (3d Cir. 1994)* (recognizing that district court may refer core and non-core proceedings to bankruptcy court). The Court is also not persuaded that the circumstances of this case justify abstention under *28 U.S.C. § 1334*. Mandatory abstention is limited to actions that "could not have been commenced in a court of the United States absent jurisdiction under *[section 1334]*," and this case could have been commenced in the Louisiana District Court instead of the Louisiana [*7] state court based on diversity jurisdiction. As for permissive abstention, the Court would be required to remand this case back to the Louisiana state court and/or the Louisiana District Court. The Court is reluctant to remand this case back to the Louisiana state court when the parties agreed to its removal to the federal court. Similarly, the Court is not persuaded that remand to the Louisiana District Court is appropriate. The Louisiana District Court was particularly reluctant to transfer this action, but felt compelled to do so in light of Kaiser Aluminum's bankruptcy proceeding in this District and the actions of Monument's parent company in filing a related adversary proceeding in its bankruptcy case in this District. This Court will not second guess the decision of the Louisiana District Court. Further, the Court is persuaded that the Bankruptcy Court, and Judge Fitzgerald in particular, is the proper forum to efficiently adjudicate the issues raised in this case. Judge Fitzgerald has presided over the settlement approval in this case, and therefore, she already has some familiarity with the parties and claims at issue. Further, it is evident to the Court that, while the case [*8] does not involve bankruptcy law, it will have

an impact on the Debtors' estate, such that referral to the Bankruptcy Court is appropriate under *28 U.S.C. § 157(a)*. Accordingly, the Court will refer this matter, including the pending motions for summary judgment, to the Bankruptcy Court for assignment to Judge Fitzgerald.

## CONCLUSION

For the reasons discussed, the Court will grant Kaiser Aluminum's Motion To Refer Case To Delaware Bankruptcy Court (D.I. 108) and deny Monument's Cross-Motion To Remand Case To The United States District Court For The Eastern District Of Louisiana (D.I. 112).

An appropriate Order will be entered.

## ORDER

At Wilmington, this 30th day of September 2004, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. The Motion To Refer Case To Delaware Bankruptcy Court filed by Kaiser Aluminum & Chemical Corporation (D.I. 108) is **GRANTED.**

2. The Cross-Motion To Remand Case To The United States District Court For The Eastern District Of Louisiana (D.I. 112) filed by Monument Select Insurance Corporation is **DENIED.**

3. The Court will refer this matter, including [*9] the pending motions for summary judgment, to the Bankruptcy Court for assignment to Judge Fitzgerald.

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that on **May 13, 2005,** I electronically filed a true and correct copy of the **Motion**

**to Intervene** with the Clerk of the Court using CM/ECF, which will send notification that such filing is

available for viewing and downloading to the following counsel of record:

Linda M. Carmichael, Esq.
Marc S. Casarino, Esq.
White and Williams LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19801
(Counsel for Indemnity Insurance Co of North
America)

Frederick B. Rosner, Esq.
Jaspan Schlesinger Hoffman LLP
1201 North Orange Street, Suite 1001
Wilmington, DE 19801
(Co-counsel for Briarwood)

I further certify that on **May 13, 2005,** I caused a copy of **Motion to Intervene** to be served by

as indicated, on the following counsel of record:

Linda M. Carmichael, Esq.
Marc S. Casarino, Esq.
White and Williams LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19801
(Counsel for Indemnity Insurance Company of North
America)
*Hand Delivery*

Francis J. Deasey, Esq.
Gerald J. Valentini, Esq.
Deasey, Mahoney & Bender, Ltd.
1800 John F. Kennedy Blvd., Suite 1300
Philadelphia, PA 19103
(Counsel for Indemnity Insurance Company of North
America)
*Federal Express*

Frederick B. Rosner, Esq.
Jaspan Schlesinger Hoffman LLP
1201 North Orange Street, Suite 1001
Wilmington, DE 19801
(Co-counsel for Briarwood)
*Hand Delivery*

Abraham J. Backenroth, Esq.
Backenroth Frankel & Krinsky LLP
489 Fifth Avenue
New York, NY 10017
(Co-counsel for Briarwood)
*Federal Express*

Leonard P. Goldberger, Esq.
Martha E. Johnston
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
Counsel for Medicare Rentals, Inc.
(Counsel for Indemnity Insurance Company of
North America)
*Federal Express*

Joseph M. Barry (No. 4221)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
jbarry@ycst.com
bankruptcy@ycst.com

*Attorneys for IHS Liquidating LLC*

WP3:1097264.4                                                    56309.1001